# EXHIBIT 1

6/7/2021 12:45 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 54158128
By: Courtni Gilbert
Filed: 6/7/2021 12:04 PM

CAUSE NO. _____

| | | |
|---|---|---|
| NESS DEUTSCHLAND GMBH and NESS KE, S.R.O., | § § § | IN THE DISTRICT COURT OF |
| PLAINTIFFS, | § § § | |
| VS. | § § | HARRIS COUNTY, TEXAS |
| SOLAR TURBINES INC. and SOLAR TURBINES SLOVAKIA S.R.O., | § § § | |
| DEFENDANTS. | § | ____ JUDICIAL DISTRICT |

**PLAINTIFFS' ORIGINAL VERIFIED PETITION,
AND APPLICATION FOR A TEMPORARY
RESTRAINING ORDER AND A TEMPORARY INJUNCTION**

Ness Deutschland GmbH ("NDG") and Ness KE, s.r.o. ("NKE," and collectively with NDG, "Ness") file this Verified Petition, and Application for a Temporary Restraining Order and a Temporary Injunction against Solar Turbines Inc. ("STI") and Solar Turbines Slovakia s.r.o. ("STS" and collectively with STI, "ST") seeking relief in connection with STI's ongoing participation in breaches of fiduciary duties by Ness employees, tortious interference with Ness' employment agreements, and misappropriation of trade secrets, all in furtherance of an employee raid:

**DISCOVERY CONTROL PLAN**

1.      Ness intends to conduct discovery under Level 2 of Texas Rule of Civil Procedure 190.3 insofar as any discovery is needed for the relief requested in this Petition. Ness affirmatively pleads that this suit is not governed by the expedited-actions process in Texas Rule of Civil Procedure 169 because Ness seeks injunctive relief and monetary relief over $250,000.

**PARTIES AND VENUE**

2.      Plaintiff  NDG is a German Corporation with its headquarters in Hamburg,

Germany.

3.      Plaintiff NKE is a Slovakian Corporation with its headquarters in Košice, Slovakia.

4.      Defendant STI is, on information and belief, a wholly-owned subsidiary of Caterpillar Inc. ("Caterpillar") and a Delaware corporation with its headquarters in San Diego, California.

5.      Defendant STS is, on information and belief, a Slovakian corporation with its headquarters in  Košice, Slovakia.  On information and belief, STS is a wholly-owned subsidiary of Defendant STI and/or controlled by Defendant STI,

6.      Venue is proper in this Court under Texas Civil Practice and Remedy Code § 15.020(a) because the parties' relationship is governed by an agreement permitting "any litigation based [on], airing out of, under, or in connection with," that agreement to be brought in the state courts of Harris County.

7.      All conditions precedent have been satisfied prior to filing this request for injunctive relief, in accordance with Texas Rule of Civil Procedure 54.

## RULE 47 STATEMENT

8.      Ness affirmatively pleads, pursuant to Texas Rule of Civil Procedure 47(b), that the damages sought are within the jurisdictional limits of this Court.

9.      Ness affirmatively pleads, pursuant to Texas Rule of Civil Procedure 47(c)(5) & (d), that it seeks non-monetary relief and all other relief to which is it justly entitled.

## FACTUAL ALLEGATIONS

### The Parties' Business Relationship

10.     NDG and NKE are part of a group of affiliated companies comprising a business that provides outsourced software engineering services from offices located around the world.  The business works through the model of an extended development center, which involves software

2

engineers employed by Ness and its affiliates working under the guidance of their clients to create software solutions specified by the clients.

11.     STI makes industrial turbines and compressors used in the oil and gas industry. Solar Digital is a unit within STI that takes information from sensors on the turbines and enables its visualization, allowing end users to see machine status and performance details.

12.     Since in or about 2013, Ness has provided software development services to STI under an overarching general terms and conditions agreement ("Master Agreement"), with specific purchase orders and scopes of work ("SOW") issued under that Master Agreement. The Master Agreement is a Caterpillar form agreement used by STI as a subsidiary of Caterpillar.

13.     Ness provides services to STI under the Master Agreement through employees working at NKE in Košice.  STI is and has been fully aware that this is the case as its personnel regularly visit NKE and direct and manage work performed by the NKE employees assigned to its account.  NKE was established in 2005 and, at 600 employees, is one of the largest engineering companies in the region.

14.     At least 160 of Ness' 600 Košice-based employees are currently engaged on STI projects.  While the specifics of the work are confidential, at a general level some of the projects on which Ness works for STI involve developing and maintaining Solar Turbines' core business platform InSight; working on Condition Based Lifting, which involves the calculation of remaining useful lifetime of turbines and parts thereof in order to optimize service intervals and avoid downtimes; and building applications to help STI's clients save energy in their turbine operation, and manage the supply and distribution of turbine parts.

15.     The projects on which Ness works for STI are highly complex and span years.  To maximize quality and efficiency for STI, Ness maintains the same teams of employees on the

projects throughout their lifespan as much as possible.  Indeed, STI expects Ness to do this.

16.     Though the SOWs that detail the work to be performed on the STI projects periodically expire, this is primarily an accounting mechanism, and new SOWs are issued as the old ones expire so that the work remains ongoing.  As recently as four weeks ago, STI indicated that it intended for Ness to continue working on the current projects through the remainder of 2021.

**Ness' Employees**

17.     As a business that sells software engineering and development services, Ness' key assets are its employees.  Ness thus devotes substantial resources to recruiting and retaining the employees needed to provide the services for which Ness is known.  It also devotes substantial resources to training its employees and developing their skills to enable them to provide the highest level of service.  Such training includes on-line courses, paid attendance at conferences, and support in obtaining industry-relevant certifications.

18.     The talent pool in and around Košice is relatively small, and people with the skills and qualifications Ness requires are in high demand.  Consequently, when employees leave, they are difficult to replace.  Time is required to find suitable replacements and, once they are hired, further time is required to train them to meet Ness' standards.

19.     Ness requires all of its employees to sign a standard employment contract.  Since 2015, that employment contract has required employees to agree that, for six months following the end of their employment with Ness, they will not engage in competitive activity, nor work on any project on which they worked as a Ness employee.

20.     In addition, pursuant to Slovakian law, the employees are required to give Ness two months' notice before terminating their employment.

### STI's Plan to "In-Source" Ness' Key Employees

21.     On May 24, STI informed Ness that STI intended to in-source at least 70 percent of the services Ness had been providing to STI.

22.     Given the complexity of the projects STI is in-sourcing, the Ness employees' long-term experience on them, and the tightness of the labor market in Slovakia, hiring and training new personnel to replace Ness' employees would require substantial time and likely disrupt the ongoing work.  Accordingly, upon hearing of STI's insourcing plan, Ness became concerned that STI intended to execute its plan by hiring away the Ness employees that had been performing the services STI intended to in-source.

23.     Acting on those concerns, Ness sent STI an email in which it: (1) instructed STI not to communicate with Ness' employees about STI's in-sourcing plans; (2) reminded STI that Ness' employees were subject to non-compete clauses that precluded them from working on STI's projects, or otherwise engaging in competitive activity vis-à-vis Ness for six months following the termination of their employment with Ness; and (3) requested that STI confirm that it had not and would not interfere in Ness' contractual relationships with its employees.

24.     STI responded with an email asserting that Ness had "a misinterpretation and incorrect assumptions of our objectives," that STI intended to hire 10-20 people per month through general advertising, and  that STI wanted to maintain good relations with Ness.

### STI Enlists A Key Ness Employee To Assist In A Raid

25.     It quickly became clear that STI's assurances were untrue—STI's announcement of its intent to open an office in Košice was, in reality, the launch of a scheme to raid Ness' employees that STI intended to execute with lightning speed by inducing breaches of fiduciary duties and contractual obligations owed by Ness employees and misappropriating Ness'

confidential information about, *inter alia*, the salaries and relative strengths of Ness' employees.

26.     After STI disclosed its plans to open an office in Košice, Ness went to work gathering as much information as it could in light of its suspicion that STI intended to lure Ness employees to staff its Košice operations. Ultimately Ness discovered that STI included at least one, and potentially more, Ness employees in preparing its raid, inducing the violation of key employees' fiduciary duties, and aiding and abetting those breaches.

27.     Ness quickly learned that STI had established a Slovakian entity, STS, in late March 2021, two months before it disclosed its "in-sourcing" plan.  The head of that office is Stinson McIlhenney, Ness' longtime contact at STI who, [upon information and belief, remains employed by STI.

28.     Ness also observed that, not later than May 26, 2021, STI's website included a page advertising open positions for software engineers and developers at STS, with a listed address ***in the very same building where Ness has its offices***.

29.     The building where Ness has its offices has five floors, and Ness fully occupies four of them. The fifth floor is mostly occupied by other tenants, with only roughly 200 square meters available for lease.  Ness realized that the only logical reason for STI to have procured the small remaining amount of space in Ness' building for STS is that STI acquired that space as a foothold and intended to expand into the space leased by Ness after hiring away a substantial portion of Ness' employees and forcing Ness to reduce its footprint.  As alleged below, subsequently-acquired information confirmed this conclusion.

30.     Upon learning that STI had listed Ness' address as the address of STI's new Slovakian entity, Ness inquired of the landlord of the building and was told that the landlord had signed a lease with STI in late 2020 after being introduced to representatives of STI by Marek

Uhrin, who was at that time a managing director and, effectively, the CEO of Ness' Košice office.

31.     Ness has an understanding with its landlord that the landlord will not lease space in Ness' building to another IT company without Ness' consent.  With the apparent purpose to circumvent this agreement, Mr. Uhrin, apparently in league with STI, informed the landlord in words or substance that Ness consented to the landlord renting space to STI and was, in fact, in favor of such an arrangement, as STI was one of its most important customers.  These representations were false.  Ness had not consented to the landlord renting space to STI and did not favor such an arrangement.

32.     In late April 2021, Uhrin gave notice of his resignation from Ness, claiming to Ness that he had no plans to join another employer but rather planned to take a break.  In reliance upon this representation, Ness released him from the last several weeks of his required two-month notice period, and his last day of employment with Ness was May 7.

33.     As noted above, prior to his resignation, Mr. Uhrin effectively functioned as the CEO of Ness' Košice office.  In that position, he had overall P&L responsibility for the office and unfettered access to virtually all information concerning the office and its business.  Of particular relevance here, Mr. Uhrin had access to information about the salary and other compensation paid to all of the employees in the Košice office, as well as the office's pricing and target margins.  Knowledge of this information would permit a customer, such as STI, to determine how much (and how little) it needed to pay particular Ness employees in order to lure them away.  Mr. Uhrin also has information about the strengths and weaknesses of individual Ness employees, which information would enable a customer, such as STI, to know which employees to target and prioritize in a raid.

***STI Launches Its Raid***

34.     Notwithstanding its assurances that it would hire employees for its new Košice office only through general advertising, it quickly became clear that STI was, in fact, engaging in a concerted effort to target Ness' employees and hire them into STS by inducing breaches of fiduciary duties and contractual obligations, and misusing Ness' confidential information.

35.     On May 27, 2021, the newly-announced head of STS, Stinson McElhinney, attended a previously scheduled all-hands meeting of the Ness employees assigned to STI's projects.  Such meetings between STI and the Ness employees assigned to STI's projects are regularly conducted as part of the management of those projects.  As noted above, prior to the meeting on May 27, 2021, Ness had expressly instructed McElhinney not to communicate with Ness' employees about STI's expansion into Košice.  In defiance of those instructions, McElhinney not only informed Ness' employees of the expansion but also advised them that open positions at STI's Košice office would be posted on STI's website.

36.     At the end of the day on May 27, 2021, another of Ness' key employees in Košice, Vedran Houdak, submitted his resignation.  Houdek, the Associate Vice President of Delivery at Ness' Košice office, was one of Uhrin's key lieutenants and was the day-to-day lead on Ness' relationship with STI.  Like Uhrin, Houdek has detailed knowledge of the salary and other benefits paid to the Ness employees assigned to work for STI, as well as the relative strengths and weaknesses of those employees.  Like Uhrin, Houdek is well positioned to advise STI on which of Ness' employees it should recruit and how much it needs to offer to lure them away.

37.     Houdek advised Ness that he had received an offer of employment from STI on May 26, 2021, the day before STI advised Ness employees of the job listings posted on its website. He denied having prior knowledge of STI's plans to expand into Košice, but there is reason to

believe that is untrue.  Specifically, on May 26, 2021, a different Ness employee assigned to the STI account submitted her resignation and informed Ness that the prior week, Houdek had advised her, in words or substance, that she should not resign because there would soon be significant changes in Ness' Košice office that would provide opportunities to take a leadership role on the team working for STI.  According to this employee, Houdek also instructed her that she should not disclose this advice from him to Ness' human resources department.

38.     Also on May 27, 2021, McElhinney was observed in the Košice town center meeting with another key Ness employee, Frantisek Kollar.  Kollar holds the position of Senior Manager – Development and is the number two ranking member of Ness' STI team.  He submitted his resignation on May 28, 2021 and confirmed he has accepted an employment offer from STI.

39.     In addition to Mr. Kollar, two other employees on the STI team submitted their resignations on May 28, 2021:  Miroslav Nozicka (Senior Software Architect) and Ondrej Scecina (Software Architect).   Messrs. Nozicka and Scecina confirmed they have accepted employment offers from STI.  With these resignations, the top four ranking members of Ness' STI team have announced their intention to leave Ness and join STI.

40.     The resignations continued into last week.   On Monday, May 31, 2021, 23 additional Ness employees assigned to STI projects resigned.  Twenty-one of them confirmed that they have accepted employment offers from STI.

41.     Through exit interviews with the resigning employees and information provided by STI, Ness learned the following facts:

> • Stinson McElhinney, the head of STS, met with at least some of the resigning Ness employees on May 27 and 28 and offered them employment.

> • Stinson told employees that they needed to submit a formal application, but

employees have reported that the "formal application" was merely a *pro forma* exercise.

- STS intended to hire the key Ness employees assigned to the STI account;

- The employees hired by STS would work in the same building where they currently worked for Ness.

- The employees hired by STS would continue to work on the same STI projects on which they worked at Ness.

- STI made 25 offers to Ness employees in Košice in May.

42.     These facts, as well as ST's actions, confirm that STI's representation to Ness that it planned to staff STS by hiring through general advertising was untrue.  ST, in fact, targeted and directly solicited Ness' employees to work for STS.

43.     ST continues to actively recruit Ness employees in Košice, including sending a message on June 4, 2021, to Ness's Košice employees regarding STI's immediate and near-term hiring plans for STS.

### STI's Actions Threaten Ness' Business in Košice and Exposes Ness to Immediate and Irreparable Harm

44.     Based on STI's stated intention to insource 70 percent of the services provided by Ness, and STI's demonstrated intention to have those services performed by the same people that have been performing them under Ness' umbrella, Ness stands to lose more than 100 of the 600 employees in its Košice office.  Further, to the extent Ness refuses to accede to STI's scheme (which it will) and ceases to provide the remaining 30 percent of the services, there is every reason to fear that STI will seek to hire *all* of the remaining employees on the STI team.  Ness thus faces the imminent threat that STI will, by interfering in its contractual relationships, poach more than 25 percent of the NKE workforce.  The rapid outflow of such a large number of employees,

especially in a relatively small and tight labor market will damages Ness' reputation and goodwill in the market, both among customers and potential employees.

45.     Additionally, as noted above, due to the difficulty of hiring qualified engineers, Ness estimates that it could take six months or longer to fill the vacancies left by the employees departing for ST and even longer to have the replacements trained to perform to Ness' high standards. During that time, Ness would be at risk of losing clients, goodwill, and a significant amount of revenue.   "Damages are an inadequate remedy if they are difficult to calculate; 'assigning a dollar amount to such intangibles as a company's loss of clientele, goodwill, marketing techniques, and office stability, among others, is not easy.'"   *Thomas v. A\*Med Mgmt., Inc.*, No. 01-19-00564-CV, 2020 WL 5269412, at \*4 (Tex. App.—Houston [1st Dist] Sept. 3, 2020) (quoting *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 228–29 (Tex. App.—Fort Worth 2009, pet. denied)); *see also Miller v. Talley Dunn Gallery, LLC*, No. 05-15-00444-CV, 2016 WL 836775, at \*8 (Tex. App.—Dallas Mar. 3, 2016) ("Disruption to a business can constitute irreparable harm.").

46.     Ness will also incur substantial costs in the recruitment, hiring, and training of the large number of employees needed to replace those poached by STI through the above-described wrongful means.

**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

47.     Based on the facts described in the preceding paragraphs, Ness is seeking a temporary restraining order and temporary injunction to prevent ST from continuing to execute a plan that has been in motion for months and has only just now come to light.   Absent injunctive relief prohibiting ST from engaging in any recruitment of Ness' employees where the employment of those employees would result in a breach of any employment agreement, working with Uhrin

or other current or former Ness employees in any capacity to recruit Ness' employees, and employing Uhrin in any capacity, Ness faces the probability of losing a significant portion of the NKE workforce, a loss of goodwill, and a massive disruption to its business.

*Temporary Injunction*

48.    To obtain a temporary injunction, "an applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (defining "an injury [as] irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard").

49.    Ness has, at least, four underlying causes of action upon which it is likely to succeed.

50.    ***First***, Ness is likely to succeed on its claims for tortious interference with Ness' employment contracts. Texas law on tortious interference with contract includes breach of employment agreements. *Sterner v. Marathon Oil Corp.*, 767 S.W.2d 686, 689 (Tex. 1989).

51.    Since 2015, Ness employees' contract of employment includes a prohibition, for six months following termination of employment with Ness, on competitive activities and working on the same projects on which the employees worked while at Ness.  Approximately 80 percent of the 160 NKE employees at issue here, are party to this version of the employment contract.  As described above, ST is actively engaged in the hiring of Ness employees to work on the same projects on which they worked at Ness, in direct contravention of this prohibition in the employment agreement.

52.    In addition, Ness employees agree in their contracts not to act contrary to Ness'

12

legitimate interests.  Assisting in a raid of Ness' employees at the behest of a new employer is directly contrary to these contractual obligations.

53.     ST was aware of the specific prohibitions contained in Ness' employment contracts and, despite such knowledge, continues to knowingly induced breaches of those contracts in an effort to insource the work Ness had been performing.

54.     **Second**, Ness is likely to succeed on its claim that ST knowingly participated in Uhrin's and Houdek's numerous breaches of their fiduciary duties to Ness.  "[W]here a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such."  *Straehla v. AL Glob. Servs., LLC*, 619 S.W.3d 795, 804 (Tex. App.—San Antonio 2020) (quoting *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (1942)).

55.     As a Ness director, Uhrin's fiduciary duties included those of care and loyalty— which were violated when Uhrin, while still employed by Ness, worked with ST to execute ST's plans.  *See* Declaration of Peter Devinsky ("Devinsky Decl.") at ¶ 7.

56.     As a Ness employee, Houdek was obligated to keep confidential information entrusted to him and refrain from acting contrary to Ness' interests. *See* Devinsky Decl. at ¶ 8. Uhrin was likewise bound by these obligations. *Id.* at 9.

57.     By enlisting Uhrin's and Houdek's assistance in establishing ST's business in Kosice, ST has been able to recruit Ness' highly skilled employees, Ness' most crucial and important asset. By leveraging Uhrin's position of authority, ST was able to secure office space in violation of Ness' agreement with its lessor because Uhrin's misrepresentations implied that Ness had consented to the ST lease. In short, ST relied on Uhrin's and Houdek's status as high-level employees (and in the case of Uhrin, status as a director) at Ness to execute its plans with full

knowledge that their senior position gave rise to specific fiduciary duties.

58.     **Third**, ST has willfully and maliciously misappropriated Ness' confidential information in furtherance of its raiding scheme.  Uhrin and Houdek had specific knowledge of Ness' confidential business information, including employee performance and salary information, which ST has used to prioritize its recruiting efforts and determine the salaries it needed to offer to lure the employees at issue away.

59.     **Finally**, the same facts supporting ST's liability for knowing participation in Uhrin's breach of fiduciary duties and tortious interference with contract also support a claim for conspiracy.  ST, Uhrin and Houdek had a meeting of the minds regarding the poaching of Ness' employees despite the non-competition provisions in those employees' employment agreements and have taken active steps in furtherance of their scheme to decimate Ness' workforce. *See Straehla*, 619 S.W.3d at 811.

60.     Ness will suffer probable, imminent, and irreparable ongoing injury that demands injunctive relief.  "Proof of a continued breach of [a] non-competition agreement by a highly-trained employee constitutes prima facie proof of probable injury." *Hartwell's Office World, Inc. v. Systex Corp.*, 598 S.W.2d 636, 639 (Tex. Civ. App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.).  ST has put in motion a plan that has resulted in the departure of Ness' most senior employees and the continued departure of other key employees.  Such ongoing harm is inherently irreparable. *Cyberx Group, LLC v. Pears*on, No. 3:20-CV-2501-B, 2021 WL 1966813, at *11 (N.D. Tex. May 17, 2021) (collecting cases).

61.     In addition, the loss of a large percentage of its highly skilled workforce also exposes Ness to a loss of goodwill and brand reputation among current and potential employees and customers, harms that are by nature irreparable. *See, e.g., Graham v. May Kay Inc.*, 25 S.W.3d

749, 753 (Tex. App.—Houston [14th Dist.] 2000); *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*,

281 S.W.3d 215, 228 (Tex. App.—Ft. Worth 2009); *Miller v. Talley Dunn Gallery, LLC*, No. 05-

15-00444-CV, 2016 WL 836775, at *8 (Tex. App.—Dallas Mar. 3, 2016); *RenewData Corp. v.

Strickler*, No. 03-05-00273-CV, 2006 WL 504998, at *16 (Tex. App.—Austin 2006, no pet.).

62.     Accordingly, Ness is entitled to a temporary injunction.

*Temporary Restraining Order*

63.     A court granting a temporary restraining order must "(1) state why the order was

granted without notice if it is granted ex parte; (2) state the reasons for the issuance of the order

by defining the injury and describing why it is irreparable; (3) state the date the order expires and

set a hearing on a temporary injunction; and (4) set a nominal bond." *In re Office of Attorney Gen.*,

257 S.W.3d 695, 697 (Tex. 2008) (citing Tex. R. Civ. P. 680, 684).

64.     The temporary restraining order is not being sought *ex parte*.

65.     Ness seeks a temporary restraining order for the reasons set forth in this Petition,

*supra* ¶¶ 48-62.

66.     Ness further requests that the Court set a hearing on its application for a temporary

injunction in this matter.

## CAUSES OF ACTION

### Count 1: Tortious Interference with Contract

67.     All of the foregoing factual allegations are incorporated herein by reference.

68.     Ness and its employees in Košice are parties to valid employment contracts

containing provisions barring them from engaging in competitive activity vis-à-vis Ness, and from

working, on projects on which they worked at Ness, for six months following the termination of

their employment with Ness.   In addition, Ness employees agree in their contracts not to act

contrary to Ness' legitimate interests.

69.     ST knew of these agreements and/or had knowledge of the facts and circumstances that would lead ST to be aware of the existence and terms of these contracts.

70.     ST willfully and intentionally interfered with these contracts by actively recruiting and hiring Ness' employees in order to have those employees engage in competitive activity vis-à-vis Ness and work on the same projects on which they had worked at Ness.  Additionally, in the case of Messrs. Uhrin and Houdek, ST willfully and intentionally interfered with their employment contracts by inducing them to act contrary to Ness' interests by assisting in preparations for ST's raid.

71.     ST's tortious conduct proximately caused harm to Ness including actual damages.

**Count 2: Knowing Participation in Breach of Fiduciary Duty**

72.     All of the foregoing factual allegations are incorporated herein by reference.

73.     As a Ness director, Uhrin's fiduciary duties included those of loyalty, candor and care—all of which were violated when Uhrin, while still employed by Ness, worked with ST to prepare ST's raid on Ness.  Houdek, as a Ness employee, also owed fiduciary duties and likewise violated them by working with ST to prepare its raid on Ness.

74.     ST knowingly participated in Uhrin's and Houdek's breaches of their fiduciary duties to Ness and, as such, is liable as a joint tortfeasor.

75.     With Uhrin's and Houdek's assistance, ST has been able to recruit Ness' highly skilled employees, Ness' most crucial and important asset. By leveraging Uhrin's position of authority, STI was able to secure office space in violation of the terms of Ness' lease because Uhrin's misrepresentations implied that Ness had consented to the STI lease. In short, STI relied on Uhrin's status as a director and senior manager at Ness to execute its plans with full knowledge

that his senior position gave rise to specific fiduciary duties.

76.     STI was aware that it was encouraging, facilitating, and participating in Uhrin's and Houdek's breaches of their fiduciary duties.

77.     STI's tortious conduct proximately caused harm to Ness including actual damages.

**Count 3: Misappropriation of Trade Secrets**

78.     STI has misappropriated Ness' trade secrets in acquiring Ness' confidential business information, information that Ness has taken reasonable measures to keep secret and confidential.

79.     ST was aware that the information provided by Uhrin in its efforts to poach Ness' employees constituted a trade secret and that Uhrin had contractual and fiduciary duties that prohibited him from disclosing or using that information, let alone providing it to ST in order for ST to recruit and hire Ness' employees.

80.     Ness seeks actual damages under Tex. Civ. Prac. & Rem. Code § 134A.004(a), including both the actual loss caused by misappropriation and unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.

81.     Ness will prove at trial that the misappropriation of trade secrets was willful and malicious and seeks exemplary damages and attorneys' fees as authorized by Tex. Civ. Prac. & Rem. Code §§ 134A.004(b) and 134A.005(3).

**Count 4: Civil Conspiracy**

82.     All of the foregoing factual allegations are incorporated herein by reference.

83.     ST conspired with Uhrin, Houdek, and potentially other Ness employees to tortiously interfere with Ness' employment contracts and engaged in numerous overt acts in furtherance of the conspiracy, including the active recruitment of Ness employees despite

prohibitions on those employees accepting employment with ST on projects those employees had worked on at Ness.

84.     Uhrin, Houdek, and ST have taken steps to conceal their conspiracy from Ness as a means of making ST's employee raid successful.

85.     STI's tortious conduct proximately caused harm to Ness including actual damages.


## PRAYER

WHEREFORE, PREMISES CONSIDERED, Ness requests this Court enter judgment in favor of Ness and against ST as follows:

A.  Issuing a temporary restraining order and temporary injunction prohibiting ST from engaging in any recruitment of Ness' employees where the employment of those employees would result in a breach of any employment agreement,  working with Uhrin or other current or former Ness employees in any capacity to recruit Ness' employees, and employing Uhrin in any capacity;

B.  Awarding damages deemed to be just and fair, which will be a sum within the jurisdictional limits of this Court;

C.  Awarding attorneys' fees, pre-judgment interest, post-judgment interest, and costs; and

D.  Awarding such other and further relief, in law or in equity, either general or special, to which Ness may be justly entitled.

Respectfully submitted,

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

_____

Christopher Porter
Attorney-in-Charge
Texas State Bar No. 24070437
chrisporter@quinnemanuel.com

Elizabeth McKee Devaney
Texas State Bar No. 24040100
lizdevaney@quinnemanuel.com

711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone:      (713) 221-7000
Facsimile:      (713) 221-7100

Kevin S. Reed (*pro hac vice* forthcoming)
kevinreed@quinnemanuel.com
51 Madison Ave.
22nd Floor
New York, New York 10010
Telephone:      (212) 849-7000
Facsimile:      (212) 849-7100

**ATTORNEYS FOR PLAINTIFFS**

# **Exhibit 1**

**Solar Turbines**

*A Caterpillar Company*

**Turbomach**

*A Caterpillar Company*

*FORM 4001-A MODIFIED*
*REV 12 MARCH 2014*

GENERAL TERMS AND CONDITIONS OF CONTRACT

FOR PROFESSIONAL SERVICES

BY

Ness Deutschland GmbH ("CONTRACTOR")

# TABLE OF CONTENTS

1.   DEFINITIONS ...................................................................................................................3

2.   SCOPE OF WORK; CONFLICTS; REPRESENTATIVES ..............................................7

3.   CONTRACTOR RESPONSIBILITIES ............................................................................8

4.   PAYMENT PRICE ........................................................................................................10

5.   TIME .............................................................................................................................11

6.   CHANGES IN THE WORK ...........................................................................................12

7.   TERMINATION FOR CONVENIENCE .........................................................................13

8.   CANCELLATION FOR CAUSE ....................................................................................14

9.   WARRANTY .................................................................................................................14

10.   INSURANCE .................................................................................................................16

11.   TITLE TO WORK PRODUCT .......................................................................................18

12.   PERFORMANCE BOND AND LABOR AND MATERIAL PAYMENT BOND ...............19

13.   INDEPENDENT CONTRACTOR ..................................................................................19

14.   LIENS AND CLAIMS ....................................................................................................20

15.   NO CONSEQUENTIAL DAMAGES, ETC ....................................................................20

16.   NO WAIVER .................................................................................................................20

17.   NOTICES ......................................................................................................................20

18.   NO IMPLIED LICENSES ..............................................................................................21

19.   RELEASE OF INFORMATION .....................................................................................21

20.   ASSIGNMENT; DELEGATION; CHANGE IN CONTROL ............................................22

21.   SUCCESSIONS ............................................................................................................22

22.   SET OFF .......................................................................................................................22

23.   APPLICABLE LAW; VENUE; WAIVER OF JURY TRIAL ...........................................22

24.   COMPLIANCE WITH LAW ...........................................................................................23

25.   ASSURANCE OF PERFORMANCE .............................................................................24

26.   SPECIFICATIONS; DESIGNS .....................................................................................24

27.   PERSONNEL ................................................................................................................25

28.   OTHER PROVISIONS ..................................................................................................25

29.   LIST OF EXHIBITS...................................................................................................26

**Solar Turbines**

*A Caterpillar Company*

**Turbomach**

*A Caterpillar Company*

*REV. 12 March 2014*

1. DEFINITIONS

As used in or pertaining to these General Terms and Conditions of Contract for Professional Services, the following terms shall be interpreted as having the meanings respectively set forth below:

1.1   "Affiliate" of any Person means any other Person which, directly or indirectly, controls, is controlled by or is under common control with such Person.  A Person shall be deemed to be "controlled" by any other Person if such other Person possesses, directly or indirectly, power

(a)   to vote 10% or more of the securities (on a fully diluted basis) of such Person having ordinary voting power for the election of directors or managers; or

(b)   to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

1.2   "Applicable Laws" means all laws, statutes, ordinances, building codes, rules, regulations, or orders of any Government having jurisdiction over the performance of the Work, as may be in effect at the time the Work is undertaken.

1.3   "Applicable Permits" means all permits, waivers, authorizations, exemptions, franchises, clearances or licenses issued or required to be issued by any Government having jurisdiction over the performance of the Work, as may be in effect at the time the Work is undertaken.

1.4   "Change Order" means a written order signed by Company's Representative, which order changes the Work, Contract Price, payment terms, Work Schedule, delivery, or any special term or condition of the Contract.

1.5   "Company" means Solar Turbines Incorporated, having offices at, among other places, 2200 Pacific Highway, San Diego, California and Turbomach SA, Via Campagna 15, 6595 Riazzino, Switzerland, and any of its and their affiliates and subsidiaries who issue a Purchase Order to Contractor, which references these terms.

1.6   "Consequential Loss" means any loss or anticipated loss of profit, loss or anticipated loss of revenue, business interruption, loss of use of any Company or Contractor equipment, or loss of any contract or other business opportunity.

1.7   "Contract" means these General Terms and Conditions of Contract for Professional Services as applied to a particular Order together with any Purchase Order and Work Order(s) and all Plans and Specifications, and other documents which are integrated herewith or incorporated herein by reference, as well as any Modifications (including Change Orders), Suspension Orders, Reinstatement Orders and Termination Orders that may be in effect from time to time.

1.8   "Contractor" means the Person entering into these General Terms and Conditions of Contract for Professional Services or a particular Contract with Company.

1.9   "Contractor IP" means Contractor's intellectual property including, but not limited to, patents, trademarks, copyrights, trade secrets, works of authorship, background software, concepts, methodologies and processes developed or existing prior to the start of the Work that is incorporated into the Work.

1.10    "Contractor Specifications" means and specifications created by Contractor pursuant to the Contract.

1.11    "Contract Time" means the period of time provided in the Contract for completion of the Work.  It is anticipated that some Purchase Orders will not have a Contract Time.

1.12    "Contract Price" means the total amount that Company shall be obligated to pay to Contractor upon the performance of all of Contractor's duties and obligations pursuant to the Contract which shall not exceed the rates as set forth in the applicable SOW.

1.13    "Customer" means Company's customer, whether one or more, unless otherwise specified.

1.14    "Date of Final Completion" means the date on which Contractor has successfully achieved Final Completion.

1.15    "Documents" means documents designs, diagrams, illustrations, schedules, sketches, charts, , technical specifications, software, source code, test plans, test scripts and other data which are prepared by Contractor or any Subcontractor, manufacturer, contractor or distributor in performance of the Work.

1.16    "Engineering" means all specifications, designs, calculations, analysis, plans, data, reports, process diagrams, , sketches, software development, programming, test plan development, testing and the like created or provided by it in the performance of the Work.

1.17    "Export Authorizations" means all applicable export permits, licenses, authorizations, certification, notifications, or other required or necessary government approvals or submissions.

1.18    "Field of Use" means software, networks, hardware, or systems for the purpose of condition monitoring, remote monitoring and diagnostics, data analytics, health management, or related systems that use data acquired from turbo-machinery equipment, gas turbine engines, compressors, reciprocating engines or electric motor drives.

1.19    "Final Completion" shall be deemed to have occurred when (i) the Work has been completed in accordance with the Contract, (ii) all deliverables required to be submitted to Company on or before the Date of Final Completion have been submitted, including all Work Product, and such other items as are required by the Contract and (iii) all other duties and obligations of Contractor under the Contract have been fully performed.

1.20    "Fixed Price Work" means work for which Contractor is paid based on specific deliverables.   Unless otherwise specified in the Contract, Firm Business Project Execution shall be Fixed Price Work.

1.21    "Government" means any United States or foreign, federal, state, regional, tribal or local government or governmental agency, department, court, tribunal or other entity charged with the administration, interpretation or enforcement of any Applicable Law.

1.22    "Hourly Work" means Work for which Contractor is paid based on the number of hours of service provided in accordance with the Contract.  Unless otherwise specified in the Contract, General Work and Manpower Work shall be Hourly Work.

# Solar Turbines
*A Caterpillar Company*

# Turbomach
*A Caterpillar Company*

REV. 12 March 2014

1.23  "Inventions" means all intangible property, ideas, conceptions, know-how, inventions, improvements, devices, methods, products, processes and discoveries, whether patentable or unpatentable, and whether in a written, graphic and/or machine readable form or format, that arise out of Contractor's or Contractor's Personnel, performance of the Contract or resulting from or based on Company Proprietary Information.

1.24  "Key Personnel" means any member of Contractor's Personnel designated as essential to the satisfactory performance by Contractor of the services to be performed under the Contract.

1.25  "Lien" means any lien, charge, mortgage, pledge, claim, security interest or encumbrance of any kind, arising by contract or under Applicable Law.

1.26  "Losses" means claims, actions, damages, losses, liabilities, penalties, interest, costs, and/or expenses including reasonable attorney's fees. Losses include loss of or damage to property and injury to or death of natural Persons.

1.27  "Modification" means (1) a written amendment to the Contract signed by both Parties, or (2) a Change Order.

1.28  "Onsite" shall mean Company's Premises

1.29  "Offsite" shall mean Contractor's development offices

1.30  "Parties" means Company and Contractor, and "Party" means either of them.

1.31  "Person" means any natural person, corporation, partnership, joint venture, limited liability company, firm, association, trust, Government or any other entity.

1.32  "Personnel" means the employees, agents, contractors, and representatives of the applicable Party and, in the case of Contractor, its subcontractors, whether or not Affiliates of such Party.  For the avoidance of doubt, subcontractors of Contractor include notably any freelance consultant who would perform services for Company under the Contract. Contractor shall execute a written subcontract with such freelance consultants on terms no less stringent to those contained in the Contract

1.33  "Plans and Specifications" means any technical requirements, specifications, codes, inspection methods, fabrication methods, application check sheet or documents provided by Company, which are applicable to the Work.

1.34  "Professional Services" means the consulting, software development, maintenance and software installation and other support services as described in a SOW or as otherwise set forth in a Purchase Order.

1.35  "Purchase Order" or "Order" means Company's document(s) describing the Work to be performed by Contractor under the Contract.  The Parties anticipate that more than one Purchase Order may be outstanding and in effect at any time.

1.36  "SOW" of "Statement of Work" means a description of the Work and/or deliverables to be provided under a Purchase Order.

1.37  "Site" means the location or locations where the Work is to be performed, which may be a site owned or controlled by Company, Contractor or a third Person.

**Solar Turbines**

*A Caterpillar Company*

**Turbomach**

*A Caterpillar Company*

REV. 12 March 2014

1.38    "Suspension Order" means a written order signed by Company's Representative, which order suspends Contractor's effort on that portion of the Work covered by the Suspension Order, as specifically set forth therein.

1.39    "Subcontractor" means a Person who has a direct contract with Contractor to perform or supply any part of the Work, including without limitation the supply or lease of any materials or equipment.

1.40    "Sub Subcontractor" means a Person who has a direct contract with a Subcontractor to perform or supply any of the Work.

1.41    "Termination Order" means a written order signed by Company's Representative, which order terminates Contractor's effort on that portion of the Work covered by the order, as specifically set forth therein.

1.42    "Work" means all training, professional, consulting or similar services and goods ancillary thereto provided or to be provided by Contractor under the Contract, including without limitation software, documentation, engineering, design, project management, drafting and other technical or similar service activities, all labor, material, equipment, services and supplies necessary to provide and deliver the Professional Services required under a Purchase Order, and all materials and incorporated or to be incorporated into the product of such professional services.   Work includes General Work, Firm Business Project Work and Manpower Work, each of which is further described in Section 2.3.

1.43    "Work Product" means any work of authorship including without limitation software and related documentation Engineering, Documents, Contractor Specifications and Inventions and other work product provided or developed by Contractor in its performance of the Work.

1.44    "Work Authorization" means a document issued by Company pursuant to a blanket Purchase Order describing the Work to be performed by Contractor under the Contract. The Parties anticipate that more than one Work Authorization may be outstanding and in effect at any time.  A Work Authorization is accepted by Contractor when Contractor has provided Acknowledgment.

The following rules of interpretation apply to these General Terms and Conditions of Contract for Professional Services:

(a)    Defined terms include the plural as well as the singular.  Any reference to an Article, Section, Exhibit, Attachment, or Appendix shall be deemed to refer to an Article, Section, Exhibit, Attachment or Appendix of the Contract unless otherwise specified.  The terms "hereof", "herein", "hereunder", and comparable terms refer to the entire Contract and not to any particular Article or other subdivision hereof.  The words "include", "includes", and "including" are not limiting.

(b)    Any agreement defined or referred to herein shall include each amendment, modification, restatement, and supplement thereto and waiver thereof as may become effective from time to time (provided that such amendment, modification, restatement, or supplement after the effective date of a Purchase Order may constitute a basis for a Change Order).

(c)    A reference to any Applicable Law includes any amendment or modification to such Applicable Law (provided that such amendment or modification after the effective date of a Purchase Order may constitute a basis for a Change Order).

**Solar Turbines**

*A Caterpillar Company*

**Turbomach**

*A Caterpillar Company*

REV. 12 March 2014

(d)     A reference to any Person or Party includes its permitted successors and permitted assigns.

(e)     A reference to any Government shall include any agency or authority succeeding to such agency's or authority's functions and capabilities.

2.     USE OF GENERAL TERMS AND CONDITIONS; SCOPE OF WORK; CONFLICTS; REPRESENTATIVES

2.1     These General Terms and Conditions of Contract for Professional Services are intended to be applicable to multiple Purchase Orders, each of which will be a separate Contract.

2.2     Company may from time to time issue a Purchase Order for the performance of services generally described below and more specifically described in the SOW.  Company may also from time to time issue an annual Purchaser Order which authorizes the issuance of multiple Work Authorizations in accordance with the  rates as set forth in the SOW for the performance of services generally described below and more specifically described in the SOW.

2.3     The Work provided under the Contract may consist of engineering, design, project management, drafting and other technical or similar service activities in the following two categories:

    A.     General Work

          Where Company requires Contractor's services for proposed or project work that is for short time periods and for specific tasks.

    B.     Manpower

          Where Contractor provides individuals of certain job qualifications for Work as directed by Company.

2.4     In exchange for the Work, Company shall pay Contractor in accordance with the rates set forth in the applicable Purchase Order.

2.5     Contractor shall provide the Professional Services comprising the Work as described in the specific Work Authorization and/or Purchase Order.  Contractor represents and warrants that Contractor is professionally qualified to perform the Work, and will utilize all necessary and appropriate skill, judgment and expertise in the performance of the Work and will satisfactorily carry out and complete the same.

2.6     The Professional Services comprising the Work are personal to and non delegable by Contractor.  Any purported delegation of duties hereunder without Company's prior written consent shall be a breach of the Contract and shall be void.

2.7     Prior to the commencement of the Work, each Party shall identify to the other Party, in writing, the name(s) and respective scope of authority of its one or more Persons (each, a "Representative") having responsibility for performance of its obligations hereunder, and having authority to agree to Modifications in its rights and obligations hereunder. Each Party shall promptly notify the other Party in writing of any change in the name(s) or scope of authority of its Representative(s) hereunder during the term of the Contract.

# Solar Turbines

*A Caterpillar Company*

# Turbomach

*A Caterpillar Company*

REV. 12 March 2014

2.8     Company's Representative will provide general administration of the Contract, including performance of the functions hereinafter described.   All of Company's instructions to Contractor pertaining to the Contract shall be issued through Company's Representative.

2.9     Contractor shall forward all communications to Company through Company's Representative.

2.10    For Fixed Price Work, based on Company's Representative's observations of the progress of the Work and Contractor's Applications for Payment, Company's Representative will determine the amounts owing to Contractor.

2.11    Company's Representative shall have authority to reject Work which does not conform to the Contract and Company shall not be responsible to make any payments to Contractor with regard to such rejected Work.   Whenever, in Company's Representative's reasonable opinion, such Representative considers it necessary or advisable to insure the proper implementation of the intent of the Contract, such Representative will have authority to require further review of the Work in accordance with this Section 2 and Section 3, whether or not such Work be then completed.

2.12    Company's Representative will prepare Change Orders in accordance with Section 6.

2.13    Company's Representative will review the Work to determine the Date of Final Completion and will receive the review documents required by the Contract and assembled by Contractor.

3.     CONTRACTOR RESPONSIBILITIES

3.1     Contractor shall carefully study the documents comprising the Contract and shall immediately report to Company's Representative any error, inconsistency or omission Contractor may discover.

3.2     Contractor shall perform the Work, using Contractor's best skill and attention, as an independent contractor, and not as an employee of Company, and shall be solely responsible for all portions of the Work.

3.3     Unless otherwise as specifically provided under the SOW, Contractor shall provide all labor, materials, equipment, tools and other facilities and services necessary for the full and proper execution and completion of the Work Onsite.

3.4     Contractor shall pay all sales, consumer, use, payroll, unemployment, disability and any other Federal, State, or local taxes required by any Applicable Law to be paid in respect to the performance of Contractor's duties and obligations hereunder.

3.5     Contractor shall secure and apply for all Applicable Permits, fees, and licenses necessary for the proper execution and completion of the Work, which are applicable at the time the Purchase Order is executed, or at any time thereafter, until completion of the Work. It is the responsibility of Contractor to make certain that the Plans and Specifications are in accordance with Applicable Laws.   Contractor shall give all notices and comply with all Applicable Laws of any Government bearing on the performance of the Work.   If Contractor observes that any terms or conditions of the Contract are at variance therewith in any respect, Contractor shall promptly notify Company's Representative in writing, and any necessary changes shall be adjusted by appropriate modification.   If Contractor performs Work knowing it to be contrary to such Applicable Laws, Contractor

**Solar Turbines**

*A Caterpillar Company*

**Turbomach**

*A Caterpillar Company*

REV. 12 March 2014

shall assume full responsibility therefore and shall bear all costs attributable to the correction thereof.

3.6     Contractor shall be solely and entirely responsible to Company for the acts and omissions of all Contractor's employees and of all Subcontractors and Sub Subcontractors, their respective agents and employees, and all other Persons performing any of the Work if delegation to such third party is approved by Company pursuant to Section 2.6. If any part of the Work depends for proper execution or results upon the work of any third Person not in privity of contract with or otherwise under the control of Contractor, Contractor shall inspect and promptly report to Company's Representative any apparent discrepancies or defects in such work that render it unsuitable for Contractor's proper execution and results.

3.7     During the term of the Agreement, and for a period of five years following its expiration or termination, Contractor shall ensure that any and all of its employees, agents, consultants, and the like who work on a Company project are not permitted to work on similar projects for any third parties who perform, sell, or provide services in Company's Field of Use.

3.8     If Contractor is obligated to prepare Documents and/or Contractor Specifications pursuant to the Contract, then Contractor shall prepare or otherwise obtain, approve in writing, and submit, with reasonable promptness and in orderly sequence so as to cause no delay in the Work or in the Work of any other contractor, all Documents and Contractor Specifications required by the Contract.

A.     At the time of submission, Contractor shall inform Company's Representative in writing of any deviation in the Documents or Contractor Specifications from the requirements of the Contract.     Company's Representative will review and approve Documents and Contractor Specifications with reasonable promptness so as to cause no delay, but only for conformance with the design concept of the Work and with the information given in the Contract.  The approval of a separate item or component shall not indicate approval of a system in which the item or component functions.

B.     Contractor shall make any corrections of Documents or Contractor Specifications required by Company's Representative and shall resubmit the required number of corrected copies of Documents or new Contractor Specifications until approved.

C.     The approval of Documents or Contractor Specifications by Company's Representative shall not relieve Contractor of responsibility for any deviation from the requirements of the Contract unless Contractor has informed Company's Representative in writing of such deviation at the time of submission and Company's Representative has given written approval in the form of a Modification to the specific deviation, nor shall the approval relieve Contractor from responsibility for errors or omissions in the Documents or Contractor Specifications.

3.9     Contractor shall be responsible, to the extent of applicable law or as required by Company, to perform drug screening of all Contractor Personnel that will perform Work on Company premises.   All expenses related to drug screening pursuant to this agreement shall be the responsibility of Contractor.

A. Contractor will comply with all applicable legal requirements concerning the procedures and methods to be used in testing its Personnel for drugs.

B. Company reserves the right to reject any individual whose drug test evidences use of illegal drugs.

C. Company reserves the right to choose the provider who will perform drug tests.

3.10 Contractor shall be responsible for a background screening on all its Personnel that will perform Work on Company premises according to Company's instructions.

3.11 Contractor shall be responsible to ensure the conduct of all Personnel performing Work on Company premises is in accordance with Exhibits A-C.

3.12 If a specific training at Company charge is deemed necessary for Contractor's Personnel, Company approval must be requested and obtained in writing in advance.

3.13 Contractor acknowledges that it must strictly adhere to Company guidelines regarding use of Company trademarks and corporate identity. Contractor shall comply with instructions received from Company and Contractor shall remedy any noncompliance at no cost to Company and use its best efforts to remedy the noncompliance as fast as possible. Contractor shall not use in advertising, publicity, promotion, marketing, or other activity, any name, trade name, trademark, service mark or other designation of, or owned by, Company, except upon the prior written permission of Company.

4. PAYMENT PRICE

4.1 No escalations, reductions or modifications in Contract Price shall be made except as expressly provided for in the Contract.  Unless otherwise agreed in writing, the Contract Price includes all applicable sales taxes, use taxes, excises, duties, and other like levies; and the cost of all permits and licenses. Unless otherwise agreed in writing, the Contract Price does not include the VAT.

4.2 Approved invoices shall be paid 30 days end of month from date of receipt of the Applications for Payment by Company; providing the Applications for Payment are accompanied by duly approved supporting documentation.

4.3 Intentionally Left Blank.

4.4 Contractor warrants and guarantees that title to all completed Work, materials or equipment will pass to Company upon receipt of such payment by Contractor, free and clear of all Liens; and that no Work, materials or equipment will have been acquired by Contractor subject to an agreement under which an interest therein or Lien thereon is retained by the seller.

4.5 No payment, nor any partial or entire use or occupancy of the Work by Company or Customer, shall constitute an acceptance of any Work not in accordance with the Contract.

4.6 Company's Representative may decline to approve Payment in whole or in part, to such extent as may be necessary in such Representative's opinion to protect Company from loss because of:

A. Defective work;

**Solar Turbines**

*A Caterpillar Company*

**Turbomach**

*A Caterpillar Company*

B.   Third party claims filed or reasonable evidence indicating probable filing of such claims;

C.   With respect to Fixed Price Work, reasonable doubt that the Work can be completed for the unpaid balance of the Contract Price;

D.   Reasonable indication that the Work will not be completed within the Contract Time; or

E.   Unsatisfactory prosecution of the Work by Contractor.

4.7   When the above grounds in Section 4.6 are remedied or cured, any amounts withheld because of them shall be paid.

4.8   With respect to Fixed Price Work, when Contractor determines that the Work is complete, Contractor shall request that Company's Representative review the Work and certify Final Completion.

The acceptance by Contractor of final payment shall constitute full and complete satisfaction and discharge of Company's obligations under the Contract, and a waiver of all claims against Company by Contractor, then outstanding.

5.   **TIME**

5.1   All time limits stated in the Contract are of the essence of the Contract.  Contractor shall begin the Work on the date stipulated in the Contract. Contractor shall carry the Work forward expeditiously with adequate forces and in accordance with the Work Schedule and shall complete the Work within the Contract Time.

5.2   Neither Company nor Contractor shall be considered in default of the Contract nor shall either Party be charged with resulting damage for delays if the delay arises from a Force Majeure.  The term "Force Majeure" means an unforeseeable cause beyond the control and without fault or negligence of the Party whose performance is affected thereby, including acts of God, acts of the public enemy, acts of the Government in either its sovereign or contractual capacity, acts of another contractor in the performance of an agreement with Company, fires, floods, earthquakes, epidemics, quarantine restrictions, freight embargoes, unusually severe weather, and as to Contractor, delays of its Sub Contractors arising from unforeseeable causes beyond the control and without the fault or negligence of both Contractor and such Sub Contractors, and as to Company, delays encountered by its Customer arising from unforeseeable causes beyond the control and without the fault or negligence of the Customer.

5.3   If Contractor is delayed at any time in the progress of the Work by any act of Force Majeure, then the Contract Time shall be extended by Change Order for such reasonable time as Company's Representative may determine.   Delays due to labor disputes involving Contractor shall be the sole responsibility of Contractor.  Nothing herein shall be construed so as to obligate any Party to settle any strike, work stoppage or other labor dispute or disturbance except in the sole discretion of the Party experiencing such difficulty.

5.4   Neither Party shall be relieved of its obligation to perform if such failure is due to causes arising out of its own negligence or due to removable or remediable causes which it fails to remove or remedy within a reasonable time period.

5.5     A Party rendered unable to fulfill any of its obligations under the Contract by reason of an event of Force Majeure shall give prompt, but in any event no later than fourteen (14) days from the occurrence of the Force Majeure, written notice of such fact to the other Party.

5.6     For so long as the event of Force Majeure is continuing, the obligations of the Party affected by the event of Force Majeure (other than the obligation to make payments hereunder) shall be suspended to the extent made necessary by the event of Force Majeure.  Such Party shall exercise commercially reasonable efforts to remedy the event of Force Majeure as soon as practicable and shall keep the other Party advised as to the continuance of the event of Force Majeure.

5.7     If an event of Force Majeure persists for a continuous period of at least sixty (60) calendar days, then the Party to whom performance is owed shall have the option, upon three (3) calendar days' prior written notice, to terminate the Contract.

5.8     An event of Force Majeure that only partially prevents performance by a Party shall not relieve such Party from performing its other obligations under the Contract to the fullest extent such Party is not prevented from performing such obligations as a result of the event of Force Majeure.

5.9     This Section 5 does not exclude the recovery of damages for delay by either Party under any other provisions of the Contract.

6.     CHANGES IN THE WORK

6.1     Company may at any time, by written Change Order, make reasonable changes in the scope of Work hereunder; provided that, upon such order, an equitable adjustment shall be made in the Contract Price and Work Schedule, subject to any conditions imposed by Company.  Contractor may at any time propose changes in the scope of the Work.  Such proposal shall be in writing and shall state the effect of the proposed change on the Contract Price and schedule.  If such a change proposal is accepted by Company, Company shall issue a written Change Order to that effect.

6.2     Upon receipt of a written Change Order for any change hereunder, Contractor shall proceed without delay to implement the change.  Contractor shall make no changes to the Work which affect price and/or schedule without prior written authorization from Company.

6.3     If Contractor wishes to make claim for an increase in the Contract Price, Contractor shall give Company's Representative written notice thereof within twenty (20) calendar days after the occurrence of the event giving rise to such claim.  This notice shall be given by Contractor before proceeding to execute the Work.  No such claim shall be valid unless so made.  Any change in the Contract Price resulting from such claim shall be authorized only by Change Order.

7.     TERMINATION FOR CONVENIENCE

7.1     Company may at any time, with 90 days termination notice and in its sole discretion, by written Termination Order, terminate any portion of, or all of, the Work.  Upon receipt by

**Solar Turbines**
*A Caterpillar Company*

**Turbomach**
*A Caterpillar Company*
REV. 12 March 2014

Contractor of such Termination Order, Contractor shall promptly take all reasonable steps to comply with the Order, to preserve, protect, and safeguard the condition of materials and information in its possession or custody in which Company has or may have any interest or right, and, consistent with the foregoing, to minimize the incidence of further costs and expenses allocable to the Work covered by a Termination Order. Contractor shall hold any materials and information covered by a Termination Order in which Company has or may have an interest, for Company's account and disposition as Company may in due time direct.

7.2 In the event of a termination for convenience hereunder, Company shall pay to Contractor and Contractor shall accept as its exclusive remedy under the Contract, in full settlement of all claims for monies due it, the following amounts, less any advances or progress payments already made on account and less any set off amount to which Company may be entitled:

A. For completed portions of the Work, that portion of the Contract Price specified for, or if not so specified, as reasonably allocable to, completed Work which conforms to the Contract;

B. For incomplete Work in progress, the actual total costs incurred by Contractor to the date of termination which are properly allocable or apportionable, according to generally accepted accounting practices, to any incomplete Work in progress, plus a reasonable profit thereon; and

C. The reasonable expenses incurred by Contractor in carrying out the Termination Order, but not including damages or lost profits in any case.

7.3 The total amounts payable by Company to Contractor hereunder shall in no event exceed that portion of the total Contract Price, for or reasonably allocable to, the terminated portion of the Work performed.

7.4 Prior to any payment hereunder, Company may in its sole discretion audit the books and records of Contractor pertaining to the terminated portion of the Work performed. Prior to final payment by Company of any amounts due Contractor hereunder, Contractor shall identify the Work for which such payment amounts are claimed. Contractor shall upon Company's demand, deliver all Work Product to Company or its designee as directed by Company. Contractor shall maintain and cause each of its subcontractors to maintain a true and correct set of records pertaining to all Work for a period of two years after completion of the Work under any Purchase Order and/or Work Authorization, which Company or its duly authorized representative shall have the right at all reasonable times to inspect. The parties agree that Company's scope of audit shall not extend to those of Contractor's records which reflect costs embodied in fixed fees, fixed rates, or expressed as percentages of other costs. Company shall have the right to obtain statements from any of Contractor's personnel to the extent it deems necessary to verify such performance and cost and Contractor shall make personnel available at their assigned locations if still under employment with Contractor to Company's representatives. Upon completion of such delivery, Company shall make final payment, subject to Section 4.

8. CANCELLATION FOR CAUSE

8.1 Company reserves the right to cancel at no cost to Company all or any part of the unperformed portion of the Contract if (a) Contractor fails to make progress or otherwise

endangers performance of the Contract and does not cure such failure within a period of fifteen (15) days (or such longer period as may be mutually agreed upon) after receipt of notice from Company specifying such failure, or (b) Contractor breaches any of the terms of the Contract, or (c) in the event of the happening of any of the following:  insolvency of Contractor; filing of a voluntary or involuntary petition in bankruptcy which is not vacated within 30 days from date of filing; the appointment of a receiver or trustee for Contractor; the execution  of a composition with creditors of any agreement of like import.  In any cancellation for cause hereunder, Company may take possession of and utilize in completing the Work all Documents, Plans and Specifications, work in progress and Work Product and such materials and information as may be necessary therefore.

8.2     Contractor hereby expressly agrees and stipulates that its failure to deliver to Company possession of such materials and information, and work on demand, as provided herein, will cause and result in irreparable harm to Company for which there would be not adequate remedy at law.  These provisions shall be cumulative and additional to any other or further remedies provided under the Contract at law or in equity.  Any cancellation hereunder shall not thereby excuse Contractor from performing uncanceled Work on the Contract.  If after any cancellation under this Section 8 it is determined that such cancellation was not proper hereunder, all rights and obligations of the Parties shall be governed as though such notice of cancellation had been given pursuant to the provisions of Section 7, "TERMINATION FOR CONVENIENCE".

8.3     Contractor reserves the right to cancel all or any part of the unperformed portion of the Contract if Company breaches any of the terms of the Contract and does not cure such failure within a period of ninety (90) days (or such longer period as may be mutually agreed upon) after receipt of notice from Contractor.

9.     WARRANTY; INDEMNITY

9.1     Contractor warrants that the Work performed hereunder shall be of good professional quality and in accordance with the requirements of the Contract.  Contractor further warrants that all Work Product provided hereunder shall be free of defect in workmanship and materials and conform to good professional standards as well as all Applicable Laws, Applicable Permits and Government requirements.  Company's approval of Contractor's Work Product shall not be deemed to relieve Contractor from any obligation hereunder.

9.2     For any Work Product provided by Contractor to Company under the Contract, Contractor has full power and authority to transfer title or grant any license herein granted without the consent of any other Party, and any and all Work Product are delivered free of any rightful claim of any third party by way of infringement or otherwise arising from or related to the claimed rights in any Work Product or Company's exercise of its rights under the Contract.  Contractor shall indemnify Company for any payments, royalties, costs, fees, expenses or otherwise that result from a breach of this Section 9.2.

9.3     Any software delivered under the Contract shall perform in accordance with any and all documentation, prepared by Contractor or by any party and Contractor jointly, referencing in any manner the performance and functionality of the software; and the software, when delivered, will have no encryption functionality, will be free of viruses or other intentionally disabling code and the software shall be delivered free of "keys," "time bombs," "time locks," or other similar devices that could interfere with Company's uninterrupted and unfettered use of the software.

9.4     No open source, shareware, software, code or firmware delivered to Company will contain any materials licensed under a license agreement that requires that derivative

works of such materials be provided to the licensor or recipient of such derivative works with a right of use, redistribution or modification.

9.5 To the maximum extent permitted under Applicable Law, Contractor hereby agrees that it shall defend, indemnify, and hold harmless Company, its Affiliates and their respective directors, officers, employees, and agents against any and all Losses on any basis whatsoever, which arise or may arise or result in whole or in part from (a) the performance of the Work (b) an intentional or negligent act or omission of Contractor or anyone directly or indirectly employed by, or responsible to Contractor or any Subcontractor of Contractor, or any other Person for whose acts Contractor may be liable (c) the death or injury of any employee or agent of Contractor, any of its affiliates, any subcontractor of Contractor, or any other person for whose acts the Contractor may be liable, regardless of how caused and regardless of whether or not it is caused in whole or in part by any of the persons indemnified hereunder, excepting only such Losses as are proximately caused by the sole act or omission of Company, its employees or agents, and (d) for any violation of Exhibits A-C. **THE FOREGOING INDEMNITY SHALL APPLY REGARDLESS OF WHETHER SUCH LOSSES ARISE OUT OF THE NEGLIGENCE, GROSS NEGLIGENCE OR STRICT LIABILITY OF COMPANY.**

9.6 Contractor shall indemnify, defend and hold harmless Company and its Affiliates, and their respective directors, officers, employees and agents against any and all Losses based upon a claim of patent infringement, of the goods or designs provided or furnished by Contractor hereunder, and not originally furnished by Company. **THE FOREGOING INDEMNITY SHALL APPLY REGARDLESS OF WHETHER SUCH LOSSES ARISE OUT OF THE NEGLIGENCE, GROSS NEGLIGENCE OR STRICT LIABILITY OF COMPANY.**

9.7 If Company brings an action to enforce the terms of the Contract, it may recover from Contractor its reasonable costs and attorneys' fees expended in connection with such an action.

9.8 With respect to third-party claims and all other claims under this Section 9, Section 10, Section 11, Section 14 and Section 24, all claims for indemnification by any Indemnified Party hereunder shall be asserted and resolved as set forth in this Section 9.8.

A. In the event that any written claim or demand for which either Party, as the case may be (an "Indemnifying Party"), would be liable to the other Party (an "Indemnified Party") hereunder is asserted against or sought to be collected from any Indemnified Party by a third party, such Indemnified Party shall promptly, but in no event more than thirty (30) calendar days following such Indemnified Party's receipt of such claim or demand, notify the Indemnifying Party of such claim or demand and the amount or the estimated amount thereof to the extent then feasible (which estimate shall not be conclusive of the final amount of such claim or demand) (the "Claim Notice"); provided, however, that the Indemnified Party's failure to provide such notice within thirty (30) calendar days shall not preclude the Indemnified Party from being indemnified for such claim or demand, except to the extent that the failure to give timely notice results in the forfeiture of substantive defenses by the Indemnifying Party.

B. Unless the matter relating to the Claim Notice requires quicker action, the Indemnifying Party shall have thirty (30) calendar days from the personal delivery or mailing of the Claim Notice (the "Notice Period") to notify the Indemnified Party (i) whether the Indemnifying Party disputes the liability of the Indemnifying Party

**Solar Turbines**

*A Caterpillar Company*

**Turbomach**

*A Caterpillar Company*

to the Indemnified Party hereunder with respect to such claim or demand and (ii) whether it desires to defend the Indemnified Party against such claim or demand.

C.  All costs and expenses incurred by the Indemnifying Party in defending such claim or demand shall be a liability of, and shall be paid by, the Indemnifying Party. Except as hereinafter provided, in the event that the Indemnifying Party notifies the Indemnified Party within the Notice Period that it desires to defend the Indemnified Party against such claim or demand, the Indemnifying Party shall have the right to defend the Indemnified Party by appropriate proceedings and shall have the sole power to direct and control such defense. If any Indemnified Party desires to participate in any such defense, it may do so at its sole cost and expense.

D.  The Indemnified Party shall not settle a claim or demand without the consent of the Indemnifying Party. The Indemnifying Party shall not, without the prior written consent of the Indemnified Party, settle, compromise or offer to settle or compromise any such claim or demand on a basis that would result in the imposition of a consent order, injunction or decree that would restrict the future activity or conduct of the Indemnified Party or any Affiliate thereof.

E.  If the Indemnifying Party elects not to defend the Indemnified Party against such claim or demand, whether by not giving the Indemnified Party timely notice as provided above or otherwise, then the amount of any such claim or demand or, if the same be contested by the Indemnified Party, then that portion thereof as to which such defense is unsuccessful (and the reasonable costs and expenses pertaining to such defense), shall be the liability and obligation of the Indemnifying Party hereunder.

F.  To the extent the Indemnifying Party shall direct, control or participate in the defense or settlement of any third-party claim or demand, the Indemnified Party shall give the Indemnifying Party and its counsel, without charge, access to, during normal business hours, the relevant business records and other documents, and shall permit them to consult with the employees and counsel of the Indemnified Party. The Indemnified Party shall use its commercially reasonable in the defense of all such claims or demands. Notwithstanding the foregoing, the Indemnified Party shall have the right to employ separate counsel at the Indemnifying Party's expense and solely to control its own defense of such asserted liability, if in the reasonable written opinion of counsel to the Indemnified Party, a conflict or potential conflict exists between the Indemnifying Party and the Indemnified Party that would make such separate representation necessary under the applicable canons of ethics; provided, however, that the Indemnified Party shall not settle or compromise any claim or demand without the consent of the Indemnifying Party, such consent not to be unreasonably withheld.

10.  INSURANCE

10.1  Contractor agrees to maintain, at its sole cost and expense, Professional Liability Insurance from an insurer acceptable to Company for the benefit of Company in the face amount of no less than One Million Dollars ($1,000,000.00), to provide protection from claims arising out of performance of Contractor's Professional Services under the Contract caused by any errors, omissions, or other negligent acts for which Contractor may be legally liable. Contractor shall furnish Company on request acceptable insurance certificates evidencing such insurance. Such insurance shall be endorsed to include Company as a named insured and shall be kept in effect, and so evidenced by such

**Solar Turbines**

*A Caterpillar Company*

**Turbomach**

*A Caterpillar Company*

REV. 12 March 2014

certificates, through the term of Contractor's Work under the Contract and for a period of three (3) years thereafter.  Any self insurance amounts shall be clearly indicated on certificates.

10.2    If any Work will be performed at the Site or a Company site or facility, then unless a higher amount of coverage is specified in a Purchase Order or a higher amount is appropriate to protect Contractor from claims which may arise out of or result from Contractor's operations under the Contract, whether such operations be by Contractor or by a Subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable, Contractor shall obtain and maintain the coverages set forth below with insurance companies acceptable to Company.  The limits set forth are minimum limits and shall not be construed to limit Contractor's liability.  All costs and deductible amounts shall be for the sole account of Contractor, its Sub Contractors or its subcontractors.  All policies required by Company pursuant to the Purchase Order (or otherwise) shall name Company as an additional insured (except Worker's Compensation and Professional Liability coverage, if required) (per ISO Endorsement #CG 2026 or its equivalent) and waive subrogation rights in favor of Company.  All policies shall also be designated as primary coverage to any similar coverage carried by Company.

(i)      Worker's Compensation and Employers' Liability Insurance providing benefits as required by Applicable Law; with a minimum limit of $1,000,000 per occurrence or limits set by Applicable Law, which ever is greater;

(ii)     Commercial General Liability Insurance (Occurrence Coverage) including products, completed operations, contractual liability coverage of indemnities contained in the Contract (if applicable) and Contractor's contingent liability for Subcontractors with a combined single limit of liability of $1,000,000 per occurrence for bodily injury or death and property damage;

(iii)    Business Automobile Liability Insurance (Occurrence Coverage) for owned, non-owned, and hired automotive equipment with a minimum combined single limit of liability of $1,000,000 for each occurrence for bodily injury and property damage;

(iv)    Umbrella/Excess Liability Insurance (Occurrence Coverage) will be required in excess of items (i) through (iii) above, depending upon the type of work performed provided;

(v)     If the scope of Work under the Contract includes design or engineering or other professional services, Company will have the option of requiring, by notice to Contractor, an Errors or Omissions Liability policy with coverage deemed appropriate by Company; and

(vi)    If designated on the face of a Purchase Order, Contractor must provide a minimum limit of $2,000,000 per occurrence for Commercial General Liability ("CGL") and Business Automobile Liability ("BAL"), or may provide $1,000,000 per occurrence coverage for CGL and BAL, with umbrella/excess coverage of $1,000,000 per occurrence.

10.3    Company shall not insure nor be responsible for any Loss or damage to property of any kind owned or leased by Contractor (including any Sub Contractor or Sub Subcontractor), its employees, servants or agents

10.4    Contractor shall not commence work or provide supplies or Services under the Purchase Order until all insurance as required hereunder has been obtained, and certified copies of such insurance policies or certificates of insurance have been submitted to and accepted by Company. Should Contractor commence performance of the Work, with or without the knowledge of Company, before providing such certificates of insurance to Company or before Company has approved the insurance coverage, it shall not constitute a waiver by Company of the requirement, and Company may require Contractor to stop work until satisfactory insurance has been acquired and certificates thereof furnished to Company.

10.5    Each insurance policy required by the Contract shall be endorsed to state that coverage shall not be suspended, voided, canceled by either Party, reduced in coverage or in limits except after thirty (30) calendar days written notice by certified mail, return receipt requested, has been given to Company.  Promptly following request by Company, Contractor shall deliver Certificates of Insurance in a form satisfactory to Company evidencing the existence of insurance required by the Contract.

10.6    Any policy of insurance pertaining to the Work and submitted by Contractor must be acceptable to Company.  Insurers must have a minimum rating of "A VII" (A7) as evaluated by the most current A.M. Best Rating Guide. If the insurer has a rating of less than A VII, Contractor must receive specific written approval from Company's Representative prior to proceeding with the Work.

10.7    Contractor shall also comply with any insurance requirements imposed by Customer or any other Person owning or managing the Site.

10.8    Contractor shall indemnify and hold Company harmless from and against any and all liabilities, claims, costs, expenses, penalties, sanctions or responsibilities of any kind which may be asserted at any time by reason of its breach of the foregoing warranties.

11.    TITLE TO WORK PRODUCT

11.1    Contractor retains ownership and the unlimited right to the use of all of the Contractor IP. Contractor hereby grants to Company and its subsidiaries and affiliates a perpetual, paid up, royalty free, world-wide uncancellable license to use and make derivative works from the Contractor IP insofar as it is incorporated in the Work Product or needed, or helpful to use the Work Product.  Contractor expressly acknowledges that any and all Work Product created under the Contract shall constitute a "work made for hire" as defined by Section 101 of the Copyright Act. All rights, title and interest in and to all Work Product (including intellectual property, trade secrets, patent rights or copyright interests) and or other subject matter prepared or produced by or on behalf of Contractor during the performance of the Work shall vest in Company. For any software constituting the Work Product under the Contract, Contractor shall provide to Company:  (i) the machine readable object code version of the software; (ii) the software source code in both human and machine readable format; (iii) full documentation and annotations associated with the software; and (iv) any and all programmer notes, documentation, and software tools which are helpful or necessary to maintain, debug, modify, alter, or otherwise build, decompile, use and support the software. Contractor shall, at Company's request, execute (1) an assignment in a form satisfactory to Company assigning to Company such rights, title, and interests to any such subject matter so prepared or produced, and (2) all other documents which Company deems necessary for the preparation, issuance, procurement and maintenance of intellectual property (including copyright interests, trade secrets or patent rights) under Applicable Laws of the United States or foreign Governments.  For all other materials and information provided to Company by or on behalf of Contractor, Contractor shall provide Company the right to the use of all such

materials and information.  Contractor agrees to indemnify Company and hold it harmless from and against any liability, costs and losses based upon infringement related to Company's use of materials or information furnished hereunder.

11.2    Contractor warrants that it has executed all necessary documentation with its employees to ensure the licenses granted above.

12.    PERFORMANCE BOND AND LABOR AND MATERIAL PAYMENT BOND

Company shall have the right at any time to require Contractor to furnish bonds covering the faithful performance of the Contract and/or the payment of all obligations arising thereunder.

13.    INDEPENDENT CONTRACTOR

13.1    It is understood that Contractor's Personnel assigned to perform Professional Services hereunder shall be and remain Personnel of Contractor whether Services are performed at Contractor's facilities or Company's facilities, and are not and shall not for any purpose be considered Company's Personnel.  Each Party will be solely responsible for: (a) paying all wages and other compensation to its employees; (b) withholding and payment of federal and state individual income tax, Federal Insurance Contributions ("FICA"), Federal Unemployment Tax ("FUTA") and other taxes and applicable amounts with respect to payments made to its employees; (c) providing all insurance and other employment related benefits to its employees; and (d) making any overtime payments to its employees if required by Applicable Laws. Upon Company's request, Contractor shall provide Company with proof of unemployment insurance coverage and the immigration status of any persons Contractor employs for the performance of the Professional Services.  Contractor indemnifies, defends, and holds Company harmless from and against any and all liabilities associated with Contractor's obligations as an employer hereunder.

13.2    Contractor shall indemnify, defend, and hold Company harmless from and against any and all liabilities associated with Contractor's tax obligations related to any payments under the Agreement.

13.3    Contractor's relationship to Company hereunder is one of independent contractor and nothing contained in this Contract, SOW(s), or Purchase Order(s) shall be construed to imply that Contractor or any of Contractor's Personnel is an employee or agent of Company for any purpose.  Contractor shall have no right, power or authority to create any obligation, expressed or implied, or to make any representation on behalf of Company, except as may be expressly authorized from time to time by Company in writing and then only to the extent of such authorization.  Nothing herein is to imply an agency, joint venture or partner relationship between the Parties.

14.    LIENS AND CLAIMS

14.1    If at any time there shall be evidence of any Lien or claim for work or materials furnished in the performance of the Work, Company shall have the right to retain out of any payment due or thereafter to become due under the terms of this or any other current or future contract with Contractor an amount sufficient to completely indemnify Company or Customer or both against any such Lien or satisfy such claim, from such retention.  If final payment has been made hereunder or if such retention is insufficient to provide such indemnity or to discharge such Lien or satisfy such claim, Contractor shall promptly either

**Solar Turbines**

*A Caterpillar Company*

**Turbomach**

*A Caterpillar Company*

REV. 12 March 2014

pay Company such sum as is required to accomplish such provisions, discharge, or satisfaction, or obtain at Contractor's expense a bond as required to discharge such Lien or claim.

14.2     Company also has the right to require from Contractor as a condition prior to final payment or after such payment satisfactory releases, satisfactions, or waivers of all claims, Liens, and claims for Liens and assignments of any sums due hereunder to Contractor's workers and material men, or any labor or furnished materials under, or in connection with performance of the Contract.

15.     NO CONSEQUENTIAL LOSSES, ETC.

WITH THE EXPRESS EXCEPTION OF CONTRACTOR'S OBLIGATIONS UNDER SECTION 19 (RELEASE OF INFORMATION), SECTION 24 (COMPLIANCE WITH LAWS) AND INDEMNITY OBLIGATIONS UNDER THE CONTRACT, NEITHER COMPANY NOR CONTRACTOR SHALL BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL LOSS ARISING FROM ANY BREACH OF ANY OBLIGATION UNDER THE CONTRACT.  .

16.     NO WAIVER

16.1     The failure of either Party to exercise a right provided it by the Contract shall not by itself be deemed a waiver of that right; nor shall waiver of a right in a particular circumstance by itself be deemed a waiver of that same right or any other right in any other circumstances.

16.2     No custom or practice which may develop between the Parties in the administration of the Contract be construed to waive or lessen the right of a Party to insist upon the performance by the other Party in strict accordance with all of the provisions of the Contract.

17.     NOTICES

17.1     All notices and other communications under the Contract shall be in writing and delivered (a) personally, (b) by registered or certified mail with postage prepaid, and return receipt requested, (c) by recognized overnight courier service with charges prepaid or (d) by facsimile transmission, directed to the person and address set forth on the Purchase Order.  Otherwise, such attempted or purported notice shall be void and of no effect for any purposes whatsoever.

17.2     Either Party may change the address to which notices and other communications hereunder can be delivered by giving the other Party notice in the manner herein set forth.  A notice or other communication shall be deemed delivered on the earlier to occur of (i) its actual receipt, (ii) the third (3rd) business day following its deposit in registered or certified mail, with postage prepaid and return receipt requested, (iii) the second business day following its deposit with a recognized overnight courier service, or (iv) the business day it is sent by confirmed facsimile transmission (if sent before 5:00 p.m. local time of the receiving Party) or the next business day (if sent after 5:00 p.m. of such local time).

18.     NO IMPLIED LICENSES

18.1     The Contract shall not be construed to create any implied license or licenses and no rights are implied, inferred, or otherwise created hereby, except as expressly set forth herein, as consistent with Applicable Law.

**Solar Turbines**

*A Caterpillar Company*

**Turbomach**

*A Caterpillar Company*

REV. 12 March 2014

18.2 Without the prior express written consent of Company, Contractor shall not use the names of or make reference to "Solar" or "Caterpillar", except as provided elsewhere in the Contract to identify the property or interest of Company; nor shall Contractor use or trademark, any brand name of Company or Caterpillar Inc. in conjunction with its own business activities.

19. RELEASE OF INFORMATION

19.1 Contractor, its Sub Contractor(s), Affiliates, employee(s), agent(s) and/or consultant(s) shall not release for publication or dissemination any article, brochure, advertisement, engineering paper, prepared speech, or other information concerning the Contract, without having prior written consent from Company.  Contractor shall not affix its name, nameplates, logos, decals, signs, or insignias to the Work without having the prior written consent of Company.

19.2 The provisions of this Section 21 shall in no way restrict Contractor's obligation to conform with the requirements of Company's Plans and Specifications or codes applicable to the Work.

19.3 In its preparation for or performance of a Purchase Order, Contractor may receive or become exposed to Company's proprietary information (or a third party's proprietary information, such as Company's customer specifications), including designs, Plans and Specifications, instructions, forecasts, trade secrets, data or "know how" pertaining to the Work covered by the Purchase Order or Contractor's performance of this Order (collectively, "Proprietary Information"). Proprietary Information shall not include information that (a) is already known by Contractor prior to the disclosure by the Company; (b) is or becomes available to the general public through no act or fault of Contractor; or (c) is rightfully disclosed to Contractor by a third Person not under a similar obligation to maintain the information in confidence.  If Contractor wishes to rely on the exceptions contained in clauses (a), (b) or (c) above, then Contractor must demonstrate to the Company the facts underlying why the exception applies within thirty (30) calendar days of receipt of the Proprietary Information from Contractor.  Contractor agrees to maintain the confidentiality of all Proprietary Information, and specifically agrees (i) to take all actions reasonably necessary under the circumstances to maintain the confidentiality of the Proprietary Information; (ii) to use Proprietary Information only in Contractor's preparation for or performance of the Purchase Order; (iii) to limit access to Proprietary Information to only those employees within Contractor's company who have a need to know, and inform these employees of the provisions of this clause; (iv) to conspicuously mark all documents and electronic files containing Proprietary Information as confidential and the property of the Company; (v) not to copy documents or electronic files that include Proprietary Information, or allow them to be copied, except as required for Contractor's efficient performance of the Purchase Order; (vi) not to use Proprietary Information for the benefit of any Person or entity other than the Company; and (vii) not to transmit or disclose Proprietary Information to others without the prior written consent of the Company.

20. ASSIGNMENT; DELEGATION; CHANGE IN CONTROL.

20.1 Contractor shall not assign its rights or delegate its duties under the Contract without the express prior written consent of Company and any purported assignment or delegation without such consent shall be void and of absolutely no legal force or effect.

20.2 Contractor shall give notice to Company in the event of any Change of Control affecting Contractor.  "Change of Control" means Contractor is no longer controlled or a significant

**Solar Turbines**

*A Caterpillar Company*

**Turbomach**

*A Caterpillar Company*

REV. 12 March 2014

portion of the assets of Contractor are no longer controlled (as such term is defined in the definition of Affiliate) by the same Persons who control Contractor on the date of the applicable Purchase Order.

21.   SUCCESSIONS

Unless otherwise expressly agreed in writing, all rights, covenants, warranties, obligations, duties, and liabilities created by or arising under the Contract shall inure to the benefit of, or bind, as the case may be, the respective successors in interest of the Parties thereto.

22.   SET OFF

Company shall have the right to set off any amount due and payable under the Contract against any claim(s) or disputed amounts under the Contract, another Contract or any other agreements or contracts existing between the Parties and their respective Affiliates.

23.   APPLICABLE LAW; VENUE; WAIVER OF JURY TRIAL

23.1   The Parties agree that these General Terms and Conditions of Contract for Professional Services and the Contract bears a reasonable relationship to the State of Texas and that these General Terms and Conditions of Contract for Professional Services and the Contract shall be governed by the laws of the State of Texas, which shall apply in any dispute between the Parties relating to or arising out of these General Terms and Conditions of Contract for Professional Services or a Contract.    Contractor expressly agrees to the provisions of the Anti-Corruption Compliance Clause attached hereto as Exhibit C.

23.2   ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THE CONTRACT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF EITHER OF THE PARTIES MAY BE BROUGHT AND MAINTAINED IN THE COURTS OF THE STATE OF TEXAS SITTING IN THE HARRIS COUNTY, TEXAS OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY PROPERTY IN WHICH COMPANY HAS A SECURITY INTEREST MAY BE BROUGHT, AT COMPANY'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE SUCH PROPERTY MAY BE FOUND.    EACH OF THE PARTIES HERETO HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF TEXAS SITTING IN THE HARRIS COUNTY, TEXAS AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH LITIGATION.

23.3   EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF TEXAS.    EACH OF THE PARTIES HERETO HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**Solar Turbines**

*A Caterpillar Company*

**Turbomach**

*A Caterpillar Company*

REV. 12 March 2014

23.4    EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THE CONTRACT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF ANY PARTY.

24.    COMPLIANCE WITH LAW

24.1    Contractor, for itself and its Sub Contractor(s), expressly warrants that it and they shall comply with all Applicable Laws during the performance of the Work hereunder. Contractor shall promptly indemnify and hold harmless Company against any and all Losses which may be asserted by any Person at any time by reason of Contractor's breach of the foregoing warranties.   THE FOREGOING INDEMNITY SHALL APPLY REGARDLESS OF WHETHER SUCH LOSSES ARISE OUT OF THE NEGLIGENCE, GROSS NEGLIGENCE OR STRICT LIABILITY OF COMPANY.

24.2    Contractor shall at its sole expense obtain and maintain all Applicable Permits required by Applicable Law for the performance of its obligations under the Contract. Contractor's Personnel will meet the same standards as apply to Contractor.

24.3    Contractor shall provide, or cause to be provided, to Company, upon written request, a copy of any Applicable Permit or other documentary evidence as reasonably required by any Government having jurisdiction, to demonstrate Contractor's compliance herewith.

24.4    Contractor further warrants that it has made and shall make no payment in money or money's worth for any reason whatsoever to any director, officer, employee, agent or customer of Company.    Contractor understands that in the course of providing Professional Services under the Contract, Contractor shall receive, handle, store, or otherwise be granted access to Company information. Contractor agrees that it shall comply with all Applicable Laws of the United States and any other applicable countries with regard to the receipt, handling, storage, dissemination, transfer or release of such information. Without limiting the generality of the foregoing, Contractor understands and accepts that the transfer, release, export, deemed export, re-export, dissemination, or distribution, whether direct or indirect, of any such information may be subject to regulation under U.S. Laws. Contractor agrees that it will not make, cause, or facilitate any release, export, re-export, deemed export, dissemination, distribution, or other form of transfer, directly or indirectly, of any information to any destination or person, or for any use, restricted under U.S. Laws, unless Contractor first obtains all required government authorizations, such as from the U.S. Department of State, U.S. Department of Commerce, the U.S. Department of Treasury, or any other governmental agencies, as applicable.   Contractor shall have sole responsibility for obtaining all such government authorizations, if any, unless otherwise agreed to by Company in writing.   Contractor shall promptly notify Company in accordance with Section 19 of this Contract, of any known or suspected breach of this section.

24.5    Any time it performs Professional Services that: (1) neither Contractor, nor any of its principals used in the course of providing Professional Services to Company are presently debarred, suspended, or proposed for debarment by the U.S. government (see Federal Acquisition Regulation ("FAR") 52.209-6); (2) Contractor has filed all compliance reports required by the Equal Opportunity clause (see FAR 52.222-22); and (3) Contractor's representations to Company about U.S. Small Business Administration or state and local classifications, including but not limited to size standards, ownership, and control, are accurate and complete. Contractor recognizes that it has a duty to maintain

**Solar Turbines**

*A Caterpillar Company*

**TURBOMACH**

*A Caterpillar Company*

REV. 12 March 2014

its size requirements for the duration of the Contract and must immediately notify Company if there is a change in its size standard, ownership, or control.

24.6 Contractor has not acted, will not act, and has not and will not cause, directly or indirectly, any other party to act, in any manner that would cause Company and its Affiliates, and its and their directors, officers, employees and agents, to violate any Applicable Laws and agrees that it will ensure that all Export Authorizations are obtained prior to the provision of Professional Services, including but not limited to obtaining any Export Authorizations necessary for the export, re-export, deemed export or deemed re-exports by or to any non-U.S. persons in the U.S., or persons located outside of the U.S., that will perform Professional Services, at its sole cost and expense.   Upon Company's request, Contractor shall at its expense provide to Company in a timely manner any and all material, documentation, information, data, or certification(s) regarding Contractor's compliance with any Applicable Laws and this section.

## 25. ASSURANCE OF PERFORMANCE

25.1 Contractor agrees that, upon request by Company, Contractor shall execute and deliver those documents, and will do any and all such acts and things, as may reasonably be required to carry out its obligations hereunder and to consummate the transactions contemplated hereby.

25.2 When reasonable grounds for insecurity arise with respect to the performance by Contractor of any obligations under the Contract, Company may in writing demand adequate assurance of due performance and, until it receives such assurance, may if commercially reasonable, suspend any payment for which it has not received the agreed performance.  After receipt of a justified demand, failure to provide within a reasonable time not exceeding thirty (30) calendar days such assurance of due performance as is adequate under the particular circumstances may be deemed at the option of Company to be a repudiation and material breach of the Contract.

25.3 For the purposes hereof, insolvency, the filing of a petition in bankruptcy, or the entering into of an arrangement for the benefit of creditors shall be deemed to be a "reasonable grounds for insecurity".

## 26. SPECIFICATIONS; DESIGNS

26.1 If applicable, Contractor shall submit to Company prior to receiving final payment "As Built" documents and all documentation required.

26.2 Contractor expressly agrees that all Work Product are commissioned at Company's request and direction shall be considered a "work-made-for-hire" under the copyright laws of the United States and are the property of Company.  Contractor shall not use or disclose to others, without the express prior written consent of Company, any Work Product or any such information and material furnished by Company or developed by Contractor in the course of the Work.26.3       Contractor agrees to:  (a) promptly and fully inform Company in writing of any Inventions developed hereunder; (b) assign, and Contractor hereby assigns to Company all rights and interests in and to such Inventions including, without limitation, patent applications and patents granted upon such Inventions; and (c) execute all papers and to perform such other proper acts as Company may deem necessary to perfect the rights, interests and titles in Inventions granted under the Contractor. 26.4       Contractor, in exchange for valuable consideration, the receipt and sufficiency are hereby acknowledged by Contractor, hereby irrevocably assigns and transfers to Company all right, title and interest worldwide in and to the Work Product and

Inventions, whether or not patentable or copyrighted, made or conceived or reduced to practice under a Purchase Order, and to all modifications and derivative works thereof and to all intellectual property rights related thereto.

27.     PERSONNEL.

27.1    <u>Removal</u>. In the event that any services are unsatisfactory in the sole discretion of Company, then Company shall have the option to (i) request the replacement of any Contractor Personnel in which case Contractor shall replace such individual(s) at its own cost.  Company will not be liable for the removed personnel's time for any period after the demand for removal, nor for any time that Company (in good faith) believes to have been falsely or otherwise improperly billed to Company.  If the replacement request has not been resolved to Company's satisfaction within sixty (60) days after Company submits the request to Contractor, Company may terminate this Contract or the applicable SOW(s) or Purchase Order(s) at any time thereafter by providing written notice to Contractor, such notice to be effective as of the date indicated in the notice.

27.2    <u>Key Personnel</u>.  The parties agree that the services of the Contractor's personnel designated as "key personnel" in the applicable SOW are essential to the satisfactory performance by Contractor of the services to be provided thereunder.  Company reserves the right to approve the appointment of and replacements for all key personnel.  Except for disability, death or involuntary termination, key personnel will not be removed by Contractor from the applicable Company project without Company's consent.  If Key Personnel leave the project (for any reason), and are not replaced within thirty (30) business days by personnel acceptable to Company, Company may replace such key personnel with Company employee(s) or third party personnel.

27.3    <u>Sensitive Projects</u>.  For specific projects requiring access to highly confidential information or projects deemed sensitive by Company, Contractor will identify in the applicable SOW each of Contractor's personnel who will provide services for the project.  Upon request by Company, Contractor will restrict such personnel from working on projects for identified Company competitors for the period of time identified in such schedule(s).  Company may require such personnel to sign additional confidentiality and non-compete agreements as a condition of their assignment on the project.

28.     OTHER PROVISIONS

28.1    The Contract constitutes the entire agreement between the Parties pertaining to the subject matter thereof, and supersedes any and all prior and contemporaneous agreements, understandings, negotiations, discussions, written and oral, between the Parties pertaining to the Work.

28.2    The agreement to be bound by these General Terms and Conditions of Contract for Professional Services may be executed by the Parties in several counterparts, each of which shall be deemed to be an original and all of which shall constitute together but one and the same agreement.

28.3    The Contract is made and entered into for the sole protection and legal benefit of the Company, Customers and Contractor, and the Persons indemnified hereunder, and their permitted successors and assigns, and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, the Contract.

**Solar Turbines**
*A Caterpillar Company*

**Turbomach**
*A Caterpillar Company*
*REV. 12 March 2014*

28.4    If any provision or provisions hereof shall be deemed by any court of competent jurisdiction to be for any reason unenforceable, the balance of the Contract shall be given effect consistent with the Applicable Law of that jurisdiction.

28.5    The headings of sections of the Contract are included only for the convenience of the reader, and shall not affect the construction or interpretation of any of the provisions of the Contract.

28.6    No amendment, addendum, modification, variation, or alterations of the Contract or of any provisions thereof shall be binding unless in writing executed by the Party to be bound thereby.

28.7    The Contract is the result of arms-length negotiations between two commercial Persons and any ambiguities or uncertainties in it shall not be construed for or against either Party, but shall be construed in a manner that most accurately reflects the intent of the Parties when the Contract was executed.

28.8    The Parties each agree to execute, acknowledge, deliver and file or cause to be executed, acknowledged, delivered, and filed such further documents or other papers and to do all such things and acts, as may be reasonably requested by the other Party, in order to carry out the provisions and purposes of the Contract and the Work.

28.9    The duties and obligations imposed by the Contract and the rights and remedies available thereunder shall be in addition to and not a limitation of any duties, obligations, rights and remedies otherwise imposed or available by law or in equity.

28.10   Contractor shall pay all royalties and license fees and shall defend all suits or claims for infringement of any patent rights and shall save Company harmless from loss on account thereof, but if Contractor has reason to believe that the design, process or product specified is an infringement of a patent, then it shall be responsible for such loss unless it promptly gives such information to Company's Representative28.11    Nothing herein shall prevent Company from hiring Contractor Personnel who respond to a general or public advertisement by Company.

29.    LIST OF EXHIBITS

Exhibit A: CONTRACT/AGENCY WORKER GUIDELINES

Exhibit B: AGREEMENT (To be filled out and signed by each Contractor employee performing work under a Purchase Order)

Exhibit C: COMPLIANCE


The person signing on behalf of Supplier below represents and warrants that he or she is authorized to bind Supplier to the Terms and Conditions.

———————————————————————

**AGREED TO AND ACCEPTED:**

SUPPLIER COMPLETE LEGAL NAME: Ness Deutschland GmbH
————————————————————

**Solar Turbines**

*A Caterpillar Company*

**Turbomach**

*A Caterpillar Company*

*REV. 12 March 2014*

SIGNATURE: *Rocco Cozza*

PRINT NAME: Rocco Cozza

TITLE: Managing Director

DATE: Mar 14, 2014

*Paul Lombardo*

Paul Lombardo

President

Mar 14, 2014

**Solar Turbines**

*A Caterpillar Company*

**Turbomach**

*A Caterpillar Company*

REV. 12 March 2014

EXHIBIT A

## CONTRACT/AGENCY WORKER GUIDELINES

Rules of Conduct

Company has developed certain rules to ensure a safe, efficient operation. Violations of these rules by a Company employee may result in disciplinary action, up to and including termination from employment. Contract/Agency Workers are not only expected to follow the guidelines established by their employer, but should also be in compliance with Company guidelines. Company has established rules of conduct for employees that include, but are not limited to, those listed below.  All those working on Company property, employees and all others are expected to adhere to these and all Company guidelines. Further explanation of these guidelines may be found on Company bulletin boards.  Violation of any of the following guidelines may result in the Agency Worker's assignment at Company being terminated:

- Violations of Company safety rules as applicable to the specific facility.
- Failure to wear safety glasses or other required protective equipment in factory areas.
- Violations of Company harassment policies.
- Failure to comply with environmental requirements as applicable to the specific facility.
- Engaging in any unprofessional behavior or language.
- Unauthorized use of Company equipment and material which includes, but is not limited to vehicles, telephones, computer systems, etc.
- Fighting on the job or on Company property.
- Deliberately causing damage or defacing Company property.
- Falsifying Company documents or records, or any documents or records intended for or used by Company.
- Bringing alcoholic beverages, consuming alcohol, or being under the influence of alcohol on Company property.
- Possession of illegal drugs or drug paraphernalia, use or sale of drugs, or being under the influence of drugs, or contributing to the use of drugs by others while on Company property.
- Removing or attempting to remove, without permission or appropriate authorization, Company property or personal property of others from Company premises.
- Using or allowing the use of issued identification by persons other than those for whom the identification was intended.
- Smoking in restricted areas.
- Solicitation on Company premises without permission.
- Possessing a camera on Company property or taking photographs of Company property without authorization.
- Possessing a weapon on Company property. Weapons will include not only those items normally and commonly defined as weapons which can injure a person, but will also include any item that a person intends to use, threatens to use, or does use to inflict physical harm upon a person, regardless of the general intended purpose or use of that item.

Personal Property

Personal property that is not related to the employee's job performance may be disruptive to the work environment and pose safety risks to other employees, thus Company has the right to restrict personal items brought into the workplace.

Contract/Agency Workers are expected to exercise reasonable care to safeguard personal items brought to work. Company is not responsible for the loss, damage, or theft of personal belongings, and workers are advised not to carry unnecessary amounts of cash or other valuables with them when they come to work.

**Solar Turbines**

*A Caterpillar Company*

**Turbomach**

*A Caterpillar Company*

*REV. 12 March 2014*

Contract/Agency Workers are permitted to bring storage containers such as purses, briefcases, and lunch pails for the transportation of appropriate personal items to and from the work area, but will be subject to random checks.

<u>Searches</u>

To maintain security and protect against theft, Company reserves the right to inspect all personal effects brought onto Company property, including vehicles, briefcases, purses, and lunch boxes. In addition, Company may inspect the contents of lockers, storage areas, file cabinets, desks, and work stations at any time and remove all Company property and other items which are in violation of company rules and policies. This policy will be administered according to the following procedures:

•       Searches of personal property may be conducted as workers enter the facility, during their shift, or as they exit the facility. Lockers, desks, file cabinets, and closets may be searched at any time.

•       Workers may be required to open briefcases, purses, and lunch boxes for inspection.

•       Workers may be asked to open their coat or jacket and may be required to remove their coat or jacket for a more thorough inspection of its contents.

•       Contract/Agency Workers may be asked to submit to a search of their personal or company vehicle while the vehicle is on Company property.

Any individual refusing to participate in a search of personal property as described by the procedures stated above, will be immediately removed from Company property and their access privileges to Company property will be removed.

# Solar Turbines
*A Caterpillar Company*

# Turbomach
*A Caterpillar Company*
*REV. 12 March 2014*

EXHIBIT B

AGREEMENT

(To be filled out and signed by each Contractor employee performing work under a Purchase Order)

_____
Last Name        First Name        Middle Initial

I agree to comply with the following ELECTRONIC COMMUNICATION GUIDELINES of COMPANY.

Electronic communications – including any access to or exchange of data via e-mail, the Internet or Intranet, voice mail, or otherwise – are a vital and growing segment of our business communications. Users of these systems are responsible for the communications in which they engage and for the resulting COMPANY records that they create, send forward or save - and for doing so only in accordance with these guidelines.

1.      The electronic communications and information systems and related equipment (the "Systems") are provided by and are the property of COMPANY, as is all information residing on or carried by these Systems.  As a condition of your use of the Systems, you acknowledge and agree that COMPANY may, at its discretion and for legitimate business purposes, inspect, use, or disclose your communications and related information without further notice.  You should have no expectation of personal privacy associated with your use of the Systems.

2.      Unauthorized access to the Systems is prohibited, and COMPANY takes reasonable precautions to secure the systems from such access.  Authorized users must exercise reasonable care to maintain the security of the Systems, including the use and management of required passwords.  However, password protection is for the security of COMPANY and the Systems, and does not imply that communications are private or confidential to individuals.

3.      The Systems are intended for COMPANY business.  You may not use the Systems for personal gain, for purposes not reasonably related to the conduct of COMPANY business, or in any manner that harms other individuals or COMPANY.

4.      Use of the Systems should be businesslike, courteous, and civil, and must comply with laws and regulations such as those regulating trademarks, copyrighted material, threatening or obscene material, and confidential, proprietary, or trade secret information.   Use that is harassing, discriminatory, defamatory, disruptive or offense to others, illegal or criminal, or that involves obscene, vulgar, or sexually explicit content, is prohibited.  Although your use of the Systems indicates your consent that COMPANY may, at its discretion, inspect, use, or disclose any resulting information, such inspection is not systematic or guaranteed.  COMPANY depends upon users to report inappropriate, offensive, illegal material to COMPANY management.

5.      Communication must clearly disclose the originator, sender, and intended recipient.  If you receive a communication by mistake, you should stop reading as soon as you realize it was not meant for you and notify the sender or your system administrator immediately.  It is impermissible, and may be illegal, to purposely read communications intended for another person without permission of that person or of COMPANY.  If you forward a communication originated by someone else, do not make changes without clearly disclosing that you have done so.

6.      Communications out side of COMPANY, for example, via the Internet, Electronic Data Interchanges, direct modem connections, or otherwise, often travel through systems not under the control of COMPANY, and might be intercepted and misused.  Therefore, confidential information must not be communicated outside of COMPANY unless clearly marked as to its confidential status.  Privileged information, such as communications between an attorney and COMPANY, must not be shared without Legal Services approval.

# Solar Turbines

*A Caterpillar Company*

# Turbomach

*A Caterpillar Company*

*REV. 12 March 2014*

7.      Marketing communications as confidential does not necessarily protect them for disclosure or misuse, and COMPANY guidelines might require the use of encryption.  However, encryption may be employed only where COMPANY has authorized its use and has been provided with all the keys necessary for decryption.  You may not intentionally encode or encrypt files to make them unreadable by authorized COMPANY representatives.

8.      Use of the Systems creates records that can be difficult to eliminate.  Communications or related information might be printed or saved and might exist on backup media or otherwise be retrievable from the Systems for indeterminate periods of time.  Therefore, you should be aware that mere "deletion" of a communication does not ensure removal of it or of related information from the Systems.  Consider this when drafting and sending communications.

9.      Various other COMPANY policies, procedures, and practices apply to electronic communications and Systems.   Examples include guidelines established by the Corporate Records Management Program, Corporate Information Services, Corporate Travel Services, Corporate Identity, and your facility and business unit.  It is your responsibility to manage your electronic communications in accordance with all such direction.

Use of the COMPANY Systems is a privilege.  Inappropriate use may result in disciplinary action, up to and including termination.  In addition, failure to follow these guidelines could subject both COMPANY and you, the individual user, to legal liabilities and embarrassment.  You should report any misuse to your supervisor, your facility Human Resources or Information Services manager, or to Security.

_____

Signature

_____

Date

**Solar Turbines**

*A Caterpillar Company*

**Turbomach**

*A Caterpillar Company*

*REV. 12 March 2014*

**EXHIBIT C**
**COMPLIANCE**

Contractor represents and warrants that it has read, understands, and has been in compliance, and agrees that it shall comply, with all applicable laws, rules, regulations, directives, ordinances, orders, or statutes (collectively, the "Laws"), including, but not limited to, the U.S. Foreign Corrupt Practices Act and any applicable anti-bribery Laws of other countries, the U.S. Export Administration Regulations, the International Traffic in Arms Regulations, and the sanctions regulations administered by the U.S. Treasury Department Office of Foreign Assets Control.

Further, Contractor represents and warrants that it has not acted, will not act, and has not and will not cause, directly or indirectly, any other party to act, in any manner that would cause Company, Caterpillar Inc. or any other Caterpillar entity organized under U.S. law, or any U.S. persons employed by Caterpillar (hereinafter, collectively "Caterpillar"), to violate the Laws.  Upon Caterpillar's request, Contractor shall at its expense provide to Caterpillar in a timely manner any and all material, documentation, information, data, or certification(s) regarding Contractor's compliance with the Laws and this Exhibit C.

If Caterpillar, in its sole discretion, has reason to believe that Contractor is not in compliance with the Laws or this Exhibit C, Caterpillar reserves the right to audit, or to have Caterpillar's authorized representatives conduct audits, to ascertain the extent of Contractor's non-compliance with the Laws and this Article.  Contractor agrees to cooperate with Caterpillar's audit.  Contractor agrees that a violation of the Laws or this Article by Contractor shall constitute a material breach of the Agreement and shall relieve Caterpillar of all its performance obligations under this Agreement including, but not limited to, all payment obligations to Contractor.

Contractor agrees to indemnify, defend, and hold harmless Caterpillar, Caterpillar's affiliates, and Caterpillar's and Caterpillar's affiliates' respective directors, officers, employees, agents, successors, and assigns, against demands, liabilities, fines, penalties, losses, and damages (including costs, investigation and litigation expenses and counsel fees incurred in connection therewith) arising out of or related to Contractor's obligations under this Exhibit C.

In the event of any enforcement action against Contractor relating to Contractor's non-compliance with the Laws that reasonably relate to Contractor's performance under this Agreement, Contractor shall provide to Caterpillar written notice of such enforcement action prior to any publication or disclosure of such enforcement action, and in no event later than ten (10) business days following such enforcement action.

# **<u>Exhibit 1</u>**



NESS KE, s.r.o.

# Contract of Employment

concluded according to § 42 and f. of Law No. 311/2001 Coll. Labor Code as amended
(hereinafter as Labor Code) on bellow mentioned day between:

**The Employer:**

| | |
|---|---|
| Commercial Name: | **NESS KE, s.r.o.** |
| Place of Seat: | Továrenská 8, 040 01 Košice |

Company entered in the Companies Register kept with District Court Košice I, section Sro, file No. 37939/V

| | |
|---|---|
| Company Reg. No.: | 48 325 830 |
| Tax Identification No.: | 2120133103 |
| VAT Identification No.: | SK2120133103 |
| Bank connection: | Tatra banka, a.s., |
| IBAN: | SK66 1100 0000 0029 4601 1148 |
| Managers acting on | RNDr. Tomáš Futáš, PhD., Executive Manager of the Company |
| behalf of the Company: | Ing. Zuzana Želinská, PhD., Executive Manager of the Company |

(hereinafter as „the Employer")

and

**The Employee:**

| | |
|---|---|
| Name and Surname: | **xxxxxxxxxxxx** |
| Permanent Address: | xxxxxxxxxxxxxxxxxxxx |
| Date of birth: | xxxxxxxxxxxxxx |
| ID Card No.: | xxxxxxxxxxxxxx |

(hereinafter as „the Employee")

### Article I
### Kind of Work Performed

1. The Employer employs the Employee as .........................................................

2. The Employee will perform following work for the Employer: ....................................
3. Detailed specification of kind of work and its short characteristics / scope of employment is described in Annex No. 1 to this Contract.

### Article II
### Day of Entering a Job

Day of entering a job of the employee was agreed for..................... From this day a Labor relation between the Employee and the Employer rises.



NESS KE, s.r.o.

**Article III**
**Place of Work**

The place of work is a place of seat of the Employer: Továrenská 8, 040 01 Košice.

**Article IV**
**Duration of Employment**

Employment has been agreed for indefinite period.

**Article V**
**Probational Period**

Probational period has been agreed for three months. Probational period will be extended accordingly to period of obstacles to work on the side of the Employee.

**Article VI**
**Working Hours**

Working hours are set according to § 85 of Labor Code in length of 40 (forty) hours a week. Working hours do not include break for rest and meal-break in duration of 30 minutes. The employer determines the beginning and the end of working hours in the form of an internal regulation.

**Article VII**
**Holiday**

Under the conditions laid down by the Labor Code in accordance with the provisions of Section 103 et seq. of the Labor Code, the Employee is entitled to leave. Under the conditions laid down by the Labor Code in accordance with the provisions of Section 103 et seq. of the Labor Code, the Employee is entitled to a leave.

**Article VIII**
**Wage Conditions and Pay-days**

1. The Employee is entitled to wage for work performed. Monthly wage is set with respect to the fact that according to § 121 section 2, the wage also includes remuneration for overtime work in maximum duration allowed by law. Detailed specification and amount of wage is in a Wage Decree forming Annex No. 2 to this Contract.

2. The wage is payable for the previous monthly period always within the 15th calendar day of the following calendar month, transferring funds to the Employee's account.



NESS KE, s.r.o.

3. Employee acknowledges that the Employer shall pay the tax advance and statutory payments to the Social Insurance Company and the Health Insurance Company in accordance with legal regulations in force in the Slovak Republic from any payment of the monetary value (in-kind wage) provided by the Employer to the Employee for the work .

**Article IX**
**Obligations of the Employer**

1. Since the day of Labor relation rise, the Employer is obliged to assign work to the Employee according to contract of employment, to pay him/her wage for work performed a to observe other conditions set by legal regulations or contract of employment as well as by addendums to this Employment Contract.

2. The Employer is in Labor-law relations obliged to treat the Employees according to the principle of equal treatment set for the field of Labor-law relations by special law on equal treatment in some fields and on protection against discrimination and on change and amendment of some laws (anti-discrimination act).

**Article X**
**Obligations of the Employee**

1. The Employee is obliged, in accordance with the instructions of the statutory bodies of the Employer and managers, to carry out in person all the work assigned under a contract of employment in the specified working time, following the instructions of the direct superiors, the rules of employment, the organizational rules, the rules on safety and health at work, regulations laid down by the Employer and other regulations applicable to his / her work, to maintain the discipline of work and rules on the protection of classified facts. The Employee declares that he  informed the employer about all the facts that would hinder the performance of the work or which could cause damage to the Employer.

2. The Contracting Parties have agreed that the Employer is entitled to order overtime work for a maximum of 150 hours a year. Overtime work and its scheduling are governed by the needs of the Employer and ordered in a form of the superior´s order.

3. The Employee is required to keep secret and not to provide third parties with information regarding the activities of the Employer without the prior written consent of the Employer. This information includes any information regarding his business activities, "know-how", but also any other information regarding the Employer. The Employee undertakes not to disclose the actual amount of his / her salary and will not request such information from other employees. The Employee is only allowed to publish the amount of his/her wage with the written consent of the Employer.

4. Breach of the duty of secrecy on the facts referred to in paragraph 3 of this article of the contract is considered a serious violation of the job discipline and is the reason (provision of § 68 of the Labor Code) for immediate termination of employment by the Employer, without prejudice to the Employer's right to compensation as a result of a breach of the duty of secrecy. This obligation persists even after termination of the employment relationship.



NESS KE, s.r.o.

5.  The Employee is obliged to notify in advance the Employer in writing of his/her interest in carrying out a further gainful activity which has a competitive character before the start of the activity. The employee may, in addition to his/her employment performed in the employment relationship, perform  other gainful activity which is of a competitive nature to the subject of the Employer's activity only with the prior written consent of the Employer. When signing this employment contract, the Employee  provides the employer with a complete list of the work activities existing in addition to the agreed employment relationship.

6.  In the event of failure to inform  the Employer under the paragraph 5 of this Article of the contract about the other the employment relationship, the employment relationship established by this contract may be terminated by an immediate termination for a serious breach of the employment discipline.

7.  The Employee is not entitled to receive personal gifts or other benefits from other organization or natural person in connection with  his / her work performed for the Employer.

8.  The Employee may not use alcoholic beverages or other narcotic drugs in the workplace or outside the workplace or start working under their influence.

9.  The Employee is obliged to behave and act in such a way that, by his/her acting, behaving and overall conduct that does not damage the reputation of the Employer, take care of his/her good looks, go to work adequately dressed,  physically and mentally prepared and fully capable of performing work properly.

10. The Employee will take maximum care of the Employer´s property  not to cause harm to the Employer and to protect him from damage, loss, destruction and abuse and shall not act contrary to the Employer's legitimate interests.

11. The Employee agrees with sending him/her to business trips for the necessary period, even repeatedly and outside the territory of the Slovak Republic.

12. In the event of the employment relationship termination, the Employee is obliged to return all records containing confidential information, regardless of whether such records have been prepared or created by the Employee, as well as all the work equipment and other values assigned to the Employee by the Employer during the period and are the property of the Employer , to the Employer.

13. If the Employee receives work equipment and things belonging to the Employer  (e.g. computer, mobile phone, car, etc.), the Employee undertakes to confirm to the Employer in writing, in accordance with § 185 of the Labor Code, the acceptance of these values. During the assignment of such items to an Employee, the Employee is liable for damage of the equipment and things and their loss. In the case of private use of work equipment without the consent of the Employer, the Employee is obliged to compensate the employer for the costs associated with it in full, in particular, the Employee undertakes to pay the Employer the cost of telephone calls made for private purposes using the Employer's devices.

14. The Employee is responsible for the damage caused to the extent stated in the Labor Code.

15. The Employee undertakes that if he / she is involved in a traffic accident and the competent body decides on his / her fault, he / she will replace the difference between the insurance claim and the actual damage caused to the service motor vehicle to the Employer in accordance with the provisions of the Labor Code.



NESS KE, s.r.o.

### Article XI
### Intellectual Property Right

1. The results of the Employee's own creative intellectual activity created by the Employee to fulfill his obligations arising from the employment relationship established by the employment contract are an Employee's piece of work in terms of § 90 of the Act No. 185/2015 Coll. - Copyright Act as amended (hereinafter referred to as the "**Copyright Act**"). The rights and obligations of the Employee and the Employer in creation of the Employee´s pieces of work are governed by the provisions of Section 90 par. 4 and following ones of the Copyright Act. Proprietary copyrights are applied by the Employer in his own name and on his behalf. The Employee agrees with assigning the Employer´s right to exercise his property rights to a third party.

2. The Employee gives the Employer his/her consent to first publication of his/her piece of work and agrees with presentation of this piece of work to the public by the Employer under his business name or other name of his choice without mentioning the name of the Employee at the same time. The Employee grants the Employer permission to complete the piece of work in progress, to change and to process the piece of work. This consent also covers the completion, modification and processing of other intellectual property objects created within his/her employment relationship.

3. The Employee grants the Employer permission to register his piece of work for industrial and legal protection. At the same time, he/she agrees that the Employer grants this right to a third party.

4. The rights and obligations of the Employee and the Employer in creation of industrial or other intellectual property objects shall be governed by the relevant provisions of specific industrial property legislation, with rights to the results of creative intellectual activity being passed on to the Employer.

5. The Employee is obliged to follow instructions of the Employer when creating intellectual property items. The Employee is not responsible for the defects and legal defects of the intellectual property created which were caused by the use of the documents and the things provided by the Employer, and the Employee, even taking his/her maximum care, could not find out their inappropriateness or he/she advised the Employer of them and the Employer insisted on their use.

6. The Employee is responsible for the fact that the intellectual property created is the result of his own creative intellectual activity and does not interfere with the rights of third parties. If theEemployee himself/herself uses the intellectual property objects belonging to third parties, he/she is responsible for having settled relations with the holders of these rights.

7. The Employee is not entitled to carry out a self-employed activity for the Employer's clients during the duration of the employment relationship. In the event of breach of this obligation, the Employer is entitled to ask the Employe to provide him with the benefit from a trade at which he/she breached the ban on competition or transfer the corresponding rights to him. This activity is considered to be a reason for which the Employer can immediately terminate the employment. This does not affect the Employer's right to compensation.

8. The Employee is entitled to wage under the employment contract for creation and use of the employment pieces of work and other intellectual property items and the Employee is not entitled to ask from the Employer of third persons any special remuneration or additional compensation for the creation and use of pieces of work and other intellectual property items.



NESS KE, s.r.o.

9. The Employee is not authorized to provide any information about the Employer's clients for the purposes of self-representation vis-à-vis third parties without the written consent of the Employer or to use the results of his / her creative activity created during the duration of employment with the Employer as a reference to third parties, even after termination of employment with the Employer. Breaching this ban is a serious violation of the  work discipline.

10. In the event that an Employee is temporarily assigned for work perfromance to a third party, he/she agrees that the third party shall exercise all the rights to the Employee's piece of work done during the assignment belonging to the Employer according to the provision of Section 90 of the Copyright Act and that the Employer can transfer these rights to such third person. They Employee´s  remuneration for such handling with the items of intellectual property rights is included in the basic wage of the Employee.

## Čl. XII
## Non-compete Clause

1. The Employee undertakes that he will not, directly or indirectly, perform any gainful activity a nature that is competitive or could be competitive with the Employer´s line of business, either as self-employed or for another employer,  without the explicit written consent of the Employer. The Employee undertakes to refrain from any activities that are contrary to the legitimate interests of the Employer.

2. The Employer and the Employee have agreed that the Employee will not perform any gainful activity  which is of a competitive nature towards the subject of the Employer's activity, the Employer's customers and the end customers of the Employer's customers for a period of 6 months after termination of the employment relationship.

3. In accordance with the preceding sentence, the Employer and the Employee agree that the Employee will not work, directly or indirectly, on projects he worked for during the employment relationship with the Employer for 6 months after the termination of his employment.

4. The employer will provide the employee with a cash refund equal to 50% of the average monthly wage of the Employee for each month of meeting this provision of limitation.

5. If the Employee violates this limitation, he/she will  pay the Employer  cash compensation equivalent to  cash compensation agreed upon for compliance with this limitation.

## Article  XIII
## Termination of Employment and Notice Period

1. The employment relationship  ends by the expiry of the period referred to in Article IV. of this contract or in other ways specified in the Labor Code. The length of the notice period is governed by the relevant provisions of §62 of the Labor Code.

2. The Employee is entitled to severance and termination pay under the relevant provisions  of the Labor Code applicable at the time of such entitlement.

3. In accordance with the provisions of Section 62 8 of the Labor Code, the Employer and the Employee have agreed that if the Employee does not stay with the Employer during the period of notice,  the Employer has the right to monetary compensation at most in the amount that is the product of the average monthly wage of this Employee and the length of the period of notice. The calculation of the amount of compensation depends on the number of working

NESS KE, s.r.o.

days at the time of the period of notice during which the Employee did not stay with the Employer and did not work for him in accordance with this employment contract.

**Article XIV**
**Execution and Changes of Contract of Employment**

1.  Contract of Employment has been executed in two copies. Both, the Employer and the Employee will receive one copy.

2.  This contract can be changed only after agreement of both parties, namely by written amendment approved and signed by both parties. The parties exclude any diversion from this requirement in oral or implied way. There are no collateral oral agreements.

**Article XV**
**Provision of Personal Data**

1.  An Employee who meets with personal data during the performance of his/her or these data are processed in any way in the course of his / her work, he/she is obliged to comply with the relevant provisions of Regulation (EU) 2016/679 of the European Parliament and of the Council on the protection of natural persons with regard to the processing of personal data and on the free movement of such data and of Act 18/2018 Coll. of the National Council of the Slovak Republic on the personal data protection.

2.  By signing this Work Contract, the Employee declares that he/she was aware of the information under Article 13 of Regulation (EU) 2016/679 of the European Parliament and of the Council on the protection of natural persons with regard to the personal data processing.

3.  By signing this agreement, the Employee declares that the Personal Data provided by him/her to the Employer's information system are true and informs the employer of their change in writing without any delay.

**Article XVI**

**Final Provisions**

1.  By signing this contract, the Employee certifies that before concluding this contract, the Employer informed him/her of rights and duties resulting for him/her from this contract of employment as well as of working and wage conditions upon which he/she will work upon this contract of employment.

2.  Rights and duties of the Employee result from the respective legal regulations, binding instructions of the Employer, internal rules issued by the Employer, instructions of direct superior and from provisions of this contract.

3.  By signing this contract, the Employee also certifies that he was duly acquainted with rules of organization, legal and other regulations for provision of safety and protection of health that must be observed during his/her work.

4.  Contractual relations, rights and duties of parties at this contract execution not regulated by this contract are governed by the respective provisions of Law No. 311/2001 Coll. of Labor Code as amended and connected regulations valid in the Slovak Republic.



NESS KE, s.r.o.

5.   In the event of a change in the data contained in the title of this contract, the Contracting Party to which the change relates shall promptly notify the other Contracting Party in writing without delay, together with the actual details.

6.   If any of provisions of this contract is declared null and void or unenforceable, validity or enforceability of other provisions of this contract remains unaffected. For such case the parties agreed to conclude an amendment to the contract and provisions losing their validity or becoming unenforceable will be replaced by provisions as much as possible similar to original intent so that the purpose and goal of this contract would remain preserved respecting new facts, without any prejudice for both parties.

7.   The participants to this contract declare that they are fully legally competent for legal acts, that this contract was concluded in accordance with their real will, on the basis of true data, was read by them, understood its vontent and in witness thereof they signed it. The parties to this agreement also declare that this contract was not concluded in distress or under other disadvantageous conditions and at signing this contract, no pressure was exerted on them in any form and that their free will and expression of their will were not limited by anything.

8.   ract of employment comes into force and effect from the day of its signing by both contracting parties.

9.   Annexes No. 1 to 4 form an inseparable part of this contract.

> Annex No. 1 - Specification of kind of work and its short characteristics / workload
> Annex No. 2 - Wage Decree
> Annex No. 3 - Confidentiality Agreement
> Annex No. 4 - The Employee statement of becoming familiar with the normative
> documentation

In Košice, on................

| **The Employer** | **The Employer** | **The Employee** |
|---|---|---|
| ...................................... | ...................................... | ...................................... |
| RNDr. Tomáš Futáš, PhD. | Ing. Zuzana Želinská, PhD. | Name |
| Executive of | Executive of | |
| NESS KE, s.r.o. | NESS KE, s.r.o. | |

The Employee confirms with his/her signature that he/she received one copy of the Contract of Employment from the Employer.

**The Employee**

...........................................
Name

# **<u>Exhibit 2</u>**



# **Exhibit 2**

**From:** Stinson McElhinney <McElhinney_Stinson_X@solarturbines.com>
**Sent:** 26 May 2021 19:03
**To:** Peter Rogers <Peter.Rogers@ness.com>; Marco Leon <LEON_MARCO_E@solarturbines.com>
**Cc:** Berthold Puchta <Berthold.Puchta@ness.com>; Ketan Karia <Ketan.Karia@ness.com>
**Subject:** RE: Solar/Ness - Sync Up

*\*\* EXTERNAL EMAIL: USE CAUTION Before Replying, Clicking Links, Opening Attachments etc.; Could be a Phishing Attempt \*\**

Pete,

Thanks for the call today.   As discussed, it sounds like there was a misinterpretation and incorrect assumptions of our objectives and plans.  As this is still an ongoing dialog, we are supportive of additional meetings as necessary.

While it is important for Solar to take a more conservative approach, and to be more independent with our own organization, insourcing significant parts of our operations, our desire and intent is to continue to work with Ness in a positive way as we have done in the past.  We plan to reduce Ness resources over time as we successfully post positions publicly into the market and hire suitable candidates to be Solar employees.   Our business is evolving and digital is important, so things will continue to change.

Personal styles and approaches aside, we are an independent business seeking to employee people in our business and believe we are acting and operating appropriately. Other parts of your engagements with Solar/Cat are currently not in scope.

Looking forward to further conversations.

Stinson


Caterpillar: Confidential Green

**From:** Peter Rogers <Peter.Rogers@ness.com>
**Sent:** Wednesday, May 26, 2021 2:32 PM
**To:** Stinson McElhinney <McElhinney_Stinson_X@solarturbines.com>; Marco Leon <LEON_MARCO_E@solarturbines.com>
**Cc:** Berthold Puchta <Berthold.Puchta@ness.com>; Ketan Karia <Ketan.Karia@ness.com>
**Subject:** Re: Solar/Ness - Sync Up

**CAUTION: EXTERNAL EMAIL**
This is a message from Peter.Rogers@ness.com.
Use caution when opening unexpected emails and do not click on links or attachments from unknown senders.
For more resources, visit security.cat.com/phishing.

Adding Ketan

Stinson,

Yes, it is difficult to hear your news given our longstanding relationship. To be clear Ness is unwilling to transfer any of our employees to Solar Turbines.

We are OK with an initial call later today. Ness is still finalising its position but, as I am sure you can appreciate, our number one concern is our employees.

We need to appropriately communicate to our employees who are currently working on the Solar Turbines' account—as we plan to reassign them to other clients to the extent we are not working on your account. You need to coordinate any communication to our employees through us and must have no direct or indirect communications with our employees regarding their employment relationship with us without our specific consent.

As you may be aware, the large majority of our employees working on the Solar Turbine account are subject to restrictive covenants that restrict them from any activities that are contrary to Ness's legitimate interests, including not to perform activities of a competitive nature for 6 months after termination of employment. Moreover, such employees have contracted that they will not work, directly or indirectly, on projects they worked for during the employment relationship with us for 6 months after the termination of their employment.

I trust you will respect and have respected our contractual relations with our employees. In order that we can have a productive discussion, we request that you confirm that you have not had any conversations with our current employees (or former employees who recently left) in any way interfering with our employment arrangements with such employees or former employees.

For your information Ness reserves all its rights in connection with this matter.

Speak soon.


Pete
+44 773 098 1750



**From:** Stinson McElhinney <McElhinney_Stinson_X@solarturbines.com>
**Date:** Tuesday, 25 May 2021 at 22:00
**To:** Peter Rogers <Peter.Rogers@ness.com>, Marco Leon <LEON_MARCO_E@solarturbines.com>
**Cc:** Berthold Puchta <Berthold.Puchta@ness.com>
**Subject:** RE: Solar/Ness - Sync Up

** EXTERNAL EMAIL: USE CAUTION Before Replying, Clicking Links, Opening Attachments etc.; Could be a Phishing Attempt **

Pete,

We understand this was a surprise and difficult news to hear.  There will undoubtably be multiple meetings needed over the course of the next months while we reduce volumes.

While we appreciate the challenge to coordinate an executive team on short notice, we're happy to keep our meeting tomorrow and support additional meetings Friday or Monday as people become available.

As discussed Monday, we will be communicating to the broader team later this week.

Thanks

Stinson


Caterpillar: Confidential Green

**From:** Peter Rogers <Peter.Rogers@ness.com>
**Sent:** Tuesday, May 25, 2021 9:40 PM
**To:** Stinson McElhinney <McElhinney_Stinson_X@solarturbines.com>; Marco Leon <LEON_MARCO_E@solarturbines.com>
**Cc:** Berthold Puchta <Berthold.Puchta@ness.com>
**Subject:** Re: Solar/Ness - Sync Up

---

**CAUTION: EXTERNAL EMAIL**
**This is a message from Peter.Rogers@ness.com.**
**Use caution when opening unexpected emails and do not click on links or attachments from unknown senders.**
**For more resources, visit security.cat.com/phishing.**

---

Marco, Stinson,

It was a complete surprise to hear your proposal yesterday. Furthermore Ranjit, our CEO is on vacation and off-grid in California this week.   I will need to confer with him before we can respond.

Can we delay our follow-up call until Friday afternoon or, preferably, Monday?

thx


Pete
+44 773 098 1750


**From:** McElhinney_Stinson_X@solarturbines.com
**When:** 14:00 - 14:30 24 May 2021
**Subject:** Solar/Ness - Sync Up
**Location:** Microsoft Teams Meeting

** EXTERNAL EMAIL: USE CAUTION Before Replying, Clicking Links, Opening Attachments etc.; Could be a Phishing Attempt **

Pete, Berthold,

Scheduling a follow up to our last call to close out open items identified during that discussion and discuss any additional relevant business updates.

Added Marco to join if he is available.

Thanks

Stinson

# Microsoft Teams meeting

**Join on your computer or mobile app**
Click here to join the meeting

**Join with a video conferencing device**
302390680@t.plcm.vc
Video Conference ID: 116 953 067 4
Alternate VTC dialing instructions

**Or call in (audio only)**
+1 312-270-1925,,412196439#   United States, Chicago
Phone Conference ID: 412 196 439#
Find a local number | Reset PIN

Learn More | Meeting options

Powered By Office365

The information contained in this communication is intended solely for the use of the individual or entity to whom it is addressed and others authorized to receive it.
It may contain confidential or legally privileged information.
If you are not the intended recipient you are hereby notified that any disclosure, copying, distribution or taking any action in reliance on the contents of this information is strictly prohibited and may be unlawful.
If you have received this communication in error, please notify us immediately by forwarding this email to MailAdmin@ness.com and then delete it from your system.
Ness technologies is neither liable for the proper and complete transmission of the information contained in this communication nor for any delay in its receipt.

# **<u>Exhibit 3</u>**



# Solar Turbines
A Caterpillar Company

HOME   DIGITAL SOLUTIONS   WHY SOLAR TURBINES   CONTACT

**Solar Turbines Slovakia s.r.o.**

Bastion Office Center
Trieda SNP 61, Košice
Slovakia

CAUSE NO. _____

| | | |
|---|---|---|
| **NESS DEUTSCHLAND GMBH and** | § | **IN THE DISTRICT COURT OF** |
| **NESS KE, S.R.O.,** | § | |
| | § | |
| **PLAINTIFFS,** | § | |
| | § | **HARRIS COUNTY, TEXAS** |
| **VS.** | § | |
| | § | |
| **SOLAR TURBINES INC. and SOLAR** | § | |
| **TURBINES SLOVAKIA S.R.O.,** | § | |
| | § | **____ JUDICIAL DISTRICT** |
| **DEFENDANTS.** | § | |

## UNSWORN DECLARATION OF PETER DEVINSKY

1.     My name is Peter Devinsky. My date of birth is 22 March 1981, and my business address is Fraňa Kráľa 17, 811 05 Bratislava I, Slovak Republic .

2.     I am an attorney at law, associated with the Bratislava, Slovakia office of Schönherr Rechtsanwälte GmbH, a full-service law firm with offices throughout Central and Eastern Europe that advises local and international companies on complex commercial matters.  I am fluent in Slovak, English and German.

3.     I received my undergraduate degree in law from Charles University in Prague, Czech Republic in 2006, and received an LL.M. from McGill University in Montreal, Canada in 2009.  I also hold a JUDr. Degree from Danubius College in the Slovak Republic in 2014, which was awarded to me for a thesis on employee privacy.

4.     Prior to joining Schönherr in 2015,  I was with the  office of Squire Patton Boggs, at major locally ranked law firm.

5.     My practice focuses on employment law. I have significant experience in employment-related disputes involving employees on all levels up to senior executives. My experience has included matters involving unfair dismissal,  redundancy (including collective

redundancy), terminations of employment of managerial employees, transfer of employees, bonus and target agreements, collective employment law matters on both national and European levels, negotiation of collective agreements, white collar crime and disciplinary investigations and proceedings. I am a member of the European Employment Lawyers Association and regularly speak at conferences and seminars on topics related to the field of employment law. A copy of my C.V. is attached as **Exhibit 1**.

6.      I have been retained by Ness Digital Engineering Group to provide legal advice and services relating to a recently-arisen dispute with Solar Turbines, Inc. and Solar Turbines Slovakia s.r.o. regarding their efforts to hire away employees from Ness KE, s.r.o. ("NKE") by unlawful means. My hourly rate for this engagement, including for my work on this declaration, is EUR 220.

7.      The fiduciary duties of a managing director of a Slovak company such as NKE are governed by Slovak Act No. 513/1991 Coll. the Commercial Code, as amended (the "Commercial Code"). They include the duty to perform directorial activities with professional care and in accordance with the interests of the company and all its shareholders. In particular, managing directors are obliged to procure and take into account all available information regarding the subject of a specific decision to be adopted within his/her powers and are also obliged to maintain the confidentiality of confidential information and facts, the disclosure of which to third parties could harm or jeopardize interests of the company or those of its shareholders. While exercising directorial powers, directors may not give priority to their own interests or the interests of third parties over the interests of the company. These duties can be summarized as duties of care and loyalty.

8.     The duties owed by an employee to his or her employer are governed by Slovak Act No. 311/2001 Coll. the Labor Code, as amended (the "Labor Code"). Under the Labor Code, the substantial obligations of employees include the following: (i) be present at his or her workplace at the beginning of working time, use working time for work, and leave the workplace only after the end of working time; (ii) comply with legal regulations and other regulations applicable to the work he or she carries out, insofar as the employee was properly informed thereof (iii); use any means entrusted to him or her by the employer in a due and economical manner, and protect the employer's assets against damage, loss, destruction and misuse, and refrain from any conduct conflicting with the employer's lawful interests; and (iv) keep in confidence any matters that the employee has learnt of during the pursuit of his or her occupation and which in the employer's interest must not be disclosed to third parties.

9.     The duty not to act in conflict with employer's lawful interests applies to both standard and managerial employees and covers any activity of the employee that could cause competitive harm to the employer.  There are many types of activities which constitute breach of employee's obligations not to act in conflict with employer's lawful interests, including soliciting or encouraging employees or clients to terminate a relationship with the employer and misuse of internal information.

10.     Section 62 Subsection 6 of the Labor Code specifies (with limited exceptions not applicable here) that an employee who wishes to terminate an employment relationship that has lasted more than one year must provide the employer with at least two months' notice. The notice period commences on the first day of the calendar month following delivery of the termination notice.

99998-09223/12748577.1

11.     The interpretation of employment contracts in Slovakia is governed by the following provision of the Slovak Act No. 40/1964 Coll. the Civil Code, as amended which provides in Section 35 Subsection 2:  "Legal acts expressed in words shall be construed not only on the basis of the verbal expression but also, in particular, on the basis of the will of the person making the legal act unless it is in conflict with the verbal expression."  In other words, the written terms of an employment agreement shall be enforced according to their plain meaning, and, while the parties' intent may be considered in resolving the meaning of ambiguous written terms, the parties' intent cannot be a basis to change or disregard unambiguous written terms. Moreover according to the Section 15 of the Labor Code ,"[w]ith regard to the circumstances under which it was made, an expression of will shall be interpreted consistently with good morals."

12.     Section 83a of the Labor Code authorizes the use of post-employment restrictive covenants to protect against competitive harm.  Specifically, Section 83a provides that, in circumstances where an employee "is able during employment to acquire information or knowledge that is not normally available and the use of which could cause substantial harm to the employer," the employer and employee "may agree in the employment contract that after termination of employment the employee shall not pursue, for certain period, but no longer than one year, any gainful activity which is competitive in character with the subject of the employer's activity."

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Bratislava, on this 2nd day of June, 2021.

_____
Peter Devinsky

CAUSE NO. _____

| | | |
|---|---|---|
| **NESS DEUTSCHLAND GMBH and NESS KE, S.R.O.,** | § § § | **IN THE DISTRICT COURT OF** |
| **PLAINTIFFS,** | § § § | |
| VS. | § § | **HARRIS COUNTY, TEXAS** |
| **SOLAR TURBINES INC. and SOLAR TURBINES SLOVAKIA S.R.O.,** | § § § § | |
| **DEFENDANTS.** | § | **____ JUDICIAL DISTRICT** |

## VERIFICATION AND UNSWORN DECLARATION OF PETER ROGERS

1.     My name is Peter John Rogers, my date of birth is 26th November 1953 and my business address is 198 High Holborn, London, WC1V 7BD, UK

2.      I currently serve as Executive Vice President and General Manager of Ness Global Services Ltd and and Geschäftsführer of Ness Deutschland GmbH.[1] I have held this position for approximately 8 years.

3.     Ness Deutschland GmbH ("NDG") is a German Corporation with its headquarters in Hamburg, Germany.

4.     Ness KE, s.r.o. ("NKE," and collectively with NDG, "Ness") is a Slovakian Corporation with its headquarters in Košice, Slovakia.

5.     The facts set forth in this Declaration are based upon my personal knowledge.  I am over the age of eighteen and am competent to make this Declaration.

6.     I submit this Declaration in support of Plaintiffs' Original Verified Petition and Application for a Temporary Restraining Order and Temporary Injunction.

---

[1]  "Geschäftsführer" translates to "Manager" in English

### Ness' Business and Employees

7.     NDG  and NKE are part of a group of affiliated companies comprising a business that provides outsourced software engineering services from offices located around the world.  The business works through the model of an extended development center, which involves software engineers employed by Ness and its affiliates working under the guidance of their clients to create software solutions specified by the clients.

8.     As a business that sells software engineering and development services, Ness' key assets are its employees.  Ness thus devotes substantial resources to recruiting and retaining the employees needed to provide the services for which Ness is known.  It also devotes substantial resources to training its employees and developing their skills to enable them to provide the highest level of service.  Such training includes on-line courses, paid attendance at conferences, and support in obtaining industry-relevant certifications.

9.     The talent pool in and around Košice is relatively small, and people with the skills and qualifications Ness requires are in high demand.  Consequently, when employees leave, they are difficult to replace.  Time is required to find suitable replacements and, once they are hired, further time is required to train them to meet Ness' standards.

10.     Since in or about 2013, Ness has provided software development services to Solar Turbines Inc. ("STI") under an overarching general terms and conditions agreement ("Master Agreement"), with specific purchase orders and scopes of work ("SOW") issued under that Master Agreement. A true and correct copy of the current General Terms and Conditions of Contract for Professional Services between Ness and STI, dated March 14, 2014 (the "Master Agreement"), is attached as **Exhibit 1.**

11.    Ness provides services to STI under the Master Agreement through employees working at NKE in Košice. STI is and has been fully aware that this is the case as its personnel regularly visit NKE and direct and manage work performed by the NKE employees assigned to its account. NKE was established in 2005 and, at 600 employees, is one of the largest engineering companies in the region.

12.    At least 160 of Ness' 600 Košice-based employees are currently engaged on STI projects. While the specifics of the work are confidential, at a general level some of the projects on which Ness works for STI involve developing and maintaining Solar Turbines' core business platform InSight; working on Condition Based Lifting, which involves the calculation of remaining useful lifetime of turbines and parts thereof in order to optimize service intervals and avoid downtimes; and building applications to help STI's clients save energy in their turbine operation, and manage the supply and distribution of turbine parts.

13.    The projects on which Ness works for STI are highly complex and span years. To maximize quality and efficiency for STI, Ness maintains the same teams of employees on the projects throughout their lifespan as much as possible. Indeed, STI expects Ness to do this.

14.    Though the SOWs that detail the work to be performed on the STI projects periodically expire, this is primarily an accounting mechanism, and new SOWs are issued as the old ones expire so that the work remains ongoing. As recently as four weeks ago, STI indicated that it intended for Ness to continuing working on the current projects through the remainder of 2021.

15.    On May 24, 2021, STI informed Ness that STI intended to in-source at least 70 percent of the services Ness had been providing to STI.

16.     Given the complexity of the projects STI is in-sourcing, the Ness employees' long-term experience on them, and the tightness of the labor market in Slovakia, hiring and training new personnel to replace Ness' employees would require substantial time and likely disrupt the ongoing work.   Accordingly, upon hearing of STI's insourcing plan, Ness became concerned that STI intended to execute its plan by hiring away the Ness employees that had been performing the services STI intended to in-source.

17.     Acting on those concerns, I sent STI an email in which it: (1) instructed STI not to communicate with Ness' employees about STI's in-sourcing plans; (2) reminded STI that Ness' employees were subject to non-compete clauses that precluded them from working on STI's projects, or otherwise engaging in competitive activity vis-à-vis Ness for six months following the termination of their employment with Ness; and (3) requested that STI confirm that it had not and would not interfere in Ness' contractual relationships with its employees.   A copy of my email is attached as **Exhibit 2**.

18.     STI responded with an email (see Exhibit **2**) asserting that Ness had "a misinterpretation and incorrect assumptions of our objectives," that STI intended to hire 10-20 people per month through general advertising, and that STI wanted to maintain good relations with Ness.

19.     On May 24, 2021, Ness learned that STI had established a Slovakian entity, Solar Turbines Slovakis s.r.o. ("STS" and with STI, "ST"), in late March 2021, two months before it disclosed its "in-sourcing" plan.

20.     Ness also observed that, not later than May 26, 2021, STI's website included a page advertising open positions for software engineers and developers at STS, with a listed address in the very same building where NKE has its offices.   A true and correct print-out of that website

page is attached as **Exhibit 3**. I have been informed that the landlord of that building was told by NKE managing director Marek Uhrin (referenced below) that Ness consented to the landlord renting space to STI and was, in fact, in favor of such an arrangement. Any such representations were false. Ness had not consented to the landlord renting space to STI and did not favor such an arrangement.

21.     The building where NKE has its offices has five floors, and NKE fully occupies four of them. The fifth floor is mostly occupied by other tenants, with only roughly 200 square meters available for lease. The only logical reason for STI to have procured the small remaining amount of space in NKE's building for STS is that STI acquired that space as a foothold and intended to expand into the space leased by NKE after hiring away a substantial portion of Ness' employees and forcing NKE to reduce its footprint.

22.     On May 27, 2021, the newly-announced head of STS, Stinson McElhinney, attended a previously scheduled all-hands meeting of the Ness employees in Košice assigned to STI's projects. According to his LinkedIn page, prior to being named head of STS, McElhinney was Global Technology Manager, Connected Product & Solar Digital at STI. I do not know if he still holds that position.

23.     All-hands meetings between STI and the Ness employees assigned to STI's projects are regularly conducted as part of the management of those projects. As noted above, prior to the meeting on May 27, 2021, Ness had expressly instructed McElhinney not to communicate with Ness' employees about STI's expansion into Košice. In defiance of those instructions, I am advised that McElhinney not only informed Ness' employees of the expansion but also told them that open positions at STI's Košice office would be posted on STI's website. Prior to the meeting,

McElhinney sent me a written copy of the announcement he intended to make at the meeting. A true and correct copy of that announcement is attached as **Exhibit 4**.

24.     I am aware that Marek Uhrin resigned from NKE in late April 2021 and left his employment on or about May 7, 2021. Uhrin effectively functioned as the CEO of NKE. In that position, he had overall P&L responsibility for the office and unfettered access to virtually all information concerning the office and its business. Of particular relevance here, Uhrin had access to information about the salary and other compensation paid to all of the employees, as well as the office's pricing and target margins. Knowledge of this information would permit a customer, such as ST, to determine how much (and how little) it needed to pay particular employees in order to lure them away. Uhrin also has information about the strengths and weaknesses of individual employees, which information would enable a customer such, such as ST, to know which employees to target and prioritize in a recruiting effort.

25.     I am also aware that Vedran Houdek resigned from NKE on May 27, 2021. Houdek was one of Uhrin's key lieutenants and was the day-to-day lead on Ness' relationship with STI. Like Uhrin, Houdek has detailed knowledge of the salary and other benefits paid to the Ness employees assigned to work for STI, as well as the relative strengths and weaknesses of those employees. Like Uhrin, Houdek is well positioned to advise STI on which of Ness' employees it should recruit and how much it needs to offer to lure them away.

26.     Based on STI's stated intention to insource 70 percent of the services provided by Ness, and ST's demonstrated intention to have those services performed by the same people that have been performing them under Ness' umbrella, Ness stands to lose more than 100 of the 600 employees in its Košice office. Further, to the extent Ness refuses to accede to ST's scheme (which it will) and ceases to provide the remaining 30 percent of the services, there is every reason to fear

that ST will seek to hire *all* of the remaining employees on the STI team.  Ness thus faces the imminent threat that ST will, by interfering in its contractual relationships, poach more than 25 percent of the NKE workforce.  The rapid outflow of such a large number of employees in a relatively small and tight labor market will damages Ness' reputation and goodwill in the market, both among customers and potential employees.

27.     Additionally, due to the difficulty of hiring qualified engineers, Ness estimates that it could take six months or longer to fill the vacancies left by the employees departing for STS and even longer to have the replacements trained to perform to Ness' high standards. During that time, Ness would be at risk of losing clients, goodwill and a significant amount of revenue.

28.     Ness will also incur substantial costs in the recruitment, hiring, and training of the large number of employees needed to replace those poached by STI

29.     I declare under penalty of perjury that the foregoing is true and correct.

Executed in Kingston Upon Thames, UK on this 2nd day of June, 2021.

*Peter Rogers*
_____
Peter Rogers

# **Exhibit 1**

FORM 4001-A MODIFIED
REV 12 MARCH 2014

GENERAL TERMS AND CONDITIONS OF CONTRACT

FOR PROFESSIONAL SERVICES

BY

Ness Deutschland GmbH ("CONTRACTOR")

# TABLE OF CONTENTS

Page

1.    DEFINITIONS .................................................................................................3

2.    SCOPE OF WORK; CONFLICTS; REPRESENTATIVES ..............................7

3.    CONTRACTOR RESPONSIBILITIES ............................................................8

4.    PAYMENT PRICE ........................................................................................10

5.    TIME .............................................................................................................11

6.    CHANGES IN THE WORK ...........................................................................12

7.    TERMINATION FOR CONVENIENCE .........................................................13

8.    CANCELLATION FOR CAUSE ....................................................................14

9.    WARRANTY .................................................................................................14

10.   INSURANCE .................................................................................................16

11.   TITLE TO WORK PRODUCT ........................................................................18

12.   PERFORMANCE BOND AND LABOR AND MATERIAL PAYMENT BOND............................19

13.   INDEPENDENT CONTRACTOR ..................................................................19

14.   LIENS AND CLAIMS ....................................................................................20

15.   NO CONSEQUENTIAL DAMAGES, ETC ....................................................20

16.   NO WAIVER .................................................................................................20

17.   NOTICES ......................................................................................................20

18.   NO IMPLIED LICENSES ..............................................................................21

19.   RELEASE OF INFORMATION .....................................................................21

20.   ASSIGNMENT; DELEGATION; CHANGE IN CONTROL .............................22

21.   SUCCESSIONS ............................................................................................22

22.   SET OFF .......................................................................................................22

23.   APPLICABLE LAW; VENUE; WAIVER OF JURY TRIAL .............................22

24.   COMPLIANCE WITH LAW ...........................................................................23

25.   ASSURANCE OF PERFORMANCE .............................................................24

26.   SPECIFICATIONS; DESIGNS ......................................................................24

27.   PERSONNEL ................................................................................................25

28.   OTHER PROVISIONS ..................................................................................25

29.   LIST OF EXHIBITS………………………………………………………………..26

**Solar Turbines**
*A Caterpillar Company*

**TURBOMACH**
*A Caterpillar Company*

*REV. 12 March 2014*

1.      DEFINITIONS

As used in or pertaining to these General Terms and Conditions of Contract for Professional Services, the following terms shall be interpreted as having the meanings respectively set forth below:

1.1     "Affiliate" of any Person means any other Person which, directly or indirectly, controls, is controlled by or is under common control with such Person.   A Person shall be deemed to be "controlled" by any other Person if such other Person possesses, directly or indirectly, power

        (a)      to vote 10% or more of the securities (on a fully diluted basis) of such Person having ordinary voting power for the election of directors or managers; or

        (b)      to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

1.2      "Applicable Laws" means all laws, statutes, ordinances, building codes, rules, regulations, or orders of any Government having jurisdiction over the performance of the Work, as may be in effect at the time the Work is undertaken.

1.3     "Applicable Permits" means all permits, waivers, authorizations, exemptions, franchises, clearances or licenses issued or required to be issued by any Government having jurisdiction over the performance of the Work, as may be in effect at the time the Work is undertaken.

1.4      "Change Order" means a written order signed by Company's Representative, which order changes the Work, Contract Price, payment terms, Work Schedule, delivery, or any special term or condition of the Contract.

1.5      "Company" means Solar Turbines Incorporated, having offices at, among other places, 2200 Pacific Highway, San Diego, California and Turbomach SA, Via Campagna 15, 6595 Riazzino, Switzerland, and any of its and their affiliates and subsidiaries who issue a Purchase Order to Contractor, which references these terms.

1.6     "Consequential Loss" means any loss or anticipated loss of profit, loss or anticipated loss of revenue, business interruption, loss of use of any Company or Contractor equipment, or loss of any contract or other business opportunity.

1.7     "Contract" means these General Terms and Conditions of Contract for Professional Services as applied to a particular Order together with any Purchase Order and Work Order(s) and all Plans and Specifications, and other documents which are integrated herewith or incorporated herein by reference, as well as any Modifications (including Change Orders), Suspension Orders, Reinstatement Orders and Termination Orders that may be in effect from time to time.

1.8     "Contractor" means the Person entering into these General Terms and Conditions of Contract for Professional Services or a particular Contract with Company.

1.9     "Contractor IP" means Contractor's intellectual property including, but not limited to, patents, trademarks, copyrights, trade secrets, works of authorship, background software, concepts, methodologies and processes developed or existing prior to the start of the Work that is incorporated into the Work.

**Solar Turbines**

A Caterpillar Company

**Turbomach**

A Caterpillar Company

REV. 12 March 2014

1.10 "Contractor Specifications" means and specifications created by Contractor pursuant to the Contract.

1.11 "Contract Time" means the period of time provided in the Contract for completion of the Work.  It is anticipated that some Purchase Orders will not have a Contract Time.

1.12 "Contract Price" means the total amount that Company shall be obligated to pay to Contractor upon the performance of all of Contractor's duties and obligations pursuant to the Contract which shall not exceed the rates as set forth in the applicable SOW.

1.13 "Customer" means Company's customer, whether one or more, unless otherwise specified.

1.14 "Date of Final Completion" means the date on which Contractor has successfully achieved Final Completion.

1.15 "Documents" means documents designs, diagrams, illustrations, schedules, sketches, charts, , technical specifications, software, source code, test plans, test scripts and other data which are prepared by Contractor or any Subcontractor, manufacturer, contractor or distributor in performance of the Work.

1.16 "Engineering" means all specifications, designs, calculations, analysis, plans, data, reports, process diagrams, , sketches, software development, programming, test plan development, testing and the like created or provided by it in the performance of the Work.

1.17 "Export Authorizations" means all applicable export permits, licenses, authorizations, certification, notifications, or other required or necessary government approvals or submissions.

1.18 "Field of Use" means software, networks, hardware, or systems for the purpose of condition monitoring, remote monitoring and diagnostics, data analytics, health management, or related systems that use data acquired from turbo-machinery equipment, gas turbine engines, compressors, reciprocating engines or electric motor drives.

1.19 "Final Completion" shall be deemed to have occurred when (i) the Work has been completed in accordance with the Contract, (ii) all deliverables required to be submitted to Company on or before the Date of Final Completion have been submitted, including all Work Product, and such other items as are required by the Contract and (iii) all other duties and obligations of Contractor under the Contract have been fully performed.

1.20 "Fixed Price Work" means work for which Contractor is paid based on specific deliverables.  Unless otherwise specified in the Contract, Firm Business Project Execution shall be Fixed Price Work.

1.21 "Government" means any United States or foreign, federal, state, regional, tribal or local government or governmental agency, department, court, tribunal or other entity charged with the administration, interpretation or enforcement of any Applicable Law.

1.22 "Hourly Work" means Work for which Contractor is paid based on the number of hours of service provided in accordance with the Contract.  Unless otherwise specified in the Contract, General Work and Manpower Work shall be Hourly Work.

**Solar Turbines**
*A Caterpillar Company*

**Turbomach**
*A Caterpillar Company*

REV. 12 March 2014

1.23 "Inventions" means all intangible property, ideas, conceptions, know-how, inventions, improvements, devices, methods, products, processes and discoveries, whether patentable or unpatentable, and whether in a written, graphic and/or machine readable form or format, that arise out of Contractor's or Contractor's Personnel, performance of the Contract or resulting from or based on Company Proprietary Information.

1.24 "Key Personnel" means any member of Contractor's Personnel designated as essential to the satisfactory performance by Contractor of the services to be performed under the Contract.

1.25 "Lien" means any lien, charge, mortgage, pledge, claim, security interest or encumbrance of any kind, arising by contract or under Applicable Law.

1.26 "Losses" means claims, actions, damages, losses, liabilities, penalties, interest, costs, and/or expenses including reasonable attorney's fees. Losses include loss of or damage to property and injury to or death of natural Persons.

1.27 "Modification" means (1) a written amendment to the Contract signed by both Parties, or (2) a Change Order.

1.28 "Onsite" shall mean Company's Premises

1.29 "Offsite" shall mean Contractor's development offices

1.30 "Parties" means Company and Contractor, and "Party" means either of them.

1.31 "Person" means any natural person, corporation, partnership, joint venture, limited liability company, firm, association, trust, Government or any other entity.

1.32 "Personnel" means the employees, agents, contractors, and representatives of the applicable Party and, in the case of Contractor, its subcontractors, whether or not Affiliates of such Party.  For the avoidance of doubt, subcontractors of Contractor include notably any freelance consultant who would perform services for Company under the Contract. Contractor shall execute a written subcontract with such freelance consultants on terms no less stringent to those contained in the Contract

1.33 "Plans and Specifications" means any technical requirements, specifications, codes, inspection methods, fabrication methods, application check sheet or documents provided by Company, which are applicable to the Work.

1.34 "Professional Services" means the consulting, software development, maintenance and software installation and other support services as described in a SOW or as otherwise set forth in a Purchase Order.

1.35 "Purchase Order" or "Order" means Company's document(s) describing the Work to be performed by Contractor under the Contract.  The Parties anticipate that more than one Purchase Order may be outstanding and in effect at any time.

1.36  "SOW" of "Statement of Work" means a description of the Work and/or deliverables to be provided under a Purchase Order.

1.37 "Site" means the location or locations where the Work is to be performed, which may be a site owned or controlled by Company, Contractor or a third Person.

**Solar Turbines**

*A Caterpillar Company*

**TURBOMACH**

*A Caterpillar Company*

REV. 12 March 2014

1.38    "Suspension Order" means a written order signed by Company's Representative, which order suspends Contractor's effort on that portion of the Work covered by the Suspension Order, as specifically set forth therein.

1.39    "Subcontractor" means a Person who has a direct contract with Contractor to perform or supply any part of the Work, including without limitation the supply or lease of any materials or equipment.

1.40    "Sub Subcontractor" means a Person who has a direct contract with a Subcontractor to perform or supply any of the Work.

1.41    "Termination Order" means a written order signed by Company's Representative, which order terminates Contractor's effort on that portion of the Work covered by the order, as specifically set forth therein.

1.42    "Work" means all training, professional, consulting or similar services and goods ancillary thereto provided or to be provided by Contractor under the Contract, including without limitation software, documentation, engineering, design, project management, drafting and other technical or similar service activities, all labor, material, equipment, services and supplies necessary to provide and deliver the Professional Services required under a Purchase Order, and all materials and incorporated or to be incorporated into the product of such professional services.   Work includes General Work, Firm Business Project Work and Manpower Work, each of which is further described in Section 2.3.

1.43    "Work Product" means any work of authorship including without limitation software and related documentation Engineering, Documents, Contractor Specifications and Inventions and other work product provided or developed by Contractor in its performance of the Work.

1.44    "Work Authorization" means a document issued by Company pursuant to a blanket Purchase Order describing the Work to be performed by Contractor under the Contract. The Parties anticipate that more than one Work Authorization may be outstanding and in effect at any time.  A Work Authorization is accepted by Contractor when Contractor has provided Acknowledgment.

The following rules of interpretation apply to these General Terms and Conditions of Contract for Professional Services:

(a)    Defined terms include the plural as well as the singular.  Any reference to an Article, Section, Exhibit, Attachment, or Appendix shall be deemed to refer to an Article, Section, Exhibit, Attachment or Appendix of the Contract unless otherwise specified.  The terms "hereof", "herein", "hereunder", and comparable terms refer to the entire Contract and not to any particular Article or other subdivision hereof.  The words "include", "includes", and "including" are not limiting.

(b)    Any agreement defined or referred to herein shall include each amendment, modification, restatement, and supplement thereto and waiver thereof as may become effective from time to time (provided that such amendment, modification, restatement, or supplement after the effective date of a Purchase Order may constitute a basis for a Change Order).

(c)    A reference to any Applicable Law includes any amendment or modification to such Applicable Law (provided that such amendment or modification after the effective date of a Purchase Order may constitute a basis for a Change Order).

REV. 12 March 2014

(d)      A reference to any Person or Party includes its permitted successors and permitted assigns.

(e)      A reference to any Government shall include any agency or authority succeeding to such agency's or authority's functions and capabilities.

2.      USE OF GENERAL TERMS AND CONDITIONS; SCOPE OF WORK; CONFLICTS; REPRESENTATIVES

2.1      These General Terms and Conditions of Contract for Professional Services are intended to be applicable to multiple Purchase Orders, each of which will be a separate Contract.

2.2      Company may from time to time issue a Purchase Order for the performance of services generally described below and more specifically described in the SOW.  Company may also from time to time issue an annual Purchaser Order which authorizes the issuance of multiple Work Authorizations in accordance with the  rates as set forth in the SOW for the performance of services generally described below and more specifically described in the SOW.

2.3      The Work provided under the Contract may consist of engineering, design, project management, drafting and other technical or similar service activities in the following two categories:

    A.      General Work

        Where Company requires Contractor's services for proposed or project work that is for short time periods and for specific tasks.

    B.      Manpower

        Where Contractor provides individuals of certain job qualifications for Work as directed by Company.

2.4      In exchange for the Work, Company shall pay Contractor in accordance with the rates set forth in the applicable Purchase Order.

2.5      Contractor shall provide the Professional Services comprising the Work as described in the specific Work Authorization and/or Purchase Order.  Contractor represents and warrants that Contractor is professionally qualified to perform the Work, and will utilize all necessary and appropriate skill, judgment and expertise in the performance of the Work and will satisfactorily carry out and complete the same.

2.6      The Professional Services comprising the Work are personal to and non delegable by Contractor.  Any purported delegation of duties hereunder without Company's prior written consent shall be a breach of the Contract and shall be void.

2.7      Prior to the commencement of the Work, each Party shall identify to the other Party, in writing, the name(s) and respective scope of authority of its one or more Persons (each, a "Representative") having responsibility for performance of its obligations hereunder, and having authority to agree to Modifications in its rights and obligations hereunder. Each Party shall promptly notify the other Party in writing of any change in the name(s) or scope of authority of its Representative(s) hereunder during the term of the Contract.

**Solar Turbines**

*A Caterpillar Company*

**Turbomach**

*A Caterpillar Company*

*REV. 12 March 2014*

2.8     Company's Representative will provide general administration of the Contract, including performance of the functions hereinafter described.  All of Company's instructions to Contractor pertaining to the Contract shall be issued through Company's Representative.

2.9     Contractor shall forward all communications to Company through Company's Representative.

2.10    For Fixed Price Work, based on Company's Representative's observations of the progress of the Work and Contractor's Applications for Payment, Company's Representative will determine the amounts owing to Contractor.

2.11    Company's Representative shall have authority to reject Work which does not conform to the Contract and Company shall not be responsible to make any payments to Contractor with regard to such rejected Work.   Whenever, in Company's Representative's reasonable opinion, such Representative considers it necessary or advisable to insure the proper implementation of the intent of the Contract, such Representative will have authority to require further review of the Work in accordance with this Section 2 and Section 3, whether or not such Work be then completed.

2.12    Company's Representative will prepare Change Orders in accordance with Section 6.

2.13    Company's Representative will review the Work to determine the Date of Final Completion and will receive the review documents required by the Contract and assembled by Contractor.

3.     CONTRACTOR RESPONSIBILITIES

3.1     Contractor shall carefully study the documents comprising the Contract and shall immediately report to Company's Representative any error, inconsistency or omission Contractor may discover.

3.2     Contractor shall perform the Work, using Contractor's best skill and attention, as an independent contractor, and not as an employee of Company, and shall be solely responsible for all portions of the Work.

3.3     Unless otherwise as specifically provided under the SOW, Contractor shall provide all labor, materials, equipment, tools and other facilities and services necessary for the full and proper execution and completion of the Work Onsite.

3.4     Contractor shall pay all sales, consumer, use, payroll, unemployment, disability and any other Federal, State, or local taxes required by any Applicable Law to be paid in respect to the performance of Contractor's duties and obligations hereunder.

3.5     Contractor shall secure and apply for all Applicable Permits, fees, and licenses necessary for the proper execution and completion of the Work, which are applicable at the time the Purchase Order is executed, or at any time thereafter, until completion of the Work. It is the responsibility of Contractor to make certain that the Plans and Specifications are in accordance with Applicable Laws.  Contractor shall give all notices and comply with all Applicable Laws of any Government bearing on the performance of the Work.   If Contractor observes that any terms or conditions of the Contract are at variance therewith in any respect, Contractor shall promptly notify Company's Representative in writing, and any necessary changes shall be adjusted by appropriate modification.  If Contractor performs Work knowing it to be contrary to such Applicable Laws, Contractor

shall assume full responsibility therefore and shall bear all costs attributable to the correction thereof.

3.6     Contractor shall be solely and entirely responsible to Company for the acts and omissions of all Contractor's employees and of all Subcontractors and Sub Subcontractors, their respective agents and employees, and all other Persons performing any of the Work if delegation to such third party is approved by Company pursuant to Section 2.6. If any part of the Work depends for proper execution or results upon the work of any third Person not in privity of contract with or otherwise under the control of Contractor, Contractor shall inspect and promptly report to Company's Representative any apparent discrepancies or defects in such work that render it unsuitable for Contractor's proper execution and results.

3.7     During the term of the Agreement, and for a period of five years following its expiration or termination, Contractor shall ensure that any and all of its employees, agents, consultants, and the like who work on a Company project are not permitted to work on similar projects for any third parties who perform, sell, or provide services in Company's Field of Use.

3.8     If Contractor is obligated to prepare Documents and/or Contractor Specifications pursuant to the Contract, then Contractor shall prepare or otherwise obtain, approve in writing, and submit, with reasonable promptness and in orderly sequence so as to cause no delay in the Work or in the Work of any other contractor, all Documents and Contractor Specifications required by the Contract.

A.     At the time of submission, Contractor shall inform Company's Representative in writing of any deviation in the Documents or Contractor Specifications from the requirements of the Contract.   Company's Representative will review and approve Documents and Contractor Specifications with reasonable promptness so as to cause no delay, but only for conformance with the design concept of the Work and with the information given in the Contract.  The approval of a separate item or component shall not indicate approval of a system in which the item or component functions.

B.     Contractor shall make any corrections of Documents or Contractor Specifications required by Company's Representative and shall resubmit the required number of corrected copies of Documents or new Contractor Specifications until approved.

C.     The approval of Documents or Contractor Specifications by Company's Representative shall not relieve Contractor of responsibility for any deviation from the requirements of the Contract unless Contractor has informed Company's Representative in writing of such deviation at the time of submission and Company's Representative has given written approval in the form of a Modification to the specific deviation, nor shall the approval relieve Contractor from responsibility for errors or omissions in the Documents or Contractor Specifications.

3.9     Contractor shall be responsible, to the extent of applicable law or as required by Company, to perform drug screening of all Contractor Personnel that will perform Work on Company premises.   All expenses related to drug screening pursuant to this agreement shall be the responsibility of Contractor.

A.    Contractor will comply with all applicable legal requirements concerning the procedures and methods to be used in testing its Personnel for drugs.

B.    Company reserves the right to reject any individual whose drug test evidences use of illegal drugs.

C.    Company reserves the right to choose the provider who will perform drug tests.

3.10   Contractor shall be responsible for a background screening on all its Personnel that will perform Work on Company premises according to Company's instructions.

3.11   Contractor shall be responsible to ensure the conduct of all Personnel performing Work on Company premises is in accordance with Exhibits A-C.

3.12   If a specific training at Company charge is deemed necessary for Contractor's Personnel, Company approval must be requested and obtained in writing in advance.

3.13   Contractor acknowledges that it must strictly adhere to Company guidelines regarding use of Company trademarks and corporate identity. Contractor shall comply with instructions received from Company and Contractor shall remedy any noncompliance at no cost to Company and use its best efforts to remedy the noncompliance as fast as possible. Contractor shall not use in advertising, publicity, promotion, marketing, or other activity, any name, trade name, trademark, service mark or other designation of, or owned by, Company, except upon the prior written permission of Company.

4.    PAYMENT PRICE

4.1    No escalations, reductions or modifications in Contract Price shall be made except as expressly provided for in the Contract. Unless otherwise agreed in writing, the Contract Price includes all applicable sales taxes, use taxes, excises, duties, and other like levies; and the cost of all permits and licenses. Unless otherwise agreed in writing, the Contract Price does not include the VAT.

4.2    Approved invoices shall be paid 30 days end of month from date of receipt of the Applications for Payment by Company; providing the Applications for Payment are accompanied by duly approved supporting documentation.

4.3    Intentionally Left Blank.

4.4    Contractor warrants and guarantees that title to all completed Work, materials or equipment will pass to Company upon receipt of such payment by Contractor, free and clear of all Liens; and that no Work, materials or equipment will have been acquired by Contractor subject to an agreement under which an interest therein or Lien thereon is retained by the seller.

4.5    No payment, nor any partial or entire use or occupancy of the Work by Company or Customer, shall constitute an acceptance of any Work not in accordance with the Contract.

4.6    Company's Representative may decline to approve Payment in whole or in part, to such extent as may be necessary in such Representative's opinion to protect Company from loss because of:

A.    Defective work;

B.   Third party claims filed or reasonable evidence indicating probable filing of such claims;

C.   With respect to Fixed Price Work, reasonable doubt that the Work can be completed for the unpaid balance of the Contract Price;

D.   Reasonable indication that the Work will not be completed within the Contract Time; or

E.   Unsatisfactory prosecution of the Work by Contractor.

4.7   When the above grounds in Section 4.6 are remedied or cured, any amounts withheld because of them shall be paid.

4.8   With respect to Fixed Price Work, when Contractor determines that the Work is complete, Contractor shall request that Company's Representative review the Work and certify Final Completion.

The acceptance by Contractor of final payment shall constitute full and complete satisfaction and discharge of Company's obligations under the Contract, and a waiver of all claims against Company by Contractor, then outstanding.

5.   TIME

5.1   All time limits stated in the Contract are of the essence of the Contract.  Contractor shall begin the Work on the date stipulated in the Contract. Contractor shall carry the Work forward expeditiously with adequate forces and in accordance with the Work Schedule and shall complete the Work within the Contract Time.

5.2   Neither Company nor Contractor shall be considered in default of the Contract nor shall either Party be charged with resulting damage for delays if the delay arises from a Force Majeure.  The term "Force Majeure" means an unforeseeable cause beyond the control and without fault or negligence of the Party whose performance is affected thereby, including acts of God, acts of the public enemy, acts of the Government in either its sovereign or contractual capacity, acts of another contractor in the performance of an agreement with Company, fires, floods, earthquakes, epidemics, quarantine restrictions, freight embargoes, unusually severe weather, and as to Contractor, delays of its Sub Contractors arising from unforeseeable causes beyond the control and without the fault or negligence of both Contractor and such Sub Contractors, and as to Company, delays encountered by its Customer arising from unforeseeable causes beyond the control and without the fault or negligence of the Customer.

5.3   If Contractor is delayed at any time in the progress of the Work by any act of Force Majeure, then the Contract Time shall be extended by Change Order for such reasonable time as Company's Representative may determine.  Delays due to labor disputes involving Contractor shall be the sole responsibility of Contractor.  Nothing herein shall be construed so as to obligate any Party to settle any strike, work stoppage or other labor dispute or disturbance except in the sole discretion of the Party experiencing such difficulty.

5.4   Neither Party shall be relieved of its obligation to perform if such failure is due to causes arising out of its own negligence or due to removable or remediable causes which it fails to remove or remedy within a reasonable time period.

**Solar Turbines**
*A Caterpillar Company*

**Turbomach**
*A Caterpillar Company*

*REV. 12 March 2014*

5.5     A Party rendered unable to fulfill any of its obligations under the Contract by reason of an event of Force Majeure shall give prompt, but in any event no later than fourteen (14) days from the occurrence of the Force Majeure, written notice of such fact to the other Party.

5.6     For so long as the event of Force Majeure is continuing, the obligations of the Party affected by the event of Force Majeure (other than the obligation to make payments hereunder) shall be suspended to the extent made necessary by the event of Force Majeure.  Such Party shall exercise commercially reasonable efforts to remedy the event of Force Majeure as soon as practicable and shall keep the other Party advised as to the continuance of the event of Force Majeure.

5.7     If an event of Force Majeure persists for a continuous period of at least sixty (60) calendar days, then the Party to whom performance is owed shall have the option, upon three (3) calendar days' prior written notice, to terminate the Contract.

5.8     An event of Force Majeure that only partially prevents performance by a Party shall not relieve such Party from performing its other obligations under the Contract to the fullest extent such Party is not prevented from performing such obligations as a result of the event of Force Majeure.

5.9     This Section 5 does not exclude the recovery of damages for delay by either Party under any other provisions of the Contract.

6.     CHANGES IN THE WORK

6.1     Company may at any time, by written Change Order, make reasonable changes in the scope of Work hereunder; provided that, upon such order, an equitable adjustment shall be made in the Contract Price and Work Schedule, subject to any conditions imposed by Company.  Contractor may at any time propose changes in the scope of the Work.  Such proposal shall be in writing and shall state the effect of the proposed change on the Contract Price and schedule.   If such a change proposal is accepted by Company, Company shall issue a written Change Order to that effect.

6.2     Upon receipt of a written Change Order for any change hereunder, Contractor shall proceed without delay to implement the change.  Contractor shall make no changes to the Work which affect price and/or schedule without prior written authorization from Company.

6.3     If Contractor wishes to make claim for an increase in the Contract Price, Contractor shall give Company's Representative written notice thereof within twenty (20) calendar days after the occurrence of the event giving rise to such claim.  This notice shall be given by Contractor before proceeding to execute the Work.  No such claim shall be valid unless so made.  Any change in the Contract Price resulting from such claim shall be authorized only by Change Order.

7.     TERMINATION FOR CONVENIENCE

7.1     Company may at any time, with 90 days termination notice and in its sole discretion, by written Termination Order, terminate any portion of, or all of, the Work.  Upon receipt by

# Solar Turbines
## A Caterpillar Company

# TURBOMACH
## A Caterpillar Company

Contractor of such Termination Order, Contractor shall promptly take all reasonable steps to comply with the Order, to preserve, protect, and safeguard the condition of materials and information in its possession or custody in which Company has or may have any interest or right, and, consistent with the foregoing, to minimize the incidence of further costs and expenses allocable to the Work covered by a Termination Order. Contractor shall hold any materials and information covered by a Termination Order in which Company has or may have an interest, for Company's account and disposition as Company may in due time direct.

7.2     In the event of a termination for convenience hereunder, Company shall pay to Contractor and Contractor shall accept as its exclusive remedy under the Contract, in full settlement of all claims for monies due it, the following amounts, less any advances or progress payments already made on account and less any set off amount to which Company may be entitled:

A.      For completed portions of the Work, that portion of the Contract Price specified for, or if not so specified, as reasonably allocable to, completed Work which conforms to the Contract;

B.      For incomplete Work in progress, the actual total costs incurred by Contractor to the date of termination which are properly allocable or apportionable, according to generally accepted accounting practices, to any incomplete Work in progress, plus a reasonable profit thereon; and

C.      The reasonable expenses incurred by Contractor in carrying out the Termination Order, but not including damages or lost profits in any case.

7.3     The total amounts payable by Company to Contractor hereunder shall in no event exceed that portion of the total Contract Price, for or reasonably allocable to, the terminated portion of the Work performed.

7.4     Prior to any payment hereunder, Company may in its sole discretion audit the books and records of Contractor pertaining to the terminated portion of the Work performed.  Prior to final payment by Company of any amounts due Contractor hereunder, Contractor shall identify the Work for which such payment amounts are claimed.  Contractor shall upon Company's demand, deliver all Work Product to Company or its designee as directed by Company.  Contractor shall maintain and cause each of its subcontractors to maintain a true and correct set of records pertaining to all Work for a period of two years after completion of the Work under any Purchase Order and/or Work Authorization, which Company or its duly authorized representative shall have the right at all reasonable times to inspect.  The parties agree that Company's scope of audit shall not extend to those of Contractor's records which reflect costs embodied in fixed fees, fixed rates, or expressed as percentages of other costs.  Company shall have the right to obtain statements from any of Contractor's personnel to the extent it deems necessary to verify such performance and cost and Contractor shall make personnel available at their assigned locations if still under employment with Contractor to Company's representatives.  Upon completion of such delivery, Company shall make final payment, subject to Section 4.

8.      CANCELLATION FOR CAUSE

8.1     Company reserves the right to cancel at no cost to Company all or any part of the unperformed portion of the Contract if (a) Contractor fails to make progress or otherwise

**Solar Turbines**
*A Caterpillar Company*

**Turbomach**
*A Caterpillar Company*

REV. 12 March 2014

endangers performance of the Contract and does not cure such failure within a period of fifteen (15) days (or such longer period as may be mutually agreed upon) after receipt of notice from Company specifying such failure, or (b) Contractor breaches any of the terms of the Contract, or (c) in the event of the happening of any of the following:  insolvency of Contractor; filing of a voluntary or involuntary petition in bankruptcy which is not vacated within 30 days from date of filing; the appointment of a receiver or trustee for Contractor; the execution  of a composition with creditors of any agreement of like import.  In any cancellation for cause hereunder, Company may take possession of and utilize in completing the Work all Documents, Plans and Specifications, work in progress and Work Product and such materials and information as may be necessary therefore.

8.2     Contractor hereby expressly agrees and stipulates that its failure to deliver to Company possession of such materials and information, and work on demand, as provided herein, will cause and result in irreparable harm to Company for which there would be not adequate remedy at law.  These provisions shall be cumulative and additional to any other or further remedies provided under the Contract at law or in equity.   Any cancellation hereunder shall not thereby excuse Contractor from performing uncanceled Work on the Contract.  If after any cancellation under this Section 8 it is determined that such cancellation was not proper hereunder, all rights and obligations of the Parties shall be governed as though such notice of cancellation had been given pursuant to the provisions of Section 7, "TERMINATION FOR CONVENIENCE".

8.3     Contractor reserves the right to cancel all or any part of the unperformed portion of the Contract if Company breaches any of the terms of the Contract and does not cure such failure within a period of ninety (90) days (or such longer period as may be mutually agreed upon) after receipt of notice from Contractor.

9.     WARRANTY; INDEMNITY

9.1     Contractor warrants that the Work performed hereunder shall be of good professional quality and in accordance with the requirements of the Contract.   Contractor further warrants that all Work Product provided hereunder shall be free of defect in workmanship and materials and conform to good professional standards as well as all Applicable Laws, Applicable Permits and Government requirements.  Company's approval of Contractor's Work Product shall not be deemed to relieve Contractor from any obligation hereunder.

9.2     For any Work Product provided by Contractor to Company under the Contract, Contractor has full power and authority to transfer title or grant any license herein granted without the consent of any other Party, and any and all Work Product are delivered free of any rightful claim of any third party by way of infringement or otherwise arising from or related to the claimed rights in any Work Product or Company's exercise of its rights under the Contract.  Contractor shall indemnify Company for any payments, royalties, costs, fees, expenses or otherwise that result from a breach of this Section 9.2.

9.3     Any software delivered under the Contract shall perform in accordance with any and all documentation, prepared by Contractor or by any party and Contractor jointly, referencing in any manner the performance and functionality of the software; and the software, when delivered, will have no encryption functionality, will be free of viruses or other intentionally disabling code and the software shall be delivered free of "keys," "time bombs," "time locks," or other similar devices that could interfere with Company's uninterrupted and unfettered use of the software.

9.4     No open source, shareware, software, code or firmware delivered to Company will contain any materials licensed under a license agreement that requires that derivative

**Solar Turbines**
*A Caterpillar Company*

**Turbomach**
*A Caterpillar Company*

REV. 12 March 2014

works of such materials be provided to the licensor or recipient of such derivative works with a right of use, redistribution or modification.

9.5    To the maximum extent permitted under Applicable Law, Contractor hereby agrees that it shall defend, indemnify, and hold harmless Company, its Affiliates and their respective directors, officers, employees, and agents against any and all Losses on any basis whatsoever, which arise or may arise or result in whole or in part from (a) the performance of the Work (b) an intentional or negligent act or omission of Contractor or anyone directly or indirectly employed by, or responsible to Contractor or any Subcontractor of Contractor, or any other Person for whose acts Contractor may be liable (c) the death or injury of any employee or agent of Contractor, any of its affiliates, any subcontractor of Contractor, or any other person for whose acts the Contractor may be liable, regardless of how caused and regardless of whether or not it is caused in whole or in part by any of the persons indemnified hereunder, excepting only such Losses as are proximately caused by the sole act or omission of Company, its employees or agents, and (d) for any violation of Exhibits A-C. **THE FOREGOING INDEMNITY SHALL APPLY REGARDLESS OF WHETHER SUCH LOSSES ARISE OUT OF THE NEGLIGENCE, GROSS NEGLIGENCE OR STRICT LIABILITY OF COMPANY.**

9.6    Contractor shall indemnify, defend and hold harmless Company and its Affiliates, and their respective directors, officers, employees and agents against any and all Losses based upon a claim of patent infringement, of the goods or designs provided or furnished by Contractor hereunder, and not originally furnished by Company. **THE FOREGOING INDEMNITY SHALL APPLY REGARDLESS OF WHETHER SUCH LOSSES ARISE OUT OF THE NEGLIGENCE, GROSS NEGLIGENCE OR STRICT LIABILITY OF COMPANY.**

9.7    If Company brings an action to enforce the terms of the Contract, it may recover from Contractor its reasonable costs and attorneys' fees expended in connection with such an action.

9.8    With respect to third-party claims and all other claims under this Section 9, Section 10, Section 11, Section 14 and Section 24, all claims for indemnification by any Indemnified Party hereunder shall be asserted and resolved as set forth in this Section 9.8.

A.    In the event that any written claim or demand for which either Party, as the case may be (an "Indemnifying Party"), would be liable to the other Party (an "Indemnified Party") hereunder is asserted against or sought to be collected from any Indemnified Party by a third party, such Indemnified Party shall promptly, but in no event more than thirty (30) calendar days following such Indemnified Party's receipt of such claim or demand, notify the Indemnifying Party of such claim or demand and the amount or the estimated amount thereof to the extent then feasible (which estimate shall not be conclusive of the final amount of such claim or demand) (the "Claim Notice"); provided, however, that the Indemnified Party's failure to provide such notice within thirty (30) calendar days shall not preclude the Indemnified Party from being indemnified for such claim or demand, except to the extent that the failure to give timely notice results in the forfeiture of substantive defenses by the Indemnifying Party.

B.    Unless the matter relating to the Claim Notice requires quicker action, the Indemnifying Party shall have thirty (30) calendar days from the personal delivery or mailing of the Claim Notice (the "Notice Period") to notify the Indemnified Party (i) whether the Indemnifying Party disputes the liability of the Indemnifying Party

REV. 12 March 2014

to the Indemnified Party hereunder with respect to such claim or demand and (ii) whether it desires to defend the Indemnified Party against such claim or demand.

C.  All costs and expenses incurred by the Indemnifying Party in defending such claim or demand shall be a liability of, and shall be paid by, the Indemnifying Party.  Except as hereinafter provided, in the event that the Indemnifying Party notifies the Indemnified Party within the Notice Period that it desires to defend the Indemnified Party against such claim or demand, the Indemnifying Party shall have the right to defend the Indemnified Party by appropriate proceedings and shall have the sole power to direct and control such defense.  If any Indemnified Party desires to participate in any such defense, it may do so at its sole cost and expense.

D.  The Indemnified Party shall not settle a claim or demand without the consent of the Indemnifying Party.  The Indemnifying Party shall not, without the prior written consent of the Indemnified Party, settle, compromise or offer to settle or compromise any such claim or demand on a basis that would result in the imposition of a consent order, injunction or decree that would restrict the future activity or conduct of the Indemnified Party or any Affiliate thereof.

E.  If the Indemnifying Party elects not to defend the Indemnified Party against such claim or demand, whether by not giving the Indemnified Party timely notice as provided above or otherwise, then the amount of any such claim or demand or, if the same be contested by the Indemnified Party, then that portion thereof as to which such defense is unsuccessful (and the reasonable costs and expenses pertaining to such defense), shall be the liability and obligation of the Indemnifying Party hereunder.

F.  To the extent the Indemnifying Party shall direct, control or participate in the defense or settlement of any third-party claim or demand, the Indemnified Party shall give the Indemnifying Party and its counsel, without charge, access to, during normal business hours, the relevant business records and other documents, and shall permit them to consult with the employees and counsel of the Indemnified Party.  The Indemnified Party shall use its commercially reasonable in the defense of all such claims or demands.  Notwithstanding the foregoing, the Indemnified Party shall have the right to employ separate counsel at the Indemnifying Party's expense and solely to control its own defense of such asserted liability, if in the reasonable written opinion of counsel to the Indemnified Party, a conflict or potential conflict exists between the Indemnifying Party and the Indemnified Party that would make such separate representation necessary under the applicable canons of ethics; provided, however, that the Indemnified Party shall not settle or compromise any claim or demand without the consent of the Indemnifying Party, such consent not to be unreasonably withheld.

10.  INSURANCE

10.1  Contractor agrees to maintain, at its sole cost and expense, Professional Liability Insurance from an insurer acceptable to Company for the benefit of Company in the face amount of no less than One Million Dollars ($1,000,000.00), to provide protection from claims arising out of performance of Contractor's Professional Services under the Contract caused by any errors, omissions, or other negligent acts for which Contractor may be legally liable.  Contractor shall furnish Company on request acceptable insurance certificates evidencing such insurance.  Such insurance shall be endorsed to include Company as a named insured and shall be kept in effect, and so evidenced by such



**Solar Turbines**
*A Caterpillar Company*

**Turbomach**
*A Caterpillar Company*

*REV. 12 March 2014*

certificates, through the term of Contractor's Work under the Contract and for a period of three (3) years thereafter.  Any self insurance amounts shall be clearly indicated on certificates.

10.2    If any Work will be performed at the Site or a Company site or facility, then unless a higher amount of coverage is specified in a Purchase Order or a higher amount is appropriate to protect Contractor from claims which may arise out of or result from Contractor's operations under the Contract, whether such operations be by Contractor or by a Subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable, Contractor shall obtain and maintain the coverages set forth below with insurance companies acceptable to Company.  The limits set forth are minimum limits and shall not be construed to limit Contractor's liability.  All costs and deductible amounts shall be for the sole account of Contractor, its Sub Contractors or its subcontractors.   All policies required by Company pursuant to the Purchase Order (or otherwise) shall name Company as an additional insured (except Worker's Compensation and Professional Liability coverage, if required) (per ISO Endorsement #CG 2026 or its equivalent) and waive subrogation rights in favor of Company.  All policies shall also be designated as primary coverage to any similar coverage carried by Company.

(i)    Worker's Compensation and Employers' Liability Insurance providing benefits as required by Applicable Law; with a minimum limit of $1,000,000 per occurrence or limits set by Applicable Law, which ever is greater;

(ii)    Commercial General Liability Insurance (Occurrence Coverage) including products, completed operations, contractual liability coverage of indemnities contained in the Contract (if applicable) and Contractor's contingent liability for Subcontractors with a combined single limit of liability of $1,000,000 per occurrence for bodily injury or death and property damage;

(iii)    Business Automobile Liability Insurance (Occurrence Coverage) for owned, non-owned, and hired automotive equipment with a minimum combined single limit of liability of $1,000,000 for each occurrence for bodily injury and property damage;

(iv)    Umbrella/Excess Liability Insurance (Occurrence Coverage) will be required in excess of items (i) through (iii) above, depending upon the type of work performed provided;

(v)    If the scope of Work under the Contract includes design or engineering or other professional services, Company will have the option of requiring, by notice to Contractor, an Errors or Omissions Liability policy with coverage deemed appropriate by Company; and

(vi)    If designated on the face of a Purchase Order, Contractor must provide a minimum limit of $2,000,000 per occurrence for Commercial General Liability ("CGL") and Business Automobile Liability ("BAL"), or may provide $1,000,000 per occurrence coverage for CGL and BAL, with umbrella/excess coverage of $1,000,000 per occurrence.

10.3    Company shall not insure nor be responsible for any Loss or damage to property of any kind owned or leased by Contractor (including any Sub Contractor or Sub Subcontractor), its employees, servants or agents

**Solar Turbines**
*A Caterpillar Company*

**Turbomach**
*A Caterpillar Company*

10.4    Contractor shall not commence work or provide supplies or Services under the Purchase Order until all insurance as required hereunder has been obtained, and certified copies of such insurance policies or certificates of insurance have been submitted to and accepted by Company. Should Contractor commence performance of the Work, with or without the knowledge of Company, before providing such certificates of insurance to Company or before Company has approved the insurance coverage, it shall not constitute a waiver by Company of the requirement, and Company may require Contractor to stop work until satisfactory insurance has been acquired and certificates thereof furnished to Company.

10.5    Each insurance policy required by the Contract shall be endorsed to state that coverage shall not be suspended, voided, canceled by either Party, reduced in coverage or in limits except after thirty (30) calendar days written notice by certified mail, return receipt requested, has been given to Company.  Promptly following request by Company, Contractor shall deliver Certificates of Insurance in a form satisfactory to Company evidencing the existence of insurance required by the Contract.

10.6    Any policy of insurance pertaining to the Work and submitted by Contractor must be acceptable to Company.  Insurers must have a minimum rating of "A VII" (A7) as evaluated by the most current A.M. Best Rating Guide. If the insurer has a rating of less than A VII, Contractor must receive specific written approval from Company's Representative prior to proceeding with the Work.

10.7    Contractor shall also comply with any insurance requirements imposed by Customer or any other Person owning or managing the Site.

10.8    Contractor shall indemnify and hold Company harmless from and against any and all liabilities, claims, costs, expenses, penalties, sanctions or responsibilities of any kind which may be asserted at any time by reason of its breach of the foregoing warranties.

11.    TITLE TO WORK PRODUCT

11.1    Contractor retains ownership and the unlimited right to the use of all of the Contractor IP. Contractor hereby grants to Company and its subsidiaries and affiliates a perpetual, paid up, royalty free, world-wide uncancellable license to use and make derivative works from the Contractor IP insofar as it is incorporated in the Work Product or needed, or helpful to use the Work Product.  Contractor expressly acknowledges that any and all Work Product created under the Contract shall constitute a "work made for hire" as defined by Section 101 of the Copyright Act. All rights, title and interest in and to all Work Product (including intellectual property, trade secrets, patent rights or copyright interests) and or other subject matter prepared or produced by or on behalf of Contractor during the performance of the Work shall vest in Company. For any software constituting the Work Product under the Contract, Contractor shall provide to Company:  (i) the machine readable object code version of the software; (ii) the software source code in both human and machine readable format; (iii) full documentation and annotations associated with the software; and (iv) any and all programmer notes, documentation, and software tools which are helpful or necessary to maintain, debug, modify, alter, or otherwise build, decompile, use and support the software. Contractor shall, at Company's request, execute (1) an assignment in a form satisfactory to Company assigning to Company such rights, title, and interests to any such subject matter so prepared or produced, and (2) all other documents which Company deems necessary for the preparation, issuance, procurement and maintenance of intellectual property (including copyright interests, trade secrets or patent rights) under Applicable Laws of the United States or foreign Governments.  For all other materials and information provided to Company by or on behalf of Contractor, Contractor shall provide Company the right to the use of all such

**Solar Turbines**

*A Caterpillar Company*

**TURBOMACH**

*A Caterpillar Company*

REV. 12 March 2014

materials and information.  Contractor agrees to indemnify Company and hold it harmless from and against any liability, costs and losses based upon infringement related to Company's use of materials or information furnished hereunder.

11.2    Contractor warrants that it has executed all necessary documentation with its employees to ensure the licenses granted above.

12.    PERFORMANCE BOND AND LABOR AND MATERIAL PAYMENT BOND

Company shall have the right at any time to require Contractor to furnish bonds covering the faithful performance of the Contract and/or the payment of all obligations arising thereunder.

13.    INDEPENDENT CONTRACTOR

13.1    It is understood that Contractor's Personnel assigned to perform Professional Services hereunder shall be and remain Personnel of Contractor whether Services are performed at Contractor's facilities or Company's facilities, and are not and shall not for any purpose be considered Company's Personnel.  Each Party will be solely responsible for: (a) paying all wages and other compensation to its employees; (b) withholding and payment of federal and state individual income tax, Federal Insurance Contributions ("FICA"), Federal Unemployment Tax ("FUTA") and other taxes and applicable amounts with respect to payments made to its employees; (c) providing all insurance and other employment related benefits to its employees; and (d) making any overtime payments to its employees if required by Applicable Laws. Upon Company's request, Contractor shall provide Company with proof of unemployment insurance coverage and the immigration status of any persons Contractor employs for the performance of the Professional Services.   Contractor indemnifies, defends, and holds Company harmless from and against any and all liabilities associated with Contractor's obligations as an employer hereunder.

13.2    Contractor shall indemnify, defend, and hold Company harmless from and against any and all liabilities associated with Contractor's tax obligations related to any payments under the Agreement.

13.3    Contractor's relationship to Company hereunder is one of independent contractor and nothing contained in this Contract, SOW(s), or Purchase Order(s) shall be construed to imply that Contractor or any of Contractor's Personnel is an employee or agent of Company for any purpose.  Contractor shall have no right, power or authority to create any obligation, expressed or implied, or to make any representation on behalf of Company, except as may be expressly authorized from time to time by Company in writing and then only to the extent of such authorization.  Nothing herein is to imply an agency, joint venture or partner relationship between the Parties.

14.    LIENS AND CLAIMS

14.1    If at any time there shall be evidence of any Lien or claim for work or materials furnished in the performance of the Work, Company shall have the right to retain out of any payment due or thereafter to become due under the terms of this or any other current or future contract with Contractor an amount sufficient to completely indemnify Company or Customer or both against any such Lien or satisfy such claim, from such retention.  If final payment has been made hereunder or if such retention is insufficient to provide such indemnity or to discharge such Lien or satisfy such claim, Contractor shall promptly either

pay Company such sum as is required to accomplish such provisions, discharge, or satisfaction, or obtain at Contractor's expense a bond as required to discharge such Lien or claim.

14.2 Company also has the right to require from Contractor as a condition prior to final payment or after such payment satisfactory releases, satisfactions, or waivers of all claims, Liens, and claims for Liens and assignments of any sums due hereunder to Contractor's workers and material men, or any labor or furnished materials under, or in connection with performance of the Contract.

15. NO CONSEQUENTIAL LOSSES, ETC.

WITH THE EXPRESS EXCEPTION OF CONTRACTOR'S OBLIGATIONS UNDER SECTION 19 (RELEASE OF INFORMATION), SECTION 24 (COMPLIANCE WITH LAWS) AND INDEMNITY OBLIGATIONS UNDER THE CONTRACT, NEITHER COMPANY NOR CONTRACTOR SHALL BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL LOSS ARISING FROM ANY BREACH OF ANY OBLIGATION UNDER THE CONTRACT. .

16. NO WAIVER

16.1 The failure of either Party to exercise a right provided it by the Contract shall not by itself be deemed a waiver of that right; nor shall waiver of a right in a particular circumstance by itself be deemed a waiver of that same right or any other right in any other circumstances.

16.2 No custom or practice which may develop between the Parties in the administration of the Contract be construed to waive or lessen the right of a Party to insist upon the performance by the other Party in strict accordance with all of the provisions of the Contract.

17. NOTICES

17.1 All notices and other communications under the Contract shall be in writing and delivered (a) personally, (b) by registered or certified mail with postage prepaid, and return receipt requested, (c) by recognized overnight courier service with charges prepaid or (d) by facsimile transmission, directed to the person and address set forth on the Purchase Order. Otherwise, such attempted or purported notice shall be void and of no effect for any purposes whatsoever.

17.2 Either Party may change the address to which notices and other communications hereunder can be delivered by giving the other Party notice in the manner herein set forth. A notice or other communication shall be deemed delivered on the earlier to occur of (i) its actual receipt, (ii) the third (3rd) business day following its deposit in registered or certified mail, with postage prepaid and return receipt requested, (iii) the second business day following its deposit with a recognized overnight courier service, or (iv) the business day it is sent by confirmed facsimile transmission (if sent before 5:00 p.m. local time of the receiving Party) or the next business day (if sent after 5:00 p.m. of such local time).

18. NO IMPLIED LICENSES

18.1 The Contract shall not be construed to create any implied license or licenses and no rights are implied, inferred, or otherwise created hereby, except as expressly set forth herein, as consistent with Applicable Law.

18.2     Without the prior express written consent of Company, Contractor shall not use the names of or make reference to "Solar" or "Caterpillar", except as provided elsewhere in the Contract to identify the property or interest of Company; nor shall Contractor use or trademark, any brand name of Company or Caterpillar Inc. in conjunction with its own business activities.

19.     RELEASE OF INFORMATION

19.1     Contractor, its Sub Contractor(s), Affiliates, employee(s), agent(s) and/or consultant(s) shall not release for publication or dissemination any article, brochure, advertisement, engineering paper, prepared speech, or other information concerning the Contract, without having prior written consent from Company.  Contractor shall not affix its name, nameplates, logos, decals, signs, or insignias to the Work without having the prior written consent of Company.

19.2     The provisions of this Section 21 shall in no way restrict Contractor's obligation to conform with the requirements of Company's Plans and Specifications or codes applicable to the Work.

19.3     In its preparation for or performance of a Purchase Order, Contractor may receive or become exposed to Company's proprietary information (or a third party's proprietary information, such as Company's customer specifications), including designs, Plans and Specifications, instructions, forecasts, trade secrets, data or "know how" pertaining to the Work covered by the Purchase Order or Contractor's performance of this Order (collectively, "Proprietary Information"). Proprietary Information shall not include information that (a) is already known by Contractor prior to the disclosure by the Company; (b) is or becomes available to the general public through no act or fault of Contractor; or (c) is rightfully disclosed to Contractor by a third Person not under a similar obligation to maintain the information in confidence.  If Contractor wishes to rely on the exceptions contained in clauses (a), (b) or (c) above, then Contractor must demonstrate to the Company the facts underlying why the exception applies within thirty (30) calendar days of receipt of the Proprietary Information from Contractor.  Contractor agrees to maintain the confidentiality of all Proprietary Information, and specifically agrees (i) to take all actions reasonably necessary under the circumstances to maintain the confidentiality of the Proprietary Information; (ii) to use Proprietary Information only in Contractor's preparation for or performance of the Purchase Order; (iii) to limit access to Proprietary Information to only those employees within Contractor's company who have a need to know, and inform these employees of the provisions of this clause; (iv) to conspicuously mark all documents and electronic files containing Proprietary Information as confidential and the property of the Company; (v) not to copy documents or electronic files that include Proprietary Information, or allow them to be copied, except as required for Contractor's efficient performance of the Purchase Order; (vi) not to use Proprietary Information for the benefit of any Person or entity other than the Company; and (vii) not to transmit or disclose Proprietary Information to others without the prior written consent of the Company.

20.     ASSIGNMENT; DELEGATION; CHANGE IN CONTROL.

20.1     Contractor shall not assign its rights or delegate its duties under the Contract without the express prior written consent of Company and any purported assignment or delegation without such consent shall be void and of absolutely no legal force or effect.

20.2     Contractor shall give notice to Company in the event of any Change of Control affecting Contractor.  "Change of Control" means Contractor is no longer controlled or a significant

portion of the assets of Contractor are no longer controlled (as such term is defined in the definition of Affiliate) by the same Persons who control Contractor on the date of the applicable Purchase Order.

21.  SUCCESSIONS

Unless otherwise expressly agreed in writing, all rights, covenants, warranties, obligations, duties, and liabilities created by or arising under the Contract shall inure to the benefit of, or bind, as the case may be, the respective successors in interest of the Parties thereto.

22.  SET OFF

Company shall have the right to set off any amount due and payable under the Contract against any claim(s) or disputed amounts under the Contract, another Contract or any other agreements or contracts existing between the Parties and their respective Affiliates.

23.  APPLICABLE LAW; VENUE; WAIVER OF JURY TRIAL

23.1  The Parties agree that these General Terms and Conditions of Contract for Professional Services and the Contract bears a reasonable relationship to the State of Texas and that these General Terms and Conditions of Contract for Professional Services and the Contract shall be governed by the laws of the State of Texas, which shall apply in any dispute between the Parties relating to or arising out of these General Terms and Conditions of Contract for Professional Services or a Contract.    Contractor expressly agrees to the provisions of the Anti-Corruption Compliance Clause attached hereto as Exhibit C.

23.2  ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THE CONTRACT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF EITHER OF THE PARTIES MAY BE BROUGHT AND MAINTAINED IN THE COURTS OF THE STATE OF TEXAS SITTING IN THE HARRIS COUNTY, TEXAS OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY PROPERTY IN WHICH COMPANY HAS A SECURITY INTEREST MAY BE BROUGHT, AT COMPANY'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE SUCH PROPERTY MAY BE FOUND.    EACH OF THE PARTIES HERETO HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF TEXAS SITTING IN THE HARRIS COUNTY, TEXAS AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH LITIGATION.

23.3  EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF TEXAS.    EACH OF THE PARTIES HERETO HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**Solar Turbines**
*A Caterpillar Company*

**TURBOMACH**
*A Caterpillar Company*

REV. 12 March 2014

23.4    EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THE CONTRACT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF ANY PARTY.

24.    COMPLIANCE WITH LAW

24.1    Contractor, for itself and its Sub Contractor(s), expressly warrants that it and they shall comply with all Applicable Laws during the performance of the Work hereunder. Contractor shall promptly indemnify and hold harmless Company against any and all Losses which may be asserted by any Person at any time by reason of Contractor's breach of the foregoing warranties.  THE FOREGOING INDEMNITY SHALL APPLY REGARDLESS OF WHETHER SUCH LOSSES ARISE OUT OF THE NEGLIGENCE, GROSS NEGLIGENCE OR STRICT LIABILITY OF COMPANY.

24.2    Contractor shall at its sole expense obtain and maintain all Applicable Permits required by Applicable Law for the performance of its obligations under the Contract. Contractor's Personnel will meet the same standards as apply to Contractor.

24.3    Contractor shall provide, or cause to be provided, to Company, upon written request, a copy of any Applicable Permit or other documentary evidence as reasonably required by any Government having jurisdiction, to demonstrate Contractor's compliance herewith.

24.4    Contractor further warrants that it has made and shall make no payment in money or money's worth for any reason whatsoever to any director, officer, employee, agent or customer of Company.   Contractor understands that in the course of providing Professional Services under the Contract, Contractor shall receive, handle, store, or otherwise be granted access to Company information.   Contractor agrees that it shall comply with all Applicable Laws of the United States and any other applicable countries with regard to the receipt, handling, storage, dissemination, transfer or release of such information.  Without limiting the generality of the foregoing, Contractor understands and accepts that the transfer, release, export, deemed export, re-export, dissemination, or distribution, whether direct or indirect, of any such information may be subject to regulation under U.S. Laws.  Contractor agrees that it will not make, cause, or facilitate any release, export, re-export, deemed export, dissemination, distribution, or other form of transfer, directly or indirectly, of any information to any destination or person, or for any use, restricted under U.S. Laws, unless Contractor first obtains all required government authorizations, such as from the U.S. Department of State, U.S. Department of Commerce, the U.S. Department of Treasury, or any other governmental agencies, as applicable.  Contractor shall have sole responsibility for obtaining all such government authorizations, if any, unless otherwise agreed to by Company in writing.  Contractor shall promptly notify Company in accordance with Section 19 of this Contract, of any known or suspected breach of this section.

24.5    Any time it performs Professional Services that: (1) neither Contractor, nor any of its principals used in the course of providing Professional Services to Company are presently debarred, suspended, or proposed for debarment by the U.S. government (see Federal Acquisition Regulation ("FAR") 52.209-6); (2) Contractor has filed all compliance reports required by the Equal Opportunity clause (see FAR 52.222-22); and (3) Contractor's representations to Company about U.S. Small Business Administration or state and local classifications, including but not limited to size standards, ownership, and control, are accurate and complete. Contractor recognizes that it has a duty to maintain

its size requirements for the duration of the Contract and must immediately notify Company if there is a change in its size standard, ownership, or control.

24.6    Contractor has not acted, will not act, and has not and will not cause, directly or indirectly, any other party to act, in any manner that would cause Company and its Affiliates, and its and their directors, officers, employees and agents, to violate any Applicable Laws and agrees that it will ensure that all Export Authorizations are obtained prior to the provision of Professional Services, including but not limited to obtaining any Export Authorizations necessary for the export, re-export, deemed export or deemed re-exports by or to any non-U.S. persons in the U.S., or persons located outside of the U.S., that will perform Professional Services, at its sole cost and expense.   Upon Company's request, Contractor shall at its expense provide to Company in a timely manner any and all material, documentation, information, data, or certification(s) regarding Contractor's compliance with any Applicable Laws and this section.

25.    ASSURANCE OF PERFORMANCE

25.1    Contractor agrees that, upon request by Company, Contractor shall execute and deliver those documents, and will do any and all such acts and things, as may reasonably be required to carry out its obligations hereunder and to consummate the transactions contemplated hereby.

25.2    When reasonable grounds for insecurity arise with respect to the performance by Contractor of any obligations under the Contract, Company may in writing demand adequate assurance of due performance and, until it receives such assurance, may if commercially reasonable, suspend any payment for which it has not received the agreed performance.  After receipt of a justified demand, failure to provide within a reasonable time not exceeding thirty (30) calendar days such assurance of due performance as is adequate under the particular circumstances may be deemed at the option of Company to be a repudiation and material breach of the Contract.

25.3    For the purposes hereof, insolvency, the filing of a petition in bankruptcy, or the entering into of an arrangement for the benefit of creditors shall be deemed to be a "reasonable grounds for insecurity".

26.    SPECIFICATIONS; DESIGNS

26.1    If applicable, Contractor shall submit to Company prior to receiving final payment "As Built" documents and all documentation required.

26.2    Contractor expressly agrees that all Work Product are commissioned at Company's request and direction shall be considered a "work-made-for-hire" under the copyright laws of the United States and are the property of Company.  Contractor shall not use or disclose to others, without the express prior written consent of Company, any Work Product or any such information and material furnished by Company or developed by Contractor in the course of the Work.26.3        Contractor agrees to:  (a) promptly and fully inform Company in writing of any Inventions developed hereunder; (b) assign, and Contractor hereby assigns to Company all rights and interests in and to such Inventions including, without limitation, patent applications and patents granted upon such Inventions; and (c) execute all papers and to perform such other proper acts as Company may deem necessary to perfect the rights, interests and titles in Inventions granted under the Contractor. 26.4        Contractor, in exchange for valuable consideration, the receipt and sufficiency are hereby acknowledged by Contractor, hereby irrevocably assigns and transfers to Company all right, title and interest worldwide in and to the Work Product and



**Solar Turbines**
*A Caterpillar Company*

**Turbomach**
*A Caterpillar Company*

*REV. 12 March 2014*

Inventions, whether or not patentable or copyrighted, made or conceived or reduced to practice under a Purchase Order, and to all modifications and derivative works thereof and to all intellectual property rights related thereto.

27. PERSONNEL.

27.1 <u>Removal</u>. In the event that any services are unsatisfactory in the sole discretion of Company, then Company shall have the option to (i) request the replacement of any Contractor Personnel in which case Contractor shall replace such individual(s) at its own cost. Company will not be liable for the removed personnel's time for any period after the demand for removal, nor for any time that Company (in good faith) believes to have been falsely or otherwise improperly billed to Company. If the replacement request has not been resolved to Company's satisfaction within sixty (60) days after Company submits the request to Contractor, Company may terminate this Contract or the applicable SOW(s) or Purchase Order(s) at any time thereafter by providing written notice to Contractor, such notice to be effective as of the date indicated in the notice.

27.2 <u>Key Personnel</u>. The parties agree that the services of the Contractor's personnel designated as "key personnel" in the applicable SOW are essential to the satisfactory performance by Contractor of the services to be provided thereunder. Company reserves the right to approve the appointment of and replacements for all key personnel. Except for disability, death or involuntary termination, key personnel will not be removed by Contractor from the applicable Company project without Company's consent. If Key Personnel leave the project (for any reason), and are not replaced within thirty (30) business days by personnel acceptable to Company, Company may replace such key personnel with Company employee(s) or third party personnel.

27.3 <u>Sensitive Projects</u>. For specific projects requiring access to highly confidential information or projects deemed sensitive by Company, Contractor will identify in the applicable SOW each of Contractor's personnel who will provide services for the project. Upon request by Company, Contractor will restrict such personnel from working on projects for identified Company competitors for the period of time identified in such schedule(s). Company may require such personnel to sign additional confidentiality and non-compete agreements as a condition of their assignment on the project.

28. OTHER PROVISIONS

28.1 The Contract constitutes the entire agreement between the Parties pertaining to the subject matter thereof, and supersedes any and all prior and contemporaneous agreements, understandings, negotiations, discussions, written and oral, between the Parties pertaining to the Work.

28.2 The agreement to be bound by these General Terms and Conditions of Contract for Professional Services may be executed by the Parties in several counterparts, each of which shall be deemed to be an original and all of which shall constitute together but one and the same agreement.

28.3 The Contract is made and entered into for the sole protection and legal benefit of the Company, Customers and Contractor, and the Persons indemnified hereunder, and their permitted successors and assigns, and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, the Contract.

28.4    If any provision or provisions hereof shall be deemed by any court of competent jurisdiction to be for any reason unenforceable, the balance of the Contract shall be given effect consistent with the Applicable Law of that jurisdiction.

28.5    The headings of sections of the Contract are included only for the convenience of the reader, and shall not affect the construction or interpretation of any of the provisions of the Contract.

28.6    No amendment, addendum, modification, variation, or alterations of the Contract or of any provisions thereof shall be binding unless in writing executed by the Party to be bound thereby.

28.7    The Contract is the result of arms-length negotiations between two commercial Persons and any ambiguities or uncertainties in it shall not be construed for or against either Party, but shall be construed in a manner that most accurately reflects the intent of the Parties when the Contract was executed.

28.8    The Parties each agree to execute, acknowledge, deliver and file or cause to be executed, acknowledged, delivered, and filed such further documents or other papers and to do all such things and acts, as may be reasonably requested by the other Party, in order to carry out the provisions and purposes of the Contract and the Work.

28.9    The duties and obligations imposed by the Contract and the rights and remedies available thereunder shall be in addition to and not a limitation of any duties, obligations, rights and remedies otherwise imposed or available by law or in equity.

28.10   Contractor shall pay all royalties and license fees and shall defend all suits or claims for infringement of any patent rights and shall save Company harmless from loss on account thereof, but if Contractor has reason to believe that the design, process or product specified is an infringement of a patent, then it shall be responsible for such loss unless it promptly gives such information to Company's Representative28.11      Nothing herein shall prevent Company from hiring Contractor Personnel who respond to a general or public advertisement by Company.

29.    LIST OF EXHIBITS

Exhibit A: CONTRACT/AGENCY WORKER GUIDELINES

Exhibit B: AGREEMENT (To be filled out and signed by each Contractor employee performing work under a Purchase Order)

Exhibit C: COMPLIANCE

The person signing on behalf of Supplier below represents and warrants that he or she is authorized to bind Supplier to the Terms and Conditions.

_____

**AGREED TO AND ACCEPTED:**

SUPPLIER COMPLETE LEGAL NAME: Ness Deutschland GmbH
_____

# Solar Turbines
*A Caterpillar Company*

# Turbomach
*A Caterpillar Company*

*REV. 12 March 2014*

SIGNATURE: *Rocco Cozza*

PRINT NAME: Rocco Cozza

TITLE: Managing Director

DATE: Mar 14, 2014

*Paul Lombardo*

Paul Lombardo
President
Mar 14, 2014

**Solar Turbines**
*A Caterpillar Company*

**Turbomach**
*A Caterpillar Company*

REV. 12 March 2014

EXHIBIT A

<p align="center">CONTRACT/AGENCY WORKER GUIDELINES</p>

Rules of Conduct

Company has developed certain rules to ensure a safe, efficient operation. Violations of these rules by a Company employee may result in disciplinary action, up to and including termination from employment. Contract/Agency Workers are not only expected to follow the guidelines established by their employer, but should also be in compliance with Company guidelines. Company has established rules of conduct for employees that include, but are not limited to, those listed below.   All those working on Company property, employees and all others are expected to adhere to these and all Company guidelines. Further explanation of these guidelines may be found on Company bulletin boards.   Violation of any of the following guidelines may result in the Agency Worker's assignment at Company being terminated:

•   Violations of Company safety rules as applicable to the specific facility.
•   Failure to wear safety glasses or other required protective equipment in factory areas.
•   Violations of Company harassment policies.
•   Failure to comply with environmental requirements as applicable to the specific facility.
•   Engaging in any unprofessional behavior or language.
•   Unauthorized use of Company equipment and material which includes, but is not limited to vehicles, telephones, computer systems, etc.
•   Fighting on the job or on Company property.
•   Deliberately causing damage or defacing Company property.
•   Falsifying Company documents or records, or any documents or records intended for or used by Company.
•   Bringing alcoholic beverages, consuming alcohol, or being under the influence of alcohol on Company property.
•   Possession of illegal drugs or drug paraphernalia, use or sale of drugs, or being under the influence of drugs, or contributing to the use of drugs by others while on Company property.
•   Removing or attempting to remove, without permission or appropriate authorization, Company property or personal property of others from Company premises.
•   Using or allowing the use of issued identification by persons other than those for whom the identification was intended.
•   Smoking in restricted areas.
•   Solicitation on Company premises without permission.
•   Possessing a camera on Company property or taking photographs of Company property without authorization.
•   Possessing a weapon on Company property. Weapons will include not only those items normally and commonly defined as weapons which can injure a person, but will also include any item that a person intends to use, threatens to use, or does use to inflict physical harm upon a person, regardless of the general intended purpose or use of that item.

Personal Property

Personal property that is not related to the employee's job performance may be disruptive to the work environment and pose safety risks to other employees, thus Company has the right to restrict personal items brought into the workplace.

Contract/Agency Workers are expected to exercise reasonable care to safeguard personal items brought to work. Company is not responsible for the loss, damage, or theft of personal belongings, and workers are advised not to carry unnecessary amounts of cash or other valuables with them when they come to work.

**Solar Turbines**

*A Caterpillar Company*

**Turbomach**

*A Caterpillar Company*

*REV. 12 March 2014*

Contract/Agency Workers are permitted to bring storage containers such as purses, briefcases, and lunch pails for the transportation of appropriate personal items to and from the work area, but will be subject to random checks.

Searches

To maintain security and protect against theft, Company reserves the right to inspect all personal effects brought onto Company property, including vehicles, briefcases, purses, and lunch boxes. In addition, Company may inspect the contents of lockers, storage areas, file cabinets, desks, and work stations at any time and remove all Company property and other items which are in violation of company rules and policies. This policy will be administered according to the following procedures:

•       Searches of personal property may be conducted as workers enter the facility, during their shift, or as they exit the facility. Lockers, desks, file cabinets, and closets may be searched at any time.

•       Workers may be required to open briefcases, purses, and lunch boxes for inspection.

•       Workers may be asked to open their coat or jacket and may be required to remove their coat or jacket for a more thorough inspection of its contents.

•       Contract/Agency Workers may be asked to submit to a search of their personal or company vehicle while the vehicle is on Company property.

Any individual refusing to participate in a search of personal property as described by the procedures stated above, will be immediately removed from Company property and their access privileges to Company property will be removed.

**Solar Turbines**
*A Caterpillar Company*

**Turbomach**
*A Caterpillar Company*

*REV. 12 March 2014*

EXHIBIT B

AGREEMENT
(To be filled out and signed by each Contractor employee performing work under a Purchase Order)

_____
Last Name        First Name        Middle Initial

I agree to comply with the following ELECTRONIC COMMUNICATION GUIDELINES of COMPANY.

Electronic communications – including any access to or exchange of data via e-mail, the Internet or Intranet, voice mail, or otherwise – are a vital and growing segment of our business communications. Users of these systems are responsible for the communications in which they engage and for the resulting COMPANY records that they create, send forward or save - and for doing so only in accordance with these guidelines.

1.      The electronic communications and information systems and related equipment (the "Systems") are provided by and are the property of COMPANY, as is all information residing on or carried by these Systems.  As a condition of your use of the Systems, you acknowledge and agree that COMPANY may, at its discretion and for legitimate business purposes, inspect, use, or disclose your communications and related information without further notice.  You should have no expectation of personal privacy associated with your use of the Systems.

2.      Unauthorized access to the Systems is prohibited, and COMPANY takes reasonable precautions to secure the systems from such access.  Authorized users must exercise reasonable care to maintain the security of the Systems, including the use and management of required passwords.  However, password protection is for the security of COMPANY and the Systems, and does not imply that communications are private or confidential to individuals.

3.      The Systems are intended for COMPANY business.  You may not use the Systems for personal gain, for purposes not reasonably related to the conduct of COMPANY business, or in any manner that harms other individuals or COMPANY.

4.      Use of the Systems should be businesslike, courteous, and civil, and must comply with laws and regulations such as those regulating trademarks, copyrighted material, threatening or obscene material, and confidential, proprietary, or trade secret information.   Use that is harassing, discriminatory, defamatory, disruptive or offense to others, illegal or criminal, or that involves obscene, vulgar, or sexually explicit content, is prohibited.  Although your use of the Systems indicates your consent that COMPANY may, at its discretion, inspect, use, or disclose any resulting information, such inspection is not systematic or guaranteed.  COMPANY depends upon users to report inappropriate, offensive, illegal material to COMPANY management.

5.      Communication must clearly disclose the originator, sender, and intended recipient.  If you receive a communication by mistake, you should stop reading as soon as you realize it was not meant for you and notify the sender or your system administrator immediately.  It is impermissible, and may be illegal, to purposely read communications intended for another person without permission of that person or of COMPANY.  If you forward a communication originated by someone else, do not make changes without clearly disclosing that you have done so.

6.      Communications out side of COMPANY, for example, via the Internet, Electronic Data Interchanges, direct modem connections, or otherwise, often travel through systems not under the control of COMPANY, and might be intercepted and misused.  Therefore, confidential information must not be communicated outside of COMPANY unless clearly marked as to its confidential status.  Privileged information, such as communications between an attorney and COMPANY, must not be shared without Legal Services approval.

# Solar Turbines
## A Caterpillar Company

# Turbomach
## A Caterpillar Company

*REV. 12 March 2014*

7.      Marketing communications as confidential does not necessarily protect them for disclosure or misuse, and COMPANY guidelines might require the use of encryption.  However, encryption may be employed only where COMPANY has authorized its use and has been provided with all the keys necessary for decryption.  You may not intentionally encode or encrypt files to make them unreadable by authorized COMPANY representatives.

8.      Use of the Systems creates records that can be difficult to eliminate.  Communications or related information might be printed or saved and might exist on backup media or otherwise be retrievable from the Systems for indeterminate periods of time.  Therefore, you should be aware that mere "deletion" of a communication does not ensure removal of it or of related information from the Systems.  Consider this when drafting and sending communications.

9.      Various other COMPANY policies, procedures, and practices apply to electronic communications and Systems.  Examples include guidelines established by the Corporate Records Management Program, Corporate Information Services, Corporate Travel Services, Corporate Identity, and your facility and business unit.  It is your responsibility to manage your electronic communications in accordance with all such direction.

Use of the COMPANY Systems is a privilege.  Inappropriate use may result in disciplinary action, up to and including termination.  In addition, failure to follow these guidelines could subject both COMPANY and you, the individual user, to legal liabilities and embarrassment.  You should report any misuse to your supervisor, your facility Human Resources or Information Services manager, or to Security.


_____

Signature


_____

Date

**Solar Turbines**
*A Caterpillar Company*

**Turbomach**
*A Caterpillar Company*

*REV. 12 March 2014*

**EXHIBIT C**
**COMPLIANCE**

Contractor represents and warrants that it has read, understands, and has been in compliance, and agrees that it shall comply, with all applicable laws, rules, regulations, directives, ordinances, orders, or statutes (collectively, the "Laws"), including, but not limited to, the U.S. Foreign Corrupt Practices Act and any applicable anti-bribery Laws of other countries, the U.S. Export Administration Regulations, the International Traffic in Arms Regulations, and the sanctions regulations administered by the U.S. Treasury Department Office of Foreign Assets Control.

Further, Contractor represents and warrants that it has not acted, will not act, and has not and will not cause, directly or indirectly, any other party to act, in any manner that would cause Company, Caterpillar Inc. or any other Caterpillar entity organized under U.S. law, or any U.S. persons employed by Caterpillar (hereinafter, collectively "Caterpillar"), to violate the Laws.  Upon Caterpillar's request, Contractor shall at its expense provide to Caterpillar in a timely manner any and all material, documentation, information, data, or certification(s) regarding Contractor's compliance with the Laws and this Exhibit C.

If Caterpillar, in its sole discretion, has reason to believe that Contractor is not in compliance with the Laws or this Exhibit C, Caterpillar reserves the right to audit, or to have Caterpillar's authorized representatives conduct audits, to ascertain the extent of Contractor's non-compliance with the Laws and this Article.  Contractor agrees to cooperate with Caterpillar's audit.  Contractor agrees that a violation of the Laws or this Article by Contractor shall constitute a material breach of the Agreement and shall relieve Caterpillar of all its performance obligations under this Agreement including, but not limited to, all payment obligations to Contractor.

Contractor agrees to indemnify, defend, and hold harmless Caterpillar, Caterpillar's affiliates, and Caterpillar's and Caterpillar's affiliates' respective directors, officers, employees, agents, successors, and assigns, against demands, liabilities, fines, penalties, losses, and damages (including costs, investigation and litigation expenses and counsel fees incurred in connection therewith) arising out of or related to Contractor's obligations under this Exhibit C.

In the event of any enforcement action against Contractor relating to Contractor's non-compliance with the Laws that reasonably relate to Contractor's performance under this Agreement, Contractor shall provide to Caterpillar written notice of such enforcement action prior to any publication or disclosure of such enforcement action, and in no event later than ten (10) business days following such enforcement action.

# **Exhibit 2**

**From:** Stinson McElhinney <McElhinney_Stinson_X@solarturbines.com>
**Sent:** 26 May 2021 19:03
**To:** Peter Rogers <Peter.Rogers@ness.com>; Marco Leon <LEON_MARCO_E@solarturbines.com>
**Cc:** Berthold Puchta <Berthold.Puchta@ness.com>; Ketan Karia <Ketan.Karia@ness.com>
**Subject:** RE: Solar/Ness - Sync Up

**\*\* EXTERNAL EMAIL: USE CAUTION Before Replying, Clicking Links, Opening Attachments etc.; Could be a Phishing Attempt \*\***

Pete,

Thanks for the call today.   As discussed, it sounds like there was a misinterpretation and incorrect assumptions of our objectives and plans.  As this is still an ongoing dialog, we are supportive of additional meetings as necessary.

While it is important for Solar to take a more conservative approach, and to be more independent with our own organization, insourcing significant parts of our operations, our desire and intent is to continue to work with Ness in a positive way as we have done in the past.  We plan to reduce Ness resources over time as we successfully post positions publicly into the market and hire suitable candidates to be Solar employees.   Our business is evolving and digital is important, so things will continue to change.

Personal styles and approaches aside, we are an independent business seeking to employee people in our business and believe we are acting and operating appropriately. Other parts of your engagements with Solar/Cat are currently not in scope.

Looking forward to further conversations.

Stinson

Caterpillar: Confidential Green

**From:** Peter Rogers <Peter.Rogers@ness.com>
**Sent:** Wednesday, May 26, 2021 2:32 PM
**To:** Stinson McElhinney <McElhinney_Stinson_X@solarturbines.com>; Marco Leon <LEON_MARCO_E@solarturbines.com>
**Cc:** Berthold Puchta <Berthold.Puchta@ness.com>; Ketan Karia <Ketan.Karia@ness.com>
**Subject:** Re: Solar/Ness - Sync Up

**CAUTION: EXTERNAL EMAIL**
**This is a message from Peter.Rogers@ness.com.**
**Use caution when opening unexpected emails and do not click on links or attachments from unknown senders.**
**For more resources, visit security.cat.com/phishing.**

Adding Ketan

Stinson,

Yes, it is difficult to hear your news given our longstanding relationship. To be clear Ness is unwilling to transfer any of our employees to Solar Turbines.

We are OK with an initial call later today. Ness is still finalising its position but, as I am sure you can appreciate, our number one concern is our employees.

We need to appropriately communicate to our employees who are currently working on the Solar Turbines' account—as we plan to reassign them to other clients to the extent we are not working on your account.  You need to coordinate any communication to our employees through us and must have no direct or indirect communications with our employees regarding their employment relationship with us without our specific consent.

As you may be aware, the large majority of our employees working on the Solar Turbine account are subject to restrictive covenants that restrict them from any activities that are contrary to Ness's legitimate interests, including not to perform activities of a competitive nature for 6 months after termination of employment.  Moreover, such employees have contracted that they will not work, directly or indirectly, on projects they worked for during the employment relationship with us for 6 months after the termination of their employment.

I trust you will respect and have respected our contractual relations with our employees.  In order that we can have a productive discussion, we request that you confirm that you have not had any conversations with our current employees (or former employees who recently left) in any way interfering with our employment arrangements with such employees or former employees.

For your information Ness reserves all its rights in connection with this matter.

Speak soon.


**Pete**
+44 773 098 1750


**From:** Stinson McElhinney <McElhinney_Stinson_X@solarturbines.com>
**Date:** Tuesday, 25 May 2021 at 22:00
**To:** Peter Rogers <Peter.Rogers@ness.com>, Marco Leon <LEON_MARCO_E@solarturbines.com>
**Cc:** Berthold Puchta <Berthold.Puchta@ness.com>
**Subject:** RE: Solar/Ness - Sync Up

**\*\* EXTERNAL EMAIL: USE CAUTION Before Replying, Clicking Links, Opening Attachments etc.; Could be a Phishing Attempt \*\***

Pete,

We understand this was a surprise and difficult news to hear.  There will undoubtably be multiple meetings needed over the course of the next months while we reduce volumes.

While we appreciate the challenge to coordinate an executive team on short notice, we're happy to keep our meeting tomorrow and support additional meetings Friday or Monday as people become available.

As discussed Monday, we will be communicating to the broader team later this week.

Thanks

Stinson

Caterpillar: Confidential Green

**From:** Peter Rogers <Peter.Rogers@ness.com>
**Sent:** Tuesday, May 25, 2021 9:40 PM
**To:** Stinson McElhinney <McElhinney_Stinson_X@solarturbines.com>; Marco Leon <LEON_MARCO_E@solarturbines.com>
**Cc:** Berthold Puchta <Berthold.Puchta@ness.com>
**Subject:** Re: Solar/Ness - Sync Up

---

### CAUTION: EXTERNAL EMAIL
### This is a message from Peter.Rogers@ness.com.
### Use caution when opening unexpected emails and do not click on links or attachments from unknown senders.
### For more resources, visit security.cat.com/phishing.

---

Marco, Stinson,

It was a complete surprise to hear your proposal yesterday. Furthermore Ranjit, our CEO is on vacation and off-grid in California this week.   I will need to confer with him before we can respond.

Can we delay our follow-up call until Friday afternoon or, preferably, Monday?

thx

**Pete**
+44 773 098 1750

---

**From:** McElhinney_Stinson_X@solarturbines.com
**When:** 14:00 - 14:30 24 May 2021
**Subject:** Solar/Ness - Sync Up
**Location:** Microsoft Teams Meeting

**\*\* EXTERNAL EMAIL: USE CAUTION Before Replying, Clicking Links, Opening Attachments etc.; Could be a Phishing Attempt \*\***

Pete, Berthold,

Scheduling a follow up to our last call to close out open items identified during that discussion and discuss any additional relevant business updates.

Added Marco to join if he is available.

Thanks

Stinson

---

# Microsoft Teams meeting

**Join on your computer or mobile app**
Click here to join the meeting

**Join with a video conferencing device**
302390680@t.plcm.vc
Video Conference ID: 116 953 067 4
Alternate VTC dialing instructions

**Or call in (audio only)**
+1 312-270-1925,,412196439#   United States, Chicago
Phone Conference ID: 412 196 439#
Find a local number | Reset PIN

Learn More | Meeting options

---

Powered By Office365

The information contained in this communication is intended solely for the use of the individual or entity to whom it is addressed and others authorized to receive it.
It may contain confidential or legally privileged information.
If you are not the intended recipient you are hereby notified that any disclosure, copying, distribution or taking any action in reliance on the contents of this information is strictly prohibited and may be unlawful.
If you have received this communication in error, please notify us immediately by forwarding this email to MailAdmin@ness.com and then delete it from your system.
Ness technologies is neither liable for the proper and complete transmission of the information contained in this communication nor for any delay in its receipt.

# **Exhibit 3**



solarturbines.sk/contact/

[redacted]

**Solar Turbines**
*A Caterpillar Company*

HOME DIGITAL SOLUTIONS WHY SOLAR TURBINES CONTACT OPEN POSITIONS

**Solar Turbines Slovakia s.r.o.**

Bastion Office Center
Továrenská 8
04001 Košice, Slovakia

# **<u>Exhibit 4</u>**

To:           Solar Digital team members
Subject:      New office for Solar Digital in Slovakia


In further support of Solar's strategic initiative to *add customer value through digital solutions*, Solar has established a new office in the Slovak Republic, primarily to support Solar Digital.

Solar is committed to continued investments in digital and seeking to build high performing digital engineering teams. These team will align to our scaled agile development framework and work together with the rest of the global Solar Digital teams, adding to our main office locations in San Diego, US; Novazzano, Switzerland; and Aguascalientes, Mexico.

More information about Solar Digital, including solutions, services, and releases can be found at:

https://insightplatform.com/resources/

Over time, new positions with Solar Turbines will be posted to Solar's web site and more information can be found at:

http://www.solarturbines.sk

In an effort to continue our successes, and consistent with our other offices, we plan to continue working with various suppliers and vendors to meet the business objectives.

Currently, Stinson McElhinney, Global Technology Manager for Solar Digital, will serve as the reporting manager for Solar Digital Slovakia. He will be based in Prague and traveling to Kosice, SK to start up and develop the new operation, as well as maintaining his current accountabilities.

Caterpillar: Confidential Green

CAUSE NO. _____

| | | |
|---|---|---|
| **NESS DEUTSCHLAND GMBH and NESS KE, S.R.O.,** | § § § | **IN THE DISTRICT COURT OF** |
| **PLAINTIFFS,** | § § | |
| **VS.** | § § | **HARRIS COUNTY, TEXAS** |
| **SOLAR TURBINES INC. and SOLAR TURBINES SLOVAKIA S.R.O.,** | § § § § | |
| **DEFENDANTS.** | § | **____ JUDICIAL DISTRICT** |

## <u>VERIFICATION AND UNSWORN DECLARATION OF ZUZANA SIEBER</u>

1.      My name is Zuzana Sieber, my date of birth is 15/04/1982, and my business address is Továrenská 8, 040 01  Košice, Slovakia.  I currently serve as Director of Human Resources of Ness KE, s.r.o. ("NKE").  I have held this position for approximately 12 years.

2.      Ness Deutschland GmbH ("NDG" and with NKE, "Ness") is a German Corporation with its headquarters in Hamburg, Germany.

3.      The facts set forth in this Declaration are based upon my personal knowledge.  I am over the age of eighteen and am competent to make this Declaration.

4.      I submit this Declaration in support of Plaintiffs' Original Verified Petition and Application for a Temporary Restraining Order and Temporary Injunction.

5.      Ness requires all NKE employees to sign a standard employment contract.  Since 2015, that employment contract has required employees to agree that, for six months following the end of their employment, they will not engage in competitive activity, nor work on any project on which they worked at NKE.  An English translation of NKE's standard employment contract since 2015 is attached as **<u>Exhibit 1.</u>**

1

6.      Until May 2021, Marek Uhrin was a managing director of NKE and effectively functioned as its CEO.  Uhrin gave notice of his resignation on or about April 27, 2021, claiming that he had no plans to join another employer but rather planned to take a break.  In reliance upon that representation, Uhrin was released from the last several weeks of his required two-month notice period, and his last day of employment was May 7.

7.      At the end of the day on May 27, 2021, another of NKE's key employees, Vedran Houdek, submitted his resignation.  Houdek, the Associate Vice President of Delivery, was one of Uhrin's key lieutenants and was the day-to-day lead on Ness' relationship with STI.

8.      Houdek advised one of my colleagues that he had received an offer of employment from STI on May 26, 2021.  He denied having prior knowledge of STI's plans to expand into Košice, but there is reason to believe that is untrue.  Specifically, on May 26, 2021, a different employee assigned to the STI account submitted her resignation and stated that, the prior week, Houdek had advised her, in words or substance, that she should not resign because there would soon be significant changes that would provide opportunities to take a leadership role on the team working for STI.  According to this employee, Houdek also instructed her that she should not disclose this advice from him to anybody.

9.      Also on May 27, 2021, Stinson McElhinney, the newly announced head of Solar Turbines Slovakia s.r.o., was observed in the Košice town center meeting with another key employee, Frantisek Kollar.  Kollar holds the position of Senior Manager – Development at NKE and is the number two ranking member of Ness' STI team.  He submitted his resignation on May 28, 2021 and confirmed he has accepted an employment offer from STI.  A photograph of Mr. McElhinney meeting with Mr. Kollar taken by one of our employees is attached as **Exhibit 2.**  Mr. McElhinney is on the left, and Mr. Kollar is on the right.

2

10.     In addition to Mr. Kollar, two other employees on the STI team submitted their resignations on May 28, 2021:  Miroslav Nozicka (Senior Software Architect) and Ondrej Scecina (Software Architect).   Messrs. Nozicka and Scecina confirmed they have accepted employment offers from STI.  With these resignations, the top four ranking members of Ness' STI team have announced their intention to leave Ness and join STI.

11.     The resignations continued into this week.   On Monday, May 31, 2021, 23 additional Ness employees assigned to STI projects resigned.  Twenty-one of them confirmed that they have accepted employment offers from STI.

12.     Through exit interviews with the resigning employees, Ness learned the following facts:

- Stinson McElhinney, the head of STS, met with at least some of the resigning Ness employees on May 27 and 28 and offered them employment.

- Stinson told employees that they needed to submit a formal application, but employees have reported that the "formal application" was merely a *pro forma* exercise.

- STS intended to hire the key Ness employees assigned to the STI account;

- The employees hired by STS would work in the same building where they currently worked for Ness.

- The employees hired by STS would continue to work on the same STI projects on which they worked at Ness.

3

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Košice, on this 2nd day of June, 2021.

_____
Zuzana Sieber

# **<u>Exhibit 1</u>**



NESS KE, s.r.o.

# Contract of Employment

concluded according to § 42 and f. of Law No. 311/2001 Coll. Labor Code as amended
(hereinafter as Labor Code) on bellow mentioned day between:

**The Employer:**

| | |
|---|---|
| Commercial Name: | **NESS KE, s.r.o.** |
| Place of Seat: | Továrenská 8, 040 01 Košice |

Company entered in the Companies Register kept with District Court Košice I, section Sro, file No. 37939/V

| | |
|---|---|
| Company Reg. No.: | 48 325 830 |
| Tax Identification No.: | 2120133103 |
| VAT Identification No.: | SK2120133103 |
| Bank connection: | Tatra banka, a.s., |
| IBAN: | SK66 1100 0000 0029 4601 1148 |
| Managers acting on | RNDr. Tomáš Futáš, PhD., Executive Manager of the Company |
| behalf of the Company: | Ing. Zuzana Želinská, PhD., Executive Manager of the Company |

(hereinafter as „the Employer")

and

**The Employee:**

| | |
|---|---|
| Name and Surname: | **xxxxxxxxxxxx** |
| Permanent Address: | xxxxxxxxxxxxxxxxxxxx |
| Date of birth: | xxxxxxxxxxxxx |
| ID Card No.: | xxxxxxxxxxxxx |

(hereinafter as „the Employee")

### Article I
### Kind of Work Performed

1. The Employer employs the Employee as ...............................................................

2. The Employee will perform following work for the Employer: ........................................

3. Detailed specification of kind of work and its short characteristics / scope of employment is described in Annex No. 1 to this Contract.

### Article II
### Day of Entering a Job

Day of entering a job of the employee was agreed for.................... From this day a Labor relation between the Employee and the Employer rises.



NESS KE, s.r.o.

**Article III**
**Place of Work**

The place of work is a place of seat of the Employer: Továrenská 8, 040 01 Košice.

**Article IV**
**Duration of Employment**

Employment has been agreed for indefinite period.

**Article V**
**Probational Period**

Probational period has been agreed for three months. Probational period will be extended accordingly to period of obstacles to work on the side of the Employee.

**Article VI**
**Working Hours**

Working hours are set according to § 85 of Labor Code in length of 40 (forty) hours a week. Working hours do not include break for rest and meal-break in duration of 30 minutes. The employer determines the beginning and the end of working hours in the form of an internal regulation.

**Article VII**
**Holiday**

Under the conditions laid down by the Labor Code in accordance with the provisions of Section 103 et seq. of the Labor Code, the Employee is entitled to leave. Under the conditions laid down by the Labor Code in accordance with the provisions of Section 103 et seq. of the Labor Code, the Employee is entitled to a leave.

**Article VIII**
**Wage Conditions and Pay-days**

1. The Employee is entitled to wage for work performed. Monthly wage is set with respect to the fact that according to § 121 section 2, the wage also includes remuneration for overtime work in maximum duration allowed by law. Detailed specification and amount of wage is in a Wage Decree forming Annex No. 2 to this Contract.

2. The wage is payable for the previous monthly period always within the 15th calendar day of the following calendar month, transferring funds to the Employee's account.



NESS KE, s.r.o.

3. Employee acknowledges that the Employer shall pay the tax advance and statutory payments to the Social Insurance Company and the Health Insurance Company in accordance with legal regulations in force in the Slovak Republic from any payment of the monetary value (in-kind wage) provided by the Employer to the Employee for the work .

**Article IX**
**Obligations of the Employer**

1. Since the day of Labor relation rise, the Employer is obliged to assign work to the Employee according to contract of employment, to pay him/her wage for work performed a to observe other conditions set by legal regulations or contract of employment as well as by addendums to this Employment Contract.

2. The Employer is in Labor-law relations obliged to treat the Employees according to the principle of equal treatment set for the field of Labor-law relations by special law on equal treatment in some fields and on protection against discrimination and on change and amendment of some laws (anti-discrimination act).

**Article X**
**Obligations of the Employee**

1. The Employee is obliged, in accordance with the instructions of the statutory bodies of the Employer and managers, to carry out in person all the work assigned under a contract of employment in the specified working time, following the instructions of the direct superiors, the rules of employment, the organizational rules, the rules on safety and health at work, regulations laid down by the Employer and other regulations applicable to his / her work, to maintain the discipline of work and rules on the protection of classified facts. The Employee declares that he  informed the employer about all the facts that would hinder the performance of the work or which could cause damage to the Employer.

2. The Contracting Parties have agreed that the Employer is entitled to order overtime work for a maximum of 150 hours a year. Overtime work and its scheduling  are governed by the needs of the Employer and ordered in a form of superior´s order.

3. The Employee is required to keep secret and not to provide third parties with information regarding the activities of the Employer without the prior written consent of the Employer. This information includes any information regarding his business activities, "know-how", but also any other information regarding the Employer. The Employee undertakes not to disclose the actual amount of his / her salary and will not request such information from other employees. The Employee is only allowed to publish the amount of his/her wage with the written consent of the Employer.

4. Breach of the duty of secrecy on the facts referred to in paragraph 3 of this article of the contract is considered a serious violation of the job discipline and is the reason (provision of § 68 of the Labor Code) for immediate termination of employment by the Employer, without prejudice to the Employer's right to compensation as a result of a breach of the duty of secrecy. This obligation persists even after termination of the employment relationship.



NESS KE, s.r.o.

5.  The Employee is obliged to notify in advance the Employer in writing of his/her interest in carrying out a further gainful activity which has a competitive character before the start of the activity. The employee may, in addition to his/her employment performed in the employment relationship, perform  other gainful activity which is of a competitive nature to the subject of the Employer's activity only with the prior written consent of the Employer. When signing this employment contract, the Employee  provides the employer with a complete list of the work activities existing in addition to the agreed employment relationship.

6.  In the event of failure to inform  the Employer under the paragraph 5 of this Article of the contract about the other the employment relationship, the employment relationship established by this contract may be terminated by an immediate termination for a serious breach of the employment discipline.

7.  The Employee is not entitled to receive personal gifts or other benefits from other organization or natural person in connection with his / her work performed for the Employer.

8.  The Employee may not use alcoholic beverages or other narcotic drugs in the workplace or outside the workplace or start working under their influence.

9.  The Employee is obliged to behave and act in such a way that, by his/her acting, behaving and overall conduct that does not damage the reputation of the Employer, take care of his/her good looks, go to work adequately dressed,  physically and mentally prepared and fully capable of performing work properly.

10. The Employee will take maximum care of the Employer´s property  not to cause harm to the Employer and to protect him from damage, loss, destruction and abuse and shall not act contrary to the Employer's legitimate interests.

11. The Employee agrees with sending him/her to business trips for the necessary period, even repeatedly and outside the territory of the Slovak Republic.

12. In the event of the employment relationship termination, the Employee is obliged to return all records containing confidential information, regardless of whether such records have been prepared or created by the Employee, as well as all the work equipment and other values assigned to the Employee by the Employer during the period and are the property of the Employer , to the Employer.

13. If the Employee receives work equipment and things belonging to the Employer  (e.g. computer, mobile phone, car, etc.), the Employee undertakes to confirm to the Employer in writing, in accordance with § 185 of the Labor Code, the acceptance of these values. During the assignment of such items to an Employee, the Employee is liable for damage of the equipment and things and their loss.  In the case of private use of work equipment without the consent of the Employer, the Employee is obliged to compensate the employer for the costs associated with it in full, in particular, the Employee undertakes to pay the Employer the cost of telephone calls made for private purposes using the Employer's devices.

14. The Employee is responsible for the damage caused to the extent stated in the Labor Code.

15. The Employee undertakes that if he / she is involved in a traffic accident and the competent body decides on his / her fault, he / she will replace the difference between the insurance claim and the actual damage caused to the service motor vehicle to the Employer in accordance with the provisions of the Labor Code.



NESS KE, s.r.o.

## Article XI
## Intellectual Property Right

1. The results of the Employee's own creative intellectual activity created by the Employee to fulfill his obligations arising from the employment relationship established by the employment contract are an Employee's piece of work in terms of § 90 of the Act No. 185/2015 Coll. - Copyright Act as amended (hereinafter referred to as the "**Copyright Act**"). The rights and obligations of the Employee and the Employer in creation of the Employee´s pieces of work are governed by the provisions of Section 90 par. 4 and following ones of the Copyright Act. Proprietary copyrights are applied by the Employer in his own name and on his behalf. The Employee agrees with assigning the Employer´s right to exercise his property rights to a third party.

2. The Employee gives the Employer his/her consent to first publication of his/her piece of work and agrees with presentation of this piece of work to the public by the Employer under his business name or other name of his choice without mentioning the name of the Employee at the same time. The Employee grants the Employer permission to complete the piece of work in progress, to change and to process the piece of work. This consent also covers the completion, modification and processing of other intellectual property objects created within his/her employment relationship.

3. The Employee grants the Employer permission to register his piece of work for industrial and legal protection. At the same time, he/she agrees that the Employer grants this right to a third party.

4. The rights and obligations of the Employee and the Employer in creation of industrial or other intellectual property objects shall be governed by the relevant provisions of specific industrial property legislation, with rights to the results of creative intellectual activity being passed on to the Employer.

5. The Employee is obliged to follow instructions of the Employer when creating intellectual property items. The Employee is not responsible for the defects and legal defects of the intellectual property created which were caused by the use of the documents and the things provided by the Employer, and the Employee, even taking his/her maximum care, could not find out their inappropriateness or he/she advised the Employer of them and the Employer insisted on their use.

6. The Employee is responsible for the fact that the intellectual property created is the result of his own creative intellectual activity and does not interfere with the rights of third parties. If the Eemployee himself/herself uses the intellectual property objects belonging to third parties, he/she is responsible for having settled relations with the holders of these rights.

7. The Employee is not entitled to carry out a self-employed activity for the Employer's clients during the duration of the employment relationship. In the event of breach of this obligation, the Employer is entitled to ask the Employe to provide him with the benefit from a trade at which he/she breached the ban on competition or transfer the corresponding rights to him. This activity is considered to be a reason for which the Employer can immediately terminate the employment. This does not affect the Employer's right to compensation.

8. The Employee is entitled to wage under the employment contract for creation and use of the employment pieces of work and other intellectual property items and the Employee is not entitled to ask from the Employer of third persons any special remuneration or additional compensation for the creation and use of pieces of work and other intellectual property items.



NESS KE, s.r.o.

9. The Employee is not authorized to provide any information about the Employer's clients for the purposes of self-representation vis-à-vis third parties without the written consent of the Employer or to use the results of his / her creative activity created during the duration of employment with the Employer as a reference to third parties, even after termination of employment with the Employer. Breaching this ban is a serious violation of the  work discipline.

10. In the event that an Employee is temporarily assigned for work perfromance to a third party, he/she agrees that the third party shall exercise all the rights to the Employee's piece of work done during the assignment belonging to the Employer according to the provision of Section 90 of the Copyright Act and that the Employer can transfer these rights to such third person. They Employee´s  remuneration for such handling with the items of intellectual property rights is included in the basic wage of the Employee.

## Čl. XII
## Non-compete Clause

1. The Employee undertakes that he will not, directly or indirectly, perform any gainful activity a nature that is competitive or could be competitive with the Employer´s line of business, either as self-employed or for another employer,  without the explicit written consent of the Employer. The Employee undertakes to refrain from any activities that are contrary to the legitimate interests of the Employer.

2. The Employer and the Employee have agreed that the Employee will not perform any gainful activity  which is of a competitive nature towards the subject of the Employer's activity, the Employer's customers and the end customers of the Employer's customers for a period of 6 months after termination of the employment relationship.

3. In accordance with the preceding sentence, the Employer and the Employee agree that the Employee will not work, directly or indirectly, on projects he worked for during the employment relationship with the Employer for 6 months after the termination of his employment.

4. The employer will provide the employee with a cash refund equal to 50% of the average monthly wage of the Employee for each month of meeting this provision of limitation.

5. If the Employee violates this limitation, he/she will  pay the Employer  cash compensation equivalent to  cash compensation agreed upon for compliance with this limitation.

## Article  XIII
## Termination of Employment and Notice Period

1. The employment relationship  ends by the expiry of the period referred to in Article IV. of this contract or in other ways specified in the Labor Code. The length of the notice period is governed by the relevant provisions of §62 of the Labor Code.

2. The Employee is entitled to severance and termination pay under the relevant provisions  of the Labor Code applicable at the time of such entitlement.

3. In accordance with the provisions of Section 62 8 of the Labor Code, the Employer and the Employee have agreed that if the Employee does not stay with the Employer during the period of notice,  the Employer has the right to monetary compensation at most in the amount that is the product of the average monthly wage of this Employee and the length of the period of notice. The calculation of the amount of compensation depends on the number of working



NESS KE, s.r.o.

days at the time of the period of notice during which the Employee did not stay with the Employer and did not work for him in accordance with this employment contract.

## Article XIV
## Execution and Changes of Contract of Employment

1. Contract of Employment has been executed in two copies. Both, the Employer and the Employee will receive one copy.

2. This contract can be changed only after agreement of both parties, namely by written amendment approved and signed by both parties. The parties exclude any diversion from this requirement in oral or implied way. There are no collateral oral agreements.

## Article XV
## Provision of Personal Data

1. An Employee who meets with personal data during the performance of his/her or these data are processed in any way in the course of his / her work, he/she is obliged to comply with the relevant provisions of Regulation (EU) 2016/679 of the European Parliament and of the Council on the protection of natural persons with regard to the processing of personal data and on the free movement of such data and of Act 18/2018 Coll. of the National Council of the Slovak Republic on the personal data protection.

2. By signing this Work Contract, the Employee declares that he/she was aware of the information under Article 13 of Regulation (EU) 2016/679 of the European Parliament and of the Council on the protection of natural persons with regard to the personal data processing.

3. By signing this agreement, the Employee declares that the Personal Data provided by him/her to the Employer's information system are true and informs the employer of their change in writing without any delay.

## Article XVI

## Final Provisions

1. By signing this contract, the Employee certifies that before concluding this contract, the Employer informed him/her of rights and duties resulting for him/her from this contract of employment as well as of working and wage conditions upon which he/she will work upon this contract of employment.

2. Rights and duties of the Employee result from the respective legal regulations, binding instructions of the Employer, internal rules issued by the Employer, instructions of direct superior and from provisions of this contract.

3. By signing this contract, the Employee also certifies that he was duly acquainted with rules of organization, legal and other regulations for provision of safety and protection of health that must be observed during his/her work.

4. Contractual relations, rights and duties of parties at this contract execution not regulated by this contract are governed by the respective provisions of Law No. 311/2001 Coll. of Labor Code as amended and connected regulations valid in the Slovak Republic.



NESS KE, s.r.o.

5.  In the event of a change in the data contained in the title of this contract, the Contracting Party to which the change relates shall promptly notify the other Contracting Party in writing without delay, together with the actual details.

6.  If any of provisions of this contract is declared null and void or unenforceable, validity or enforceability of other provisions of this contract remains unaffected. For such case the parties agreed to conclude an amendment to the contract and provisions losing their validity or becoming unenforceable will be replaced by provisions as much as possible similar to original intent so that the purpose and goal of this contract would remain preserved respecting new facts, without any prejudice for both parties.

7.  The participants to this contract declare that they are fully legally competent for legal acts, that this contract was concluded in accordance with their real will, on the basis of true data, was read by them, understood its vontent and in witness thereof they signed it. The parties to this agreement also declare that this contract was not concluded in distress or under other disadvantageous conditions and at signing this contract,  no pressure was exerted on them in any form and that their free will and expression of their will were not limited by anything.

8.  ract of employment comes into force and effect from the day of its signing by both contracting parties.

9.  Annexes No. 1 to 4 form an inseparable part of this contract.

Annex No. 1 - Specification of kind of work and its short characteristics / workload
Annex No. 2 - Wage Decree
Annex No. 3 - Confidentiality Agreement
Annex No. 4 - The Employee statement of becoming familiar with  the normative
                        documentation

In Košice, on…….…..……

|      **The Employer**      |      **The Employer**      |      **The Employee**      |
| --- | --- | --- |
| …………………………………. | …………………………………. | …………………………………. |
| RNDr. Tomáš Futáš, PhD. | Ing. Zuzana Želinská, PhD. | Name |
| Executive of | Executive of | |
| NESS KE, s.r.o. | NESS KE, s.r.o. | |

The Employee confirms with his/her signature that he/she received one copy of the Contract of Employment from the Employer.

**The Employee**

…………………………………….
Name

# **<u>Exhibit 2</u>**



CAUSE NO. _____

| | | |
|---|---|---|
| NESS DEUTSCHLAND GMBH and NESS KE, S.R.O., | § § § | IN THE DISTRICT COURT OF |
| PLAINTIFFS, | § § § | |
| VS. | § § | HARRIS COUNTY, TEXAS |
| SOLAR TURBINES INC. and SOLAR TURBINES SLOVAKIA S.R.O., | § § § § | |
| DEFENDANTS. | § | ____ JUDICIAL DISTRICT |

## VERIFICATION AND UNSWORN DECLARATION OF ZUZANA ZELINSKA

1.       My name is Ing. Zuzana Želinská, PhD., my date of birth is 31.05.1982, and my business address is Továrenska 8, 040 01  Košice, Slovakia.  I currently serve as AVP – Finance & Operations, Company Executive of NESS KE, s.r.o., Slovakia.  I have held this position for approximately 8 years.

2.       Ness Deutschland GmbH ("NDG") is a German Corporation with its headquarters in Hamburg, Germany.

3.       Ness KE, s.r.o. ("NKE," and collectively with NDG, "Ness") is a Slovakian Corporation with its headquarters in Košice, Slovakia.

4.       The facts set forth in this Declaration are based upon my personal knowledge.  I am over the age of eighteen and am competent to make this Declaration.

5.       I submit this Declaration in support of Plaintiffs' Original Verified Petition and Application for a Temporary Restraining Order and Temporary Injunction.

6.       On or about May 26, 2021, I became aware that Solar Turbines, Inc. ("STI") had publicly identified NKE's address as the address of STI's new Slovakian entity, Solar Turbines Slovokia, s.r.o.  I subsequently inquired of the landlord of the building and was told that the

landlord had signed a lease with STI in late 2020 after being introduced to representatives of STI by Marek Uhrin, who was at that time a managing director and, effectively, the CEO of NKE.

7.     Ness has an understanding with its landlord that the landlord will not lease space in NKE's building to another IT company without Ness' consent.  The landlord informed me that Uhrin told him, in words or substance, that Ness consented to the landlord renting space to STI and was, in fact, in favor of such an arrangement, as STI was one of its most important customers.

8.     Ness was not in favor of this arrangement and did not consent to it.


I declare under penalty of perjury that the foregoing is true and correct.

Executed in Košice, Slovakia , on this 6th day of June, 2021.



_____
              Zuzana Zelinska